## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

------------------------------------------------------------ X

YOAV SEGEV,         :

            :

            :

            :

     Plaintiff,     :

    v.         :    **COMPLAINT**

            :

PRESIDENT AND FELLOWS OF   :

HARVARD COLLEGE and HARVARD  :    Jury Trial

UNIVERSITY POLICE DEPARTMENT,    Demanded

            :

     Defendants.     :

------------------------------------------------------------ X

Plaintiff Yoav Segev for his complaint against Defendants President and Fellows of Harvard College ("Harvard") and the Harvard University Police Department ("HUPD") alleges as follows:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................... 1

JURISDICTION AND VENUE ......................................................................... 9

PARTIES ........................................................................................................... 9

FACTS .............................................................................................................. 10

A.  Harvard's Institutionalized Antisemitism Creates a Dangerous, Hostile
Environment for Jewish Students Like Mr. Segev ....................................... 10

   i.  Harvard's Long History of Antisemitism, Before October 7 ........................... 10

   ii. Harvard Invites the Most Severe and Pervasive Antisemitism on Campus
After October 7 ................................................................................................ 18

B.  Harvard Repeatedly Discriminates Against and Mistreats Mr. Segev ............... 34

   i.  A Rabid Mob of Harvard-Affiliated Protestors Attacks Mr. Segev for Being
Jewish ............................................................................................................. 34

   ii. Harvard's Student and Faculty Gang Up On Mr. Segev, Defame Him, and
Blame Him For Being Attacked; Harvard Does Nothing Despite Mr. Segev
Reporting the Issues Repeatedly ..................................................................... 37

   iii. Mr. Segev Seeks Redress from the University for the Attack, but Harvard
Invents a Bogus "Policy" to Delay and Ultimately Avoid Punishing the
Assailants ...................................................................................................... 40

   iv. Harvard Launches a Sham, Internal "Investigation" That Goes Nowhere ..... 42

   v.  Harvard Tries To Deter Mr. Segev From Vindicating His Civil Rights By
Outing Him In Litigation ................................................................................ 45

   vi. While It Uses Tactics to Dissuade and Mislead Mr. Segev From Obtaining
Relief, Harvard Actively Obstructs the Criminal Investigation into Mr. Segev's
Attackers ........................................................................................................ 51

   vii. Harvard Not Only Refuses to Punish the Assailants in the End, It Rewards
Them and Signals That Antisemitism Is Acceptable On Campus and
Commendable ................................................................................................ 54

C.  Harvard's Mistreatment of Jews Like Mr. Segev Is Directly Discriminatory and
Based on Racist Hypocrisy and Double Standards ..................................... 55

   i.  Harvard Has Numerous Policies to Punish and Deter Discrimination and
Bullying, Like Mr. Segev Experienced ........................................................... 55

   ii. Harvard Applies Those Policies Vigorously to Protect Other Students, but Not
Jews ............................................................................................................... 64

D.  Numerous Reports, Articles, Investigations, and This Court's Decision Find
Harvard in Violation of Law for Antisemitic Discrimination ..................... 75

   i.  Judge Stearns Holds That Harvard "Failed Its Jewish Students" .................. 75

   ii. Harvard Investigation Finds that Professor Discriminated Against Jews, but

Harvard Refuses to Discipline Him ................................................................ 77

iii. The House Education Committee Announces Investigation, Finds Antisemitism.................................................................................................... 79

iv. Harvard Creates Powerless Antisemitism Advisory Group, With Many Members Resigning in Protest ........................................................................ 85

v. President Garber and Presidential Task Force Find Shocking Antisemitism . 90

vi. The Federal Government Finds Harvard in Violation of Title VI Based on an "Institutional-Level Acceptance of Antisemitism"........................................... 92

vii. HJAA Disturbing Report Shows Jewish Students Fear for Safety and Well-Being at Harvard.............................................................................................. 96

viii. Many Other Outside Observers Recognize Harvard's Antisemitism .......... 98

E.    Despite "Virtuous Statements," Harvard Has Continued to Permit Virulent Antisemitism ............................................................................................................. 100

F.    Harvard's Institutional Antisemitism and Illegality Has Severely Injured Mr. Segev ......................................................................................................................... 101

CAUSES OF ACTION .............................................................................................. 104

PRAYER FOR RELIEF ............................................................................................. 120

**PRELIMINARY STATEMENT**

1.      Harvard discriminated against and severely mistreated its former student, Yoav Segev, because he is Jewish.

2.      Since October 7, 2023, when Hamas terrorists invaded Israel and slaughtered, tortured, raped, burned, and mutilated 1,200 people—including infants, children, and the elderly—antisemitism at Harvard has not only become more severe and pervasive than it was previously, it has transformed the campus into the academic center for anti-Jewish hatred and harassment.

3.      Amidst that out-of-control and hostile educational environment, Mr. Segev was physically assaulted by an antisemitic mob of students and student-employees on October 18, 2023. As videos of the attack show, dozens of rabid protesters surrounded Mr. Segev, grabbing and pushing him, and using keffiyehs to block him as he tried to escape and as he implored them to leave him alone. During the attack, the mob repeatedly yelled "Shame!" in Mr. Segev's face for being Jewish and Israeli.

4.      This malicious, violent, and antisemitic conduct violated several University policies—such as its anti-discrimination and anti-bullying policies—and it prompted criminal charges against two of the student-employees who incited the attack. Nonetheless, Harvard refused to take any reasonable action to punish the assailants or to redress the victim, Mr. Segev.

5.      No one doubts for a second that Harvard would have taken swift, aggressive, and public action to enforce its policies had the victim been one of Harvard's "favored" minorities. A recent report found that Harvard has "attempted to silence twenty-two scholars' speech through petitions, investigations, and disciplinary actions"

and that "Harvard has also sanctioned at least six students for their expression during a campus controversy."[1] And that aggressive disciplinary enforcement was for *expression* deemed "offensive"—not for assaults, like Mr. Segev experienced. Yet Harvard refused to enforce its policies in this case, at all, simply because Mr. Segev is Jewish and does not identify as a member of one of Harvard's favored minority groups.

6.    But Harvard's antisemitic discrimination against Mr. Segev is far more sinister than inaction and indifference. Harvard did everything it could to defend, protect, and reward the assailants; to impede the criminal investigation; and to prevent Mr. Segev from obtaining administrative relief from the University.

7.    Harvard's antisemitic intent is obvious. Several of its faculty publicly supported the attackers and tried to blame the victim (because, the faculty said, his Jewish presence was "threatening" to other students). And, of course, hundreds of rabidly anti-Israel students disrupting campus life pressured the Harvard administration. Ultimately, and shamefully, the University kowtowed to the antisemitic mob it had allowed to take over its campus.

8.    For one, Harvard intentionally obstructed the criminal investigation into the attack and assisted the assailants. According to the Assistant District Attorney prosecuting the case, she was "shocked" that Harvard had essentially "refused" to investigate, even after she directly requested information from the University.

9.    In addition to refusing to even assist the local prosecutor's investigation, Harvard directly instructed its campus officer to stop investigating the attack and then retaliated against him by removing him from the investigation.

---

[1]  David L. Berstein & David E. Bernstein, *Supporting Free Speech and Countering Antisemitism on American College Campuses*, HARVARD J. L. & PUB. POL'Y Per Curiam, No. 11 (2025).

10.     Worse, Harvard misled this Court, Congress, and Mr. Segev for nearly two years in its attempt to sweep the entire incident under the rug.

11.     Immediately after the attack, Harvard invented a facially absurd, unwritten "policy" out of whole cloth, claiming that it could not discipline student-employee-assailants while there was an ongoing criminal investigation—even though there was clear, dispositive video evidence of the attack and such a policy would reward criminals, vis-à-vis less serious offenders who have faced school discipline.

12.     Then, while it delayed by relying on this invented policy, Harvard's attorney represented to Judge Stearns in this Court[2] and Harvard's President Claudine Gay testified in Congress under oath that Harvard would complete a disciplinary process after the criminal process concluded and before the student-employees graduated.[3]

13.     Yet, despite both Harvard Kennedy School (HKS) and Harvard Divinity School (HDS) having declared the criminal proceedings to be over, Harvard has never subjected the assailants to discipline, as it represented it would do. To the contrary, the assailants—who had been charged with crimes and egregiously violated school policy by attacking a fellow student—were allowed to graduate in good standing.

14.     To add insult to injury, Harvard even *rewarded* the student-employees who assaulted Mr. Segev and yelled "Shame!" in his face. One received a $65,000 public interest fellowship from *The Harvard Law Review*, as well as several glowing profiles on Harvard's various websites, including the HLS Admissions Blog,[4] while the other was

---

[2] Transcript of Motion Hearing at 36:2-6, *The Louis D. Brandeis Center for Human Rights Under Law v. President and Follows of Harvard College* (Brandeis Case), 1:24-cv-11354-RGS (Nov. 6, 2024), ECF No. 76.

[3] House Comm. on Educ. & Workforce, *Holding Campus Leaders Accountable and Confronting Antisemitism*, YOUTUBE (Dec. 5, 2023), https://www.youtube.com/watch?v=3J0Nu9BN5Qk.

[4] Ben    Badejo    (@BenTelAviv),    X    (May    9,    2025,    11:34    AM)

given the honor as serving as a "marshal" at graduation.

15.    Meanwhile, Harvard callously ignored Mr. Segev, as he simply asked for updates on the disciplinary action that Harvard had promised him, this Court, and Congress.

16.    Harvard also discriminated against Mr. Segev in its aggressive litigation tactics and in its efforts to block and misdirect Mr. Segev from ever obtaining administrative relief through the University.

17.    Shortly after the attack, Mr. Segev was told that he could not pursue administrative remedies unless he did so publicly and non-anonymously—notwithstanding the obvious threat to his safety from retaliation. Because he preferred to proceed anonymously to avoid that threat, he stood by to let the University pursue its own disciplinary action, as it promised it would do.

18.    Instead, Harvard delayed and obfuscated for more than a year, and then it refused to take any action when the time came. Then, when Mr. Segev tried to file a non-anonymous complaint, Harvard *rejected* it as untimely because, Harvard said, it had already "completed" the purported investigation into the matter. Though Harvard said it could not share the results of that investigation with him, leaving Mr. Segev completely in the dark in a Kafkaesque, arbitrary process. With such blatantly misleading tactics, obfuscation, and misrepresentations, Harvard misled Mr. Segev and prevented him from ever obtaining administrative remedies.

19.    In addition to deceiving Mr. Segev, Harvard did everything it could to make life exceedingly difficult for him and his family during the complaint process,

---

https://x.com/BenTelAviv/status/1920864864609661061.

which spanned a year and a half. To begin, a Harvard instructor directly contributed to Mr. Segev being outed and identified in *The Boston Globe*, calling attention to Mr. Segev in a way that unnecessarily put him at the center of a national controversy, and that ultimately harmed his reputation and job opportunities.

20.     At the same time, to protect lawless antisemitic protestors from repercussions for their *public* expressions of antisemitism, Harvard created a task force for their protection and then announced the adoption of an anti-doxxing policy in April 2024. Yet, when Mr. Segev sought to take legal action against the University for its complicity in his attack, Harvard would not offer Mr. Segev—a Jew—the same basic protection.

21.     Then, as Mr. Segev attempted to pursue litigation against the University under a pseudonym while he was still a student (because administrative remedies were futile), the University cruelly opposed his request, trying to out him in Court. Harvard knew that doing so would guarantee retaliation and harassment from students and faculty—especially those who had already tried to blame Mr. Segev for the assault—or would otherwise deter Mr. Segev from pursuing legal recourse. Likewise, Harvard began invasively collecting Mr. Segev's emails, even before the Court granted Mr. Segev's motion to join an amended complaint in the *Kestenbaum* matter. In short, Harvard did everything it could to make it difficult for Mr. Segev to obtain justice—even using its control over school emails and the antisemitic mobs as leverage against him.

22.     Worse still, the University again outed Mr. Segev in its response brief by using public filings to highlight articles about Mr. Segev and, in turn, enabling *The Harvard Crimson* to publish Mr. Segev's identity before this Court could rule on the

motion.[5]

23.     Because Harvard is supposed to be one of America's leading education institutions, its indifference to and institutional support for antisemitic violence is not only shameful and embarrassing—it is extremely dangerous at a time when antisemites are emboldened to commit violence against Jews. On May 21, 2025, a young Israeli couple working at the Israeli embassy in Washington, D.C. was shot and killed outside the Capital Jewish Museum, while the terrorist yelled "Free Palestine!" One week later, Harvard permitted the student-employees who had physically assaulted Mr. Segev to graduate in good standing, with generous fellowships and honors. Harvard signaled to the world that antisemitic violence is not only acceptable but considered virtuous at one of America's wealthiest and most prestigious institutions.

24.     Harvard's antisemitic discrimination against Mr. Segev is not an isolated incident. It is part of a much larger pattern and practice of institutionalized antisemitism and mistreatment of Jewish students.

25.     Since October 7, mobs of pro-Hamas students and faculty have marched by the hundreds through Harvard's campus, shouting vile antisemitic slogans and calling for death to Jews and Israel. Those mobs have occupied buildings, classrooms, libraries, student lounges, plazas, and study halls, often for days or weeks at a time, while promoting violence against Jews and harassing them on campus. Jewish students have been relentlessly attacked in person, in classrooms, and on social media, and Harvard faculty members have promulgated antisemitism in their courses and dismissed and

---

[5] When Harvard filed its response, the Court had already inadvertently granted the motion to proceed anonymously. Harvard filed its response nonetheless, without waiting for clarification from the Court, showing that its litigation strategy was simply to reveal Mr. Segev's identity.

intimidated students who object. But Harvard repeatedly refuses to act, even when its own internal reports find blatant and unlawful acts of anti-Jewish discrimination.

26.    Accordingly, as Judge Stearns held based on facts in complaints brought by civil rights organizations, Harvard has "failed its Jewish students."[6] The federal government recently investigated Harvard, concluding that it is violating Title VI, citing, among many other things, an "institutional-level acceptance of antisemitism."[7] Harvard's president, Alan Garber, admitted in an April 21, 2025 University-wide message that Harvard has a problem with antisemitism.[8] Harvard's Presidential Task Force on Combating Antisemitism and Anti-Israel Bias released a report ("Presidential Task Force Report") in April 2025, finding that 39% of Jewish students felt "not at home" at Harvard, while over 25% reported feeling "*physically unsafe*."[9] According to one student, "I feel lucky I don't look Jewish. I know if I do the 'wrong thing' I might get the antisemitism. So, put your headphones in, make sure you're not outwardly Jewish, and just walk to class."[10] An internal investigation from 2023 found that one professor, Marshall Ganz, created a hostile environment for his Jewish students—yet, Harvard continued to laud and celebrate the professor.

---

[6] *Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297, 310 (D. Mass. 2024).

[7] U.S. Dep't of Health and Hum. Serv., Off. for Civ. Rts.: Notice of Violation: Harvard University (2025), https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-violation.pdf.

[8] Alan M. Garber, *Upholding Our Values, Defending Our University*, HARVARD OFF. OF THE PRESIDENT (Apr. 21, 2025), https://www.harvard.edu/president/news/2025/upholding-our-values-defending-our-university/; *see also* Steve Inskeep, Obed Manuel & Reena Advani, *As Trump Targets Elite Schools, Harvard's President Says They Should 'Stand Firm'*, NPR (May 28, 2025), https://www.npr.org/2025/05/27/nx-s1-5409576/trump-harvard-lawsuit-funding-international-students.

[9] Final Report, Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, 1, 26 (April 29, 2025), https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf [hereinafter "Final Report"].

[10] *Id.* at 125.

27.     According to the Harvard Jewish Alumni Alliance ("HJAA"), a group of

3,000 Jewish Harvard alums:

> [S]cores of students, faculty and administrators appear to be getting a free
> pass/slap on the wrist for behavior that would result in immediate
> administrative action including expulsion were any other minority or ethnic
> group targeted. What we see is leniency, supported by legalese, that would
> not have been afforded transgressors against any other university
> community.

HJAA also noted that Harvard affords "leniency, supported by legalese, that would not

have been afforded transgressors against any other university community."[11] Moreover,

according to a recent academic article, Harvard's "hypocrisy" and "double standards"

when it comes to antisemitic speech are obvious and unlawful.[12]

28.     The hostile and antisemitic educational environment on Harvard's

campus could not be more obvious, well-reported, and investigated. Nonetheless,

Harvard—to this day—refuses to take any meaningful or reasonable action that would

deter future antisemitism, including the most obvious one: punishing student-

employees who harass, intimidate, and assault Jewish students in blatant violation of

numerous school policies. For all its virtuous statements about wanting to fight

antisemitism, Harvard deliberately and completely ignores antisemitism, only, while it

vigorously punishes all other forms of discrimination.

29.     By refusing to enforce its rules equally as to Jewish victims like Mr. Segev,

Harvard acts immorally and unethically, and it signals to the public that antisemitism is

---

[11] Ira Stoll, *Dean Was "Kissing the Feet of Zionist Power," Harvard Scholar's Account Contended*, The Editors (May 21, 2024), https://www.theeditors.com/p/dean-was-kissing-the-feet-of-zionist; *see also The Soil Beneath the Encampments: How Israel and Jews Became the Focus of Hate at Harvard,* Harvard Jewish Alumni All. (May 2024), https://harvardjewishalumni.org/wp-content/uploads/2024/08/Final-HJAA-Report.The_Soil_Beneath_the_Encampments.pdf.

[12] David L. Berstein & David E. Bernstein, *Supporting Free Speech and Countering Antisemitism on American College Campuses*, Harvard J. L. & Pub. Pol'y Per Curiam, No. 11 (2025).

acceptable. But Harvard is also acting unlawfully. Harvard has discriminated against Mr. Segev and other Jewish students, in violation of state and federal civil rights laws and in breach of its contract with Mr. Segev.

30.     These violations and the hostile environment on campus deprived Mr. Segev of a safe learning environment, which he was guaranteed by law and by school policy. It has also caused Mr. Segev serious emotional, reputational, and professional harm. For those reasons, and others that follow, Mr. Segev is entitled to substantial damages to redress his suffering and sufficient to deter Harvard from continuing to violate the law, as it has been doing without repercussion for years.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq*.) and claims arising under 42 U.S.C. §§ 1983 and 1985. This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claim.

32.     This Court has personal jurisdiction over Harvard because it is based and operates in Cambridge, Massachusetts.

33.     Venue in the District of Massachusetts is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and where Harvard is located.

## PARTIES

34.     Plaintiff Yoav Segev is Jewish and is a citizen of the United States, Israel, and Canada. He recently completed his two-year Master's Degree program at Harvard

Business School ("HBS").

35.    Defendant President and Fellows of Harvard College, the legal name of Harvard University, is a private educational institution in Cambridge, Massachusetts.

36.    Defendant HUPD ("HUPD") is a law enforcement agency operated by Harvard University that provides public safety services to the Harvard community. HUPD officers are appointed as special state police officers under M.G.L. c. 22C, § 63 and "have the same power to make arrests as regular police officers for any criminal offense committed in or upon lands or structures owned, used or occupied by" Harvard.

37.    Despite its endowment of nearly $53.2 billion—the largest among American universities—Harvard accepts substantial financial assistance from the federal government through, among other things, grants and loans, including in fiscal years 2022, 2023, and 2024, of at least $642 million, $676 million, and $686 million, respectively. It will receive substantial federal financial assistance in fiscal year 2025 and indirect federal assistance through, among other things, tuition paid with federal financial aid. As a recipient of federal financial assistance, Harvard is subject to Title VI.

**FACTS**

**A.    Harvard's Institutionalized Antisemitism Creates a Dangerous, Hostile Environment for Jewish Students Like Mr. Segev**

38.    Harvard's institutionalized racism and antisemitism dates back years and has been well-documented. *See Students for Fair Admissions v. President and Fellows of Harvard College*, 600 U.S. 181, 298 (2003).

**i.    Harvard's Long History of Antisemitism, Before October 7**

39.    In the 1920s, it was official Harvard policy to "diminish the Jews" and restore Harvard as a "Gentile" college by, for example, using quotas on admissions.

40.     Over the last decade, Harvard's tolerance for antisemitism has caused a surge in antisemitic hate and harassment culminating in the current hostile and anti-Jewish environment following Hamas's October 7 terrorist attack.

41.     This hostile environment is reflected in a 2022 study conducted by the AMCHA Initiative, a non-profit organization which investigates and documents antisemitism in higher education—finding that Harvard was the most antisemitic college in the United States—and in a Harvard student's March 2023 senior thesis, "The Death of Discourse: Antisemitism at Harvard College," for which she interviewed Jewish Harvard students, large percentages of whom (as much as eighty percent or more) reported experiencing antisemitism and anti-Zionism on campus or knowing someone who had. The thesis provided numerous accounts reflecting the widespread, virulent antisemitism Jewish students experience on campus, including how Harvard's hostile environment has effectively made certain courses off-limits to Jewish students because of the bias and harassment they face and the "degree of censorship [they] must take on in order to protect themselves socially and academically."

42.     Over the past ten years, Harvard's Jewish students have endured numerous antisemitic incidents, of which the following are only a few examples.

43.     On October 15, 2015, Harvard College Palestine Solidarity Committee ("Harvard PSC")—a Students for Justice in Palestine ("SJP") affiliate and Harvard-recognized student group—hosted a "die-in" in front of Harvard Hillel, a Jewish campus organization, to protest and interrupt an event featuring an Israeli soldier—according to Harvard Hillel Executive Director Jonah C. Steinberg, the "first time in my five years at Harvard that I have seen an effort to interfere with the event of another organization."

44.     Although Harvard's Statement on Rights and Responsibilities proscribes

"blocking ingress or egress to campus buildings, classrooms, administrative offices, or other spaces" and "protest[ing] a speech or event in a manner that interferes with the right of the speaker(s) to be heard or of the audience to hear them," Harvard not only failed to discipline Harvard PSC, but its administrators and faculty members, including Dean Stephen Lassonde and Harvard Foundation for Intercultural and Race Relations Director S. Allen Counter, attended and supported the violative activity.

45.     On November 5, 2015, three weeks after the die-in, a swastika was discovered on an HLS classroom desk.

46.     On April 14, 2016, HLS held an event featuring a speech by Tzipi Livni, a leading Israeli politician. At the event, a student SJP leader Husam El-Quolaq accosted Livni, asking her, and echoing anti-Jewish stereotypes promoted by, among others, the Nazis: "How is that you are so smelly? It's regarding your odor—about the odor of Tzipi Livni, very smelly." Harvard did not discipline this student, but, instead, the then-Dean of HLS—while recognizing that "[m]any perceive [the incident] as anti-Semitic"—responded "that speech is and should be free," notwithstanding that the conduct plainly violated policies including Harvard's Statement on Rights and Responsibilities.

47.     Not only did Harvard not punish El-Quolaq; it rewarded him.  HLS hired El-Quolaq—who changed his name to Sam Koolaq—as a Clinical Instructor in 2020, promoted him to Director of the Entertainment Law Clinic in spring 2023, and then to Lecturer on Law in the spring 2024 semester.

48.     In October 2017, Harvard's student-led Phillips Brooks House Association granted Nihad Awad its "Call of Service" Lecture and Award, designated for a "significant leader in public service" invited to speak at Harvard to inspire a "deeper engagement with critical social issues on campus and in the wider community"—notwithstanding that

Awad had long been an open supporter of Hamas. Awad most recently said that he was "happy to see" the people of Gaza "break the siege . . . on October 7," a statement the White House "condemn[ed]" as "shocking" and "antisemitic."

49.    On May 10, 2018, a swastika was discovered on a bulletin board at the Harvard T.H. Chan School of Public Health ("Harvard Public Health"). A few months later, on December 2, 2018, a man intentionally toppled the menorah at Harvard Chabad, a center of Jewish life and faith. Harvard has not disclosed what, if anything, it has done to find and discipline the perpetrators of these antisemitic incidents.

50.    In March 2019, the Harvard Undergraduate Council met to vote on whether to award University funding to Harvard PSC for its upcoming Israeli Apartheid Week. During the meeting, Jewish students, in the words of Harvard Hillel's president, were met "with angry interjections and unfounded accusations, as well as references to age-old tropes of prejudice and bigotry," leaving her "shocked and disappointed by the way in which students were prevented from expressing their very real concerns." Harvard did not take disciplinary action against Harvard PSC, the council, or anyone who spewed antisemitism during the meeting.

51.    In May 2021, in response to a Jewish Israeli student's post in a WhatsApp group, an HLS student, Shayaan A. Essa, messaged, "We shed your blood with stones." A group of Jewish Israeli students reported the incident to then-Dean Jessica Soban, Deputy Dean I. Glenn Cohen, and Assistant Dean-appointee Catherine Peshkin. In a meeting with the deans, the students explained how this violent threat left them "heartbroken and humiliated" and "no longer feel[ing] comfortable," and asked the deans to denounce Essa's call for violence. The deans refused to do so, instead downplaying the message and telling the students to ignore or respond directly to such

harassment. Harvard chose to do the former, and Essa graduated without consequence.

52.    Also in May 2021, Harvard Hillel's building was vandalized twice. Two masked individuals tied a Palestinian flag emblazoned with an anti-police slogan to Hillel's door, after which Hillel's windows were shattered. While Harvard purports to have investigated these incidents, nothing came of it, and no one was arrested or disciplined.

53.    In October 2021, the HLS Program on Law & Society in the Muslim World and numerous Harvard student groups co-sponsored a pro-BDS event, "Law and Violence in Palestine." Invited to speak was Mohammed El-Kurd, who espouses antisemitic views, has repeatedly expresses how "we must normalize massacres as the status quo," and claims that Israelis and Zionist Jews—whom he calls part of a "death cult"—"harvest organs of" dead Palestinians to "feed their warriors."

54.    In December 2021, a Jewish Ph.D. student taking courses at Harvard Public Health informed Professor Bram Wispelwey that his winter semester course, *The Settler Colonial Determinants of Health*, in Harvard Public Health's Department of Global Health and Population, contained disturbing antisemitic topics and materials, including required readings propagating antisemitic claims and Hamas propaganda, by denying Jewish ethnic identity (which one reading calls an "invented transnational ethnic identity"), calling Jewish history a "mythology," denying Jewish indigeneity to Israel, and downplaying antisemitism and the Holocaust. Professor Wispelwey dismissed these concerns in an emailed response, as "demonstrably false."

55.    Despite at least one student alerting the Administration to Professor Wispelwey's antisemitic course material, including via the submission of a formal complaint to Harvard's bias reporting system, Harvard did not take any steps to prevent

Professor Wispelwey from promulgating antisemitism in his course or to otherwise discipline him. Rather, Harvard promoted his course from a truncated winter-term course to a full-length spring-semester course, which, according to Harvard Public Health's website, entailed Harvard approving the course content. Following Hamas's October 7 terrorist attack, the Jewish student followed up with administrators, providing resources to explain the bias in Wispelwey's course—as Chief Diversity, Inclusion, and Belonging ("DIB") Officer Amarildo Barbosa admitted that his office lacked sufficient expertise in understanding antisemitism.

56.    Harvard Out of Palestine ("HOOP"), another student group, led a relentless campaign against retired Israeli Major General Amos Yadlin, a senior fellow at Harvard Kennedy School of Government ("HKS"). On February 1, 2022, HOOP organized a disruptive rally outside Yadlin's first study group of the semester where they chanted loudly and disrupted his discussion with the students. On April 7, 2022, HOOP marched through campus, in and out of buildings, banging on drums and using a megaphone to shout at Yadlin, accusing him of personal responsibility for alleged "genocide." Harvard did nothing to prevent HOOP from severely and pervasively harassing Yadlin and his students, notwithstanding, among other policies, Harvard's Statement on Rights and Responsibilities proscribing such conduct as "unacceptable" violations of Harvard policy.

57.    The April 2022 Israeli Apartheid Week included a display in Harvard Yard, which read: "ZIONISM IS RACISM SETTLER COLONIALISM WHITE SUPREMACY APARTHEID." When a swastika was again found after Israeli Apartheid Week—this time in the undergraduate residence Currier House—Harvard failed to publicly condemn it, outside of a statement to the Currier House community, or take any other remedial steps.

15

58.     In the spring semester of 2023, several Jewish students at HKS were harassed and discriminated against by Professor Marshall Ganz, the Rita E. Hauser Senior Lecturer in Leadership, Organizing, and Civil Society at HKS.

59.     For a group project, the Jewish HKS students chose the topic of Israel to examine the ways in which "to harness and unite a majority of diverse and moderate Israelis to strengthen Israel's liberal and Jewish democracy." Professor Ganz first pressured the students to change their project description so that it did not refer to Israel as a "liberal Jewish democracy," and then told them to remove the word "Jewish" because, when used in connection with "Israel," it "creates an unsafe space" akin to describing the United States as led by "white supremacy," and ultimately prohibited them from using the phrase "liberal Jewish democracy" because the phrase is "highly controversial," "disrupt[s] the learning environment," and is "deeply offensive" to certain students.

60.     Ganz threatened the students with academic consequences when they defended themselves and their project. In retaliation for the students' refusal to capitulate to his intimidation, Ganz made the topic for the last day of class "Palestinian solidarity"—even though no student project involved Palestine—and Ganz refused to let the Jewish students speak that day, rebuffing them for having "caused enough problems already."

61.     Though an independent investigation later commissioned by Harvard determined that Professor Ganz had engaged in discriminatory and harassing behavior, thus violating Harvard's Statement on Rights and Responsibilities, to this day, Harvard still has not taken any public disciplinary action against Professor Ganz. To the contrary, the University has praised him, with *The Harvard Gazette*—the official news site of

Harvard University—publishing a glowing profile of him in September of 2023: "Marshall Ganz started at Harvard but took some time off — about three decades — to become Civil Rights, labor, political organizer, and finally scholar, mentor."[13]

62.     That same semester, Harvard PSC carried out its annual boycott campaign against Israel Trek—a ten-day trip to Israel sponsored by Harvard Hillel that is held for non-Jewish students to learn more about Israeli history and culture and to speak with high-ranking Israeli and Palestinian officials—during which participants and prospective participants were harassed and intimidated, with no response by Harvard.

63.     Harvard PSC organized another protest at the September 4, 2023 convocation, at which one of its members—who on October 7 justified that day's massacre by saying the "oppressed have the right to resist"—interrupted Dean Rakesh Khurana mid-speech, shouting: "Here's the real truth: Harvard supports, upholds, and invests in Israeli apartheid, and the oppression of Palestinians." Harvard did not discipline that member or any other protester; instead, the student who interrupted Dean Khurana was later selected as a Rhodes Scholar, after receiving Harvard's endorsement.

64.     At the 2023 convocation, protesters encircled the seated freshman class and screamed "boycott Israel," "stop supporting genocide," and "boycott Israel Trek," among other things. Harvard did not make any attempt to stop the protesters, who interrupted multiple speakers in addition to Dean Khurana. At least one Jewish freshman who wears a kippah got up and left the convocation due to being extremely

---

[13] Christina Pazzanese, *What is Compelling to Do Right Now?*, THE HARVARD GAZETTE, (Sep. 26, 2023), https://news.harvard.edu/gazette/story/2023/09/how-marshall-ganz-found-his-calling-as-activist-scholar-mentor/.

uncomfortable.

65.    On September 21, 2023, HDS invited former Palestine Liberation Organization spokeswoman Diana Buttu to speak in HDS's main building at a screening of *Israelism*, a film that argues American Jews raise their children with pro-Israel "indoctrination" and suggests that Zionism is akin to white supremacy. Ms. Buttu claimed that Jews are trained to mistreat Palestinians, a behavior she said they learned facing Nazi extermination at Auschwitz. Antisemitic tropes displayed during that screening drew applause rather than denunciation. No opposing viewpoint was presented. Buttu currently serves as an instructor at Harvard.

### ii.    Harvard Invites the Most Severe and Pervasive Antisemitism on Campus After October 7

66.    On October 7, 2023, Hamas launched an unprovoked surprise attack on Israel, engaging in depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens. Thousands of armed terrorists invaded southern Israel, while others launched thousands of rockets toward Israeli civilians. Once inside Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel. Hamas has murdered several hostages—including young children—and is holding hostages to this day.

67.    In the immediate aftermath of Hamas's October 7 massacre, Harvard failed to make a public statement about the greatest loss of Jewish life since the Holocaust. Instead, it allowed the massacre to fuel anti-Jewish discrimination and harassment, as students and faculty members were permitted to justify and celebrate the slaughter.

68.     While it was silent on the October 7 massacre of Jews in Israel, Harvard President Lawrence Bacow had responded to Russia's invasion of Ukraine in 2022 with a strongly worded condemnation, sharing his "deep concern about the capricious and senseless invasion of Ukraine." He ended his letter by stating, "Today the Ukrainian flag flies over Harvard Yard.  Harvard University stands with the people of Ukraine."[14]

69.     Following the death of George Floyd in 2020, President Bacow sent a school-wide email condemning the "senseless killing" of Mr. Floyd.[15]

70.     Starting directly after October 7, student organizations including Harvard PSC, Harvard Afro, Harvard Graduate Students for Palestine ("Harvard GS4P"), HDS's Jews for Liberation, and Harvard BDS, among others, led near-daily antisemitic protests, disruptions, and harassment campaigns, regularly calling for violence against Jews at campus events and on social media, employing genocidal chants to advocate "globaliz[ing] the Intifada," and eradicating Israel and its Jewish inhabitants "from the river to the sea."

71.     According to a Harvard study, during the 2023-2024 academic year, Harvard had the *second-highest* number of days with protest activity among major U.S. universities with a harrowing 70 days of protest. Assuming only 130 business days per academic year, it is probable that Jewish students were subjected to antisemitic protests for a majority of the academic year.

72.     The harassment began before Israel was even finished identifying its

---

[14] News and Statements by President Bacow, *Statement on the Russian Invasion of Ukraine* (Feb. 28, 2022), https://www.harvard.edu/president/news-and-statements-by-president-bacow/2022/statement-on-the-russia-ukraine-crisis.

[15] News and Statements by President Bacow, *What I Believe,* (May 30, 2020) https://www.harvard.edu/president/news-and-statements-by-president-bacow/2020/what-i-believe.

deceased, some of whom had been burned or mutilated beyond recognition. On October 8, 2023, the day after Hamas's attack, a coalition of more than thirty Harvard student groups calling themselves the Harvard Palestine Solidarity Groups, which included Harvard PSC, Harvard GS4P, HDS SJP, and Harvard Afro, among others, signed a statement, organized by Harvard PSC and publicized on its Instagram, blaming Israel for Hamas's massacre: "We, the undersigned student organizations, hold the Israeli regime entirely responsible for all unfolding violence . . . The apartheid regime is the only one to blame."[16]

73.     Rather than suspend the student groups—a sanction provided for in many of the policies these groups violated and continue to violate—Harvard remained silent. Harvard's abject failure to address the student organizations' antisemitic statement quickly drew public criticism, including from former Harvard President Lawrence Summers, who posted the following on Twitter on October 9:

> In nearly 50 years of @Harvard affiliation, I have never been as disillusioned and alienated as I am today. The silence from Harvard's leadership, so far, coupled with a vocal and widely reported student groups' statement blaming Israel solely, has allowed Harvard to appear at best neutral towards acts of terror against the Jewish state of Israel.

74.     On October 9, Harvard finally broke its silence on Hamas's attack, issuing a public statement containing platitudes but avoiding any condemnation of Hamas or of the antisemitic statement signed by the Harvard student organizations, any expression of solidarity with Jewish students, or any acknowledgment of the antisemitism on campus.

---

[16] J. Sellers Hill & Nia L. Orakwue, *Harvard Student Groups Face Intense Backlash for Statement Calling Israel 'Entirely Responsible' for Hamas Attack*, THE HARVARD CRIMSON (Oct. 10, 2023), https://www.thecrimson.com/article/2023/10/10/psc-statement-backlash/.

75.    As Professor Summers stated in his October 10 response to Harvard's October 9 statement, "[t]he delayed @Harvard leadership statement fails to meet the needs of the moment," and Harvard should have given "reassurance" to "frightened students" that it "stands squarely against Hamas terror . . . when 35 groups of their fellow students appear to be blaming all the violence on Israel."

76.    On October 10, President Gay issued another statement called "Our Choices," in which she finally "condemn[ed] the terrorist atrocities perpetuated by Hamas," but failed to condemn the students' reprehensible October 8 statement, noting only that they did not speak for Harvard or its leadership but affirming that they "have the right to speak for themselves." Under intense criticism, President Gay later attempted to defend her failure to denounce the students: "Had I known that the statement issued by the students would have been wrongly attributed to the University, I would have spoken sooner about it." But President Gay missed the point—the problem is not that some thought that Harvard itself sent the student statement, but rather that Harvard failed to condemn it or take any other actions to prevent the statement from further contributing to the hostile antisemitic environment on campus.

77.    On October 10 and 11, a billboard truck drove around Harvard displaying the identities of students affiliated with the groups that signed the October 8 statement. On October 24, Harvard College Dean of Students Thomas Dunne emailed these students to inform them of the steps Harvard was taking to protect them from being publicly identified, including the formation of a task force—to protect the students who had publicly issued a shocking, widely condemned pro-Hamas antisemitic statement. In other words, the first step that Harvard took in response to the campus environment following October 7 was to protect the pro-Hamas faction. Meanwhile, despite the

21

avalanche of bullying to which Mr. Segev was subjected, and the unwanted publicity from the attack—facilitated by a Harvard instructor—the University never reached out to Mr. Segev to offer him protection.

78. The creation of this task force sent a strong message that the University was not just ignoring the antisemitic incidents and continuous threats to Jewish students on campus, but that it was taking sides in the conflict by supporting and protecting only students who held Israel responsible for Hamas's terrorism.

79. Dean Dunne referred to the public identification of these students as a "repugnant assault on our community," a harsher condemnation than Harvard issued against Hamas's massacre. Harvard then removed student groups, like Harvard PSC, from Harvard's online student organization directory to protect their members from being further identified and rebuked for their antisemitic statement. Harvard PSC has since been reinstated as a Harvard-recognized organization, with access to the Harvard mailing lists, Harvard rooms and spaces, and Harvard funding.[17]

80. On October 11, the leadership of HDS's Religion and Public Life Department sent a statement to HDS's student body on the "Current Spate of Violence in Palestine/Israel," signed by its Associate Dean, Associate Director of the Religion, Conflict, and Peace Initiative Hillary Rantisi and Professor Atalia Omer, among others, and itself rife with antisemitic historical distortion.

81. Below the statement was a list of events and announcements, including the winners of the Harvard Divinity RPL's Summer Photography Competition. One honorable mention was a student submission of a photograph of graffiti near Bethlehem,

---

[17] Several other universities revoked or suspended indefinitely the recognition of their respective Students for Justice in Palestine chapters in the wake of the October 7 terror attacks.

depicting a Jewish individual with a stereotypical elongated nose and wearing a shirt with a Star of David greedily hoarding water from three faucets simultaneously, while an individual wearing Palestinian garb stands nearby. Under the photograph, the student's description read, in part: "Through my experience with RCPI [the Harvard Divinity Religion, Conflict, and Peace Initiative], I became further attuned to the ways in which Zionism, as a form of religious nationalism, impacts Palestinians living under occupation in myriad ways, such as water sovereignty. Here, not only is the water a literal representation, but it also doubles as an allusion to the ways that religion is weaponized through Zionism, and violently denies Palestinians daily of their livelihood and humanity by taking their natural resources."

82.    On October 13, a group of members of Congress who are Harvard alumni wrote a letter to President Gay to express their "outrage and profound disappointment over the statement made by" the Harvard student groups that "blame[d] Israel for the Hamas terrorist attacks brutally carried out against Israeli civilians." The letter demanded, among other things, that President Gay "immediately condemn" the "abhorrent" and "heinous" statement justifying Hamas's barbaric behavior; "investigate the origins" of the "unified hate and ignorance" among students who "have such a deep hatred for Israel that they have chosen to ignore reality, celebrate ruthless terrorists, and blame innocent civilians"; and publicly clarify that Harvard "strongly opposes this dangerous antisemitism."

83.    The following day, Harvard PSC and Harvard GS4P organized an "emergency rally" at Harvard's flagship Widener Library to denounce Israel. Hundreds of students gathered on Widener's steps to block the entire length of the building while holding signs accusing Israel of "apartheid" and "genocide," and engaging in nonstop

anti-Zionist chants. Although the organizers advertised the rally as "open to all," protesters forced a photojournalist to flee after they surrounded and pushed him.

84.    Two days later, students chalked antisemitic writings at the entrance to HLS, using phrases such as "from the river to the sea" and "divest from Israeli apartheid." Notwithstanding requests to administrators, no action was taken. Soon thereafter, "free Palestine" was painted outside Harvard Chabad, a center of Jewish life at Harvard and a frequent gathering place for Harvard's Jewish community. It remained for months.

85.    Meanwhile, Mr. Segev was subjected to a series of vile antisemitic statements and conspiracy theories that his classmates posted on "Sidechat," an anonymous social network that is accessible with Harvard emails.

86.    One student asked his classmates to "reflect on how much power the Jewish population has over the media."[18]

87.    Another student stated that he or she "proudly accept[s] the label of terrorist" and that it is "very hard to gaf [i.e., "give a f---"] about the concertgoers"— referring to the over 350 innocent young men and women who were raped, mutilated, and slaughtered by Hamas terrorists at the Nova music festival on October 7.

88.    Another student claimed that the "nova massacre"—again, referring to the same terrorist attack at the music festival—was "carried out by the [Israel Defense Forces]."

89.    Another student referred to a Jewish student as "pro-genocide" and said that she "looks just as dumb as her nose is crooked."

---

[18] Yvette Alt Miller, *My Kids are at Columbia and Harvard – This is What They're Seeing*, AISH, (April 28, 2024) https://aish.com/my-kids-are-at-columbia-and-harvard-this-is-what-theyre-seeing/.

90.     Another student posted a rhyme about "Harvard Hillel burning in hell," and claimed that it is "funded by Epstein" (i.e., Jeffrey Epstein) and that it "support[s] genocide."

91.     Another student referred to "Zionists" as "[k]illers and rapists of children!"

92.     Another student expressed that he or she "support[s] Hamas" and views "Oct 7 as a moment of decolonization."

93.     Among the messages that students saw were the following: "LET EM COOK"[19] next to a Palestinian flag emoji; "I proudly accept the label of terrorist";[20] "stfu pedo lover! all of you Zionists are the same. Killers and rapists of children!";[21] "pro-genocide sophomore ... looks just as dumb as her nose is crooked"; "Forgot the moment where yall made it clear that the 'nova massacre' [the music festival where Hamas murdered, tortured and raped young people on October 7] that our zionist classmates were using as propaganda was carried out by the IDF."; and "I . . . support Hamas as representatives of Palestinian frustration and Oct 7 as a moment of decolonization."

94.     One student wrote a post to her classmates that said: "I'm begging you all to recognize the 'Jewish people are controlling everything' (and are the reason Gay resigned) narrative as an antisemitic conspiracy theory. It is a common white supremacist argument against Jewish people." In response, another student said, "It's

---

[19] Michelle N. Amponsah and Joyce E. Kim, *Harvard Asks Sidechat to Enforce Content Moderation as Jewish Students Decry 'Vicious' Antisemitism,* THE HARVARD CRIMSON (Jan. 22, 2024), https://www.thecrimson.com/article/2024/1/22/sidechat-antisemitism-enforce-moderation/

[20] Antonette Bowman, *The Campus Antisemite's Secret Weapon*, FOUNDATION FOR DEFENSE OF DEMOCRACIES, https://www.fdd.org/analysis/op_eds/2024/03/15/the-campus-antisemites-secret-weapon/.

[21] Harvard Jewish Alumni Alliance, *The Soil Beneath the Encampments: How Israel and Jews Became the Focus of Hate at Harvard* (May 2024), https://harvardjewishalumni.org/wp-content/uploads/2024/08/Final-HJAA-Report.The_Soil_Beneath_the_Encampments.pdf.

not a theory if it's mostly true."

95.    Harvard's failure to appropriately condemn or take meaningful steps to ameliorate antisemitism on campus emboldened students to engage in increasingly aggressive antisemitic protests, intensifying the hostile environment Jewish students were forced to endure.

96.    On October 19, 2023, just one day after the attack on Mr. Segev, Harvard PSC and Harvard GS4P recruited hundreds of protesters to march through campus, invading the Science Center, HLS's Caspersen Student Center and Wasserstein Hall buildings, the Harvard Kennedy courtyard, and Harvard Square, using noisemakers, drumsticks, buckets, and megaphones to chant "from the river to the sea," accuse Israel of "genocide," and demand that Harvard "divest[] from Israeli apartheid that is funding genocide in Gaza." The mob disrupted multiple classes, leading Jewish students to flee for their safety, with some removing identifying garb to avoid attack. Harvard failed to take steps to prevent the disruptions.

97.    By January 2024, antisemitic vandalism and graffiti had been plastered across several posters hanging in Harvard Yard dedicated to the Jewish hostages taken by Hamas. At least two posters were of ten-month-old hostage, Kfir Bibas, and on one poster, someone had written, "HEAD STILL ON." Written on several other posters were messages that "ISRAEL DID 9/11" and "GOOGLE THE DANCING ISRAELIS," with a URL for a website called "911 TRUTH NOW," which is a forum dedicated to the antisemitic conspiracy theory that Israel was behind the September 11, 2001, terrorist attacks. Others were defaced by comparisons of victims to pedophile Jeffrey Epstein.

98.    Dozens of students immediately sent emails reporting the vandalism to Interim President Garber, the Antisemitism Task Force, the Antisemitism Advisory

Group, OEDIB, and Harvard Divinity DIB, along with pictures and videos.

99.    In April 2024, Mr. Segev and other Jewish Harvard students' fears for their physical safety increased when a new wave of antisemitic protests began across college campuses nationwide. These protests included tent encampments that became hotbeds of flagrant conduct policy violations and intimidation, harassment, and discrimination against Jewish students, including blocking Jewish students from access to those spaces and campus buildings.

100.    Harvard was aware of the risk that an encampment would be erected on its campus, as reflected by its email announcement that Harvard Yard would remain restricted indefinitely to only Harvard affiliates, and signs Harvard affixed on April 22, 2024, to the gates of Harvard Yard that read:

> Harvard Yard will be closed today. . . .  Harvard affiliates must produce their ID card when requested.  Structures, including tents and tables, are not permitted in the Yard without prior permission. Blocking pedestrian pathways or access to building entrances is prohibited.  Students violating these policies are subject to disciplinary action.

101.    On April 24—the first day of the Jewish holiday of Passover—the purportedly suspended Harvard PSC, HOOP, and other groups announced on Instagram an "emergency rally" in Harvard Yard that day at 12:00 p.m.  By 12:30 p.m., approximately 500 students and faculty had gathered in front of the John Harvard statue in Harvard Yard.  They lined the walkways through Harvard Yard before revealing their true intentions: to establish the Harvard encampment.  People with backpacks, tents, suitcases, and carts of food dove under the ropes that outline the grassy areas of Harvard Yard and began setting up tents, yelling, cheering, and utilizing noisemakers. The demonstrators, now inside the ropes designed to keep people off the grass,

designated the area the "Liberated Zone," and began policing entry right away.

102.    HUPD officers stood by watching but never intervened. As reported by *The Harvard Crimson*, HUPD officers were "instructed to keep students safe and allow protests to proceed unless they become violent or destructive." However, they did nothing when a visibly Jewish teaching fellow at Harvard College was charged by one of the occupiers, who proceeded to physically push him away from the area. Several HUPD officers were protecting the entrance to Massachusetts Hall, where Interim President Garber and other top administrators have offices. But Jewish community members on the ground were left unprotected.

103.    Hundreds of students and faculty were participating in the rally, and about thirty to forty protestors had set up tents in front of the John Harvard statue. Several posters had been hung, including a massive banner that read, "from the river to the sea, Palestine will be free." One witness reported seeing the assailants who had physically assaulted Mr. Segev on October 18, 2023 (*see infra*), as well as Sadaf Kahn, a Harvard College senior who had recently taken to Instagram to call himself a "terrorist" and post a picture of himself holding a knife.

104.    On the first day of the encampment, students and faculty members put up twenty-two tents in Harvard Yard. Attendees chanted, "there is only one solution, Intifada revolution," and "Intifada revolution, Intifada revolution." Despite the blatant disregard of Harvard policies prohibiting the encampment and evidence that an extended takeover was planned, Harvard allowed demonstrators to continue entering the Yard. HOOP continued to recruit people on social media: "Today was just the beginning. Keep showing up. Support the campers."

105.    Many members of Harvard's faculty and staff participated in the

encampment. One of the first tents was labeled the "Faculty Tent." Harvard FSJP published a statement, "Solidarity with Harvard Gaza Solidarity Encampment," offering the disruptors its "unwavering support." Some Harvard faculty lined up to watch the encampment dressed in full regalia in order to commemorate the occasion.[22] Harvard administrators took no action. Another Harvard professor, Vijay Iyer, delivered a statement on Harvard FSJP's behalf to the 500-person crowd through a bullhorn, urging the "administration to refrain from  any retaliation against the students" and rejecting its "use of . . . safety to stifle protest."[23] Professor Walter Johnson was acting as the police liaison on behalf of the protestors, despite his resignation from his position as Harvard PSC's faculty advisor.[24]

106.    At the end of the first day, Dean Dunne told the protestors at nearly 10:00 p.m. that they must abide by "quiet hours," should notify him if non-Harvard affiliates arrive so he can "work to address" the situation, and may not light open flames, but otherwise said nothing to indicate Harvard would do anything to stop the encampment.

107.    By April 26, 2024, the encampment had expanded to over thirty tents. The campers, making clear their intentions to restrict free access to the campus, posted a large sign at the encampment entrance which read: "Welcome to the liberated zone! Make sure to talk to one of us before entering." The organizers designated student "safety marshals," who patrolled the encampment and refused visibly Jewish people access to the grounds it occupied. These "marshals" wore bright neon vests and

---

[22] *LIVE UPDATES: Pro-Palestine Protesters Begin Encampment in Harvard Yard,* THE HARVARD CRIMSON (April 25, 2024), https://www.thecrimson.com/article/2024/4/25/harvard-yard-protest-palestine/.

[23] *Id.*

[24] *Id.*

repeatedly followed and harassed Jews walking through or around Harvard Yard.

108.    Various Harvard administrators confirmed that the encampment violated Harvard policy.  Harvard Graduate School of Arts and Sciences Dean Bill Stackman and the HLS Dean of Students Office emailed students, confirming that the encampment's unauthorized actions "[were] a violation of rules" and stating that "[i]nterference with the academic mission or business functions of the University will not be tolerated. Disruption or interference that hinder members of our community from performing their normal duties and activities will be regarded as an unacceptable obstruction of the essential processes of the University and will lead to disciplinary consequences[.]"  In blatant violation of this warning, on May 8, the occupiers refused to submit to HUID checks and surrounded the administrators chanting "shame!" and banging on drums and buckets.

109.    On April 27, 2024, Dean Dunne emailed Harvard College students confirming that "the encampment in Harvard Yard has continued and grown in direct violation of Harvard policies," and that their "[m]aintaining and participating in this extensive encampment of tents in Harvard Yard constitutes an ongoing violation of University rules." The email noted that "[a]mplified sound and other noise regularly coming from the encampment has disrupted the living spaces of first-year students in adjacent dormitories during . . . a critical juncture in the academic year when students study and prepare for examinations and complete end-of-term projects."  Dunne's email was forwarded to HLS students by the Dean of Students Office on April 28.

110.    Jewish students were stalked by members of the encampment while

walking across Harvard yard.[25] At least one Jewish student reported the stalking to the Harvard Administration.[26] As another student noted, "Literally have been stalked across Harvard Yard by protestors while walking my dog, had 'Heil Hitler' yelled at me twice while waiting for the M2, lost most of my non-Jewish friends and acquaintances on campus after posting about antisemitism I've been experiencing (nothing about Israel or politics). I've never felt less safe on a campus than I did this past year at Harvard."

111.    On May 2, 2024, several Jewish Harvard students placed 1,200 small Israeli and American flags near HDS to honor the 1,200 victims of October 7.  The installation also included a poster of those kidnapped by Hamas.  Over the next two days, vandals ripped the flags out of the ground and scattered them across campus and destroyed the hostage poster.  One Jewish HDS student publicized the vandalism on social media. Harvard took no action in response to punish the vandals.

112.    On May 3, 2024, the encampment expanded to the side of Harvard Yard in front of Widener Library, where commencement was scheduled to take place on May 23, 2024.

113.    On May 6, 2024, which was Holocaust Remembrance Day, Interim President Garber addressed the encampment for the first time.  He sent a University-wide email in which he "call[ed] on those participating . . . to end the occupation of Harvard Yard," and acknowledged that the "continuation of the encampment presents a significant risk to the educational environment of the University."  He then explained

---

[25] Nick Baker, *YAF's Israeli Flag Display at Harvard Destroyed by Pro-Hamas Vandals*, YOUNG AMERICA'S FOUNDATION (May 6, 2024) https://yaf.org/news/yafs-israeli-flag-display-at-harvard-destroyed-by-pro-hamas-vandals/; Final Report at 1, 245.

[26] Shabbos    Kestenbaum    (@ShabbosK),    X    (Nov.    27,    2024,    12:46    PM), https://x.com/ShabbosK/status/1861829053071626314.

that those who "participate in or perpetuate [the encampment's] continuation will be referred for involuntary leave from their Schools."

114.    In response, Professor Johnson—the former Harvard PSC faculty advisor who resigned from his role advising PSC after allowing PSC to post the blatantly antisemitic cartoon—gave a speech in support of the students during which he spewed harmful and false rhetoric.  Using a megaphone, Johnson falsely claimed that "the International Court of Justice has declared that there is plausible evidence that a genocide is occurring in Gaza."

115.    Hours later, HOOP organized a rally of over 400 Harvard students and Cambridge residents to march from the gates of Harvard Yard to Garber's house.  Before beginning the march, organizers made speeches, including one by a student who posed the question: "Does Harvard think this is going to stop?  The student Intifada has engulfed the entire country."

116.    The following day, on May 7, 2024, over 300 faculty members, as employees of Defendant Harvard, signed a public letter pressuring Garber to negotiate with the students.

117.    On May 8, 2024, Interim President Garber met with members of HOOP to ask that they end the encampment in exchange for a meeting with more top Harvard officials.  They rejected his offer.

118.    On May 10, 2024, at the end of the encampment's second week, Garber offered to waive the disciplinary actions against participants if they ended the occupation.  The students again refused, demanding confirmation that Harvard would disclose and divest from all investments in Israel.

119.    Even as Garber offered to let the student protestors off without

punishment, the protestors' violations of Harvard policies continued to mount. For example, on May 7, the encampment students gathered to chant "there is only one solution, Intifada revolution," as they banged drums and other noisemakers. HUPD officers in Harvard Yard allowed the disruptive event to occur on the eve of final examinations. On May 8, the protestors engaged in vandalism by removing the American flag flying above the John Harvard statue and replaced it with a Palestinian flag—something they had already gotten away with on April 27.

120.    On May 9, the campers hung a large banner over the encampment, which depicted Garber, who is Jewish, as a devil with horns and a tail—a classic antisemitic trope—sitting on a toilet, with a caption stating, "Alan Garbage funds genocide." One of the Antisemitism Task Force members, Professor Boaz Barak, stated that he was "embarrassed for Harvard" that such an antisemitic trope had been used by its students. He also stated, "There is certainly antisemitism and hate among that movement."

121.    On May 10, 2024, more than 200 students, faculty, and staff gathered at the encampment. The protestors chanted, among other things, "Intifada! Intifada!"

122.    On May 11, 2024, someone with an HUID (*i.e.*, a student or Harvard employee) cut a lock securing Johnston Gate to allow roughly 150 protesters to access Harvard Yard for a Saturday afternoon protest. Harvard confirmed that "persons not affiliated and affiliated with the University" attended. On May 12, a crowd of protestors gathered at one of the Harvard gates. At least five students climbed to the top of the gate to hang a banner reading, "Welcome to the Liberated Zone." By May 13, the encampment still had nearly fifty tents.

123.    On May 14, 2024, Harvard capitulated to the unlawful occupiers, entering into an agreement with protest organizers from HOOP, an unrecognized student

33

organization not permitted to conduct activities on campus. Garber announced that Harvard schools should begin reinstating demonstrators who had been placed on involuntary leave, that Harvard would expedite Administrative Board hearings in line with "precedents of leniency," and that HOOP would be offered meetings with Harvard's governing boards about divestment from Israel.

124.    HOOP announced that it will "re-group and carry out this protracted struggle through other means," and that supporters should "rest assured" that the concessions it gained from Harvard would not "pacify" it. HOOP continued, "we can only come back stronger in our fight for Palestine," and "Our fight for Palestinian liberation does not begin nor end with this encampment." A key encampment organizer said, "This action, this movement, wasn't just the finale of a semester, it was the beginning."

## B.    Harvard Repeatedly Discriminates Against and Mistreats Mr. Segev

### i.    A Rabid Mob of Harvard-Affiliated Protestors Attacks Mr. Segev for Being Jewish

125.    On October 18, 2023, Harvard PSC and Harvard GS4P organized a "die-in" and protest (the "October 18 Demonstration") at HBS, heavily promoted on social media as a "demand [to] end [an] ongoing genocide," with organizers repeating Hamas falsehoods that Israel bombed al-Ahli Hospital in Gaza. Hundreds of die-in protesters marched from outside President Gay's office to HBS, where they lay on the ground playing dead while raising "from the river to the sea" signs and chanting "free, free Palestine" and other slogans.

126.    After Harvard had allowed antisemitic hatred to fester for so long and permitted these public and online threats to go unpunished, things were bound to turn physical. Indeed, the October 18 Demonstration protesters harassed and physically

assaulted Mr. Segev—*because he was Jewish.*

127.    The entire event was captured on videos taken by student protestors, video taken by Mr. Segev himself, and by aerial news footage.

128.    As the videos show, Mr. Segev was walking outside HBS's Klarman Hall, which was near his residence on HBS's campus. He was wearing a blue bracelet, a public symbol of his Israeli identity and his solidarity with his homeland. While walking, he encountered the October 18 Demonstration taking place on the quad accessible to all Harvard students.

129.    The October 18 Demonstration was coordinated by two organizations, "Harvard Undergraduate Palestine Solidarity Committee" and "Graduate Students 4 Palestine." Scores of Harvard students gathered to protest Israel's right to exist and to accuse Israel of "war crimes."

130.    A leader from a group invited to speak at the October 18 Demonstration explained that the protest was fueled by the belief that "Israel is a fascist, genocidal government" that operates an "apartheid regime . . . rooted in the same logic of settler colonialism."62'

131.    Several students at the event held up signs featuring slogans accusing Israel of committing "genocide" and calling for the eradication of the Jewish state— such as "From the River to the Sea!" and "Free Free Palestine!"

132.    The event was being widely recorded by cameras, including by one on an NBC helicopter. Students used their phones to film the event, and Mr. Segev chose to do so as well. Like others had, Mr. Segev walked through the demonstration and silently recorded.

133.    As Mr. Segev was walking and filming quietly, the protest's self-designated

"safety marshals"—which included at least one HDS student and one HLS student, both of whom were also employed by Harvard—began to accost Mr. Segev. Although the event was taking place in a University space—not to mention on the campus where he lived—and was ostensibly open to all students, Mr. Segev was repeatedly shouted at to "get out."

134.    The "safety marshals" had no legitimate reason to approach Mr. Segev, to ask him to leave, and certainly not to accost him physically. Mr. Segev was doing nothing more than walking around silently, and—like other students who were not asked to leave—was filming the event on his phone. Indeed, as Suffolk County District Attorney Kevin Hayden later noted, Mr. Segev was "an entirely innocent victim" who "did nothing wrong leading up to this incident and nothing wrong during this incident."[27]

135.    The videos show numerous other individuals filming the event, and no other person with a camera or taking a video with a phone was approached by "safety marshals."

136.    One of the first students to confront Mr. Segev was an HLS student, who shoved a keffiyeh[28] in Mr. Segev's face as he attempted to walk. It appears from the video that Mr. Segev said to him, "I'm allowed to be here," to which the HLS student appears to respond, "I'm allowed to cover you." Mr. Segev can be heard saying, "Back up."

137.    Shortly thereafter, a protester dressed in all black, including a black hood and black face mask, leapt up at Mr. Segev. Following the lead of the self-designated

---

[27] James Borghesani, *Anger Management and 80 Hours of Community Service Ordered for Two Harvard Students Charged in 2023 Campus Assault*, Suffolk County District Attorney Massachusetts (April 29, 2025), https://www.suffolkdistrictattorney.com/press-releases/items/2025/4/29/anger-management-and-80-hours-of-community-service-ordered-for-two-harvard-students-charged-in-2023-campus-assault.

[28] The keffiyeh is a symbol of violence against Jews. It was popularized by Yasser Arafat, who led the Palestine Liberation Organization, a designated foreign terrorist organization. *See* 22 U.S.C. § 5201(b).

"safety marshals," additional individuals began to approach and gather around Mr. Segev, surrounded him with keffiyehs, and then violently grabbed him. The mob swarmed in even closer, constantly repeating the word "exit"—making it very clear that somebody like Mr. Segev, an Israeli Jewish student, was not welcome.

138.    The mob succeeded in forcing Mr. Segev to the outside perimeter of the die-in, all while continuing to force their keffiyehs in his face. One individual threw his arm into Mr. Segev's neck.

139.    When Mr. Segev attempted to move past the mob, things took an even more violent turn. Multiple members of the mob began to forcefully grab him and physically push him back away from the protest. Mr. Segev repeatedly pleaded with those assaulting him to stop, but they refused. "Please don't touch me" and "Please don't grab me," Mr. Segev repeated—firmly but peacefully, trying to deescalate.

140.    Even as Mr. Segev attempted to walk by, however, the mob of students continued to surround him, press up against him, and shove protest signs and keffiyehs in his face. The crowd then began yelling chaotically in his face, "Shame! Shame! Shame!" Fearful for his safety, Mr. Segev tried to escape and was finally able to move past the protestors.

141.    HUPD officers watched the entire event unfold but did not intervene.

**ii.    Harvard's Student and Faculty Gang Up On Mr. Segev, Defame Him, and Blame Him For Being Attacked; Harvard Does Nothing Despite Mr. Segev Reporting the Issues Repeatedly**

142.    Following the assault, Harvard allowed Mr. Segev to be bullied and harassed without repercussions on the basis of his Jewish and Israeli identity by both students *and* faculty.

143.    A first-year law student at HLS accused Mr. Segev on X of acting

37

"aggressive[ly]" and "taking invasive photos and getting in [the protesters'] faces." She falsely claimed that Mr. Segev was "masked/covered to hide his identity," and that "the safety marshals did NOT touch this student." The same student falsely claimed on X that Mr. Segev was "nearly stepping on" the demonstrators "for the explicit purpose of doxing [sic] students." She repeated the falsehood that "safety marshals intervened without touching the student," and that Mr. Segev was "harass[ing] peaceful protestors."

144.    A second-year law student at HLS falsely alleged on X that Mr. Segev had been "getting close to our faces and taking invasive pics" and "aggressively stepping over and near people." The student also falsely claimed that "nobody there got physical with" Mr. Segev.

145.    Later, these same two law students published an article on Medium accusing Mr. Segev of "harassment" at the event and blaming him for bringing the assault on himself.

146.    Of course, none of this was true, and it is directly belied by the video. Mr. Segev was physically assaulted at the October 18 Demonstration. And, unlike many of those who attacked him, Mr. Segev was not covering his face, he remained quiet and peaceful, and he was not acting aggressively or harassing anyone.

147.    Worse, after the attack, several Harvard faculty and staff issued a public statement blaming Mr. Segev because his presence—read: his *Jewish* presence— somehow made the protestors feel "unsafe" and "frighten[ed]." The faculty and staff called for the assaulters' protection because of their "dark skin," notwithstanding that they mobbed and assaulted another student.[29]

---

[29] Harvard Faculty and Staff for Justice in Palestine, *Statement in Support of Harvard Student Elom Tettey-Tamaklo,* MEDIUM (Dec. 5, 2023), https://medium.com/@harvardfsjp/statement-in-support-of-

148.    A Harvard student, Unnamed Student B, posted defamatory remarks about Mr. Segev in various official club group chats. He called Mr. Segev a "Zionist aggressor," invoking antisemitic tropes: "we all know who controls the media," and called Israel a "terrorist state." In November 2023, Mr. Segev reported this to Ben Longstreth, Associate Director, Community Standards and Program Services at HBS. However, Harvard refused to discipline Unnamed Student B.

149.    In November 2023, Mr. Segev reported to HBS that an HBS student, Unnamed Student C, had been actively harassing, cyber-bullying, and defaming Mr. Segev online. Mr. Segev reported that he feared for his physical safety, as Unnamed Student C posted about resistance "by any means necessary." Unnamed Student C also posted a picture of Mr. Segev's face on X. Despite the reports, Harvard seemingly did not take any action to remedy the situation or to discipline Unnamed Student C for doxxing Mr. Segev.

150.    The targeted harassment carried out by Unnamed Student C against Mr. Segev aligns with what other students have described—namely, the larger, overarching strategy of the BDS movement which "encourage[es] students and faculty to avoid normalizing relations with Jewish students. This involves social shaming, which is a particularly harmful tactic in academia and the impact can vary depending on your field."[30]

151.    At an HBS Middle East and North Africa ("MENA") Club event on November 15, 2023, event attendees were required to RSVP in advance. Upon arrival at

---

harvard-student-elom-tetteytamaklo-cdb164760bf3.

[30] Final Report at 124.

the registration table, Mr. Segev found that the administrator handling sign-ins had a separate list of Jewish students at HBS who had RSVPed, and next to each Jewish student's name on the list was a notation of either "protestor" or "peaceful." Presenters at the event espoused antisemitic rhetoric, despite advance warning of the anticipated conduct and content brought to the attention of the HBS administration by the HBS Jewish Students Association in advance of the event.

152.    Many Jewish students, including Mr. Segev, brought the nature of the event to the attention of the HBS leadership immediately, both at the event and in the days following. At the event, the administrator with the list of Jewish students told the objectors it was essentially "not a big deal." To date, no action has been taken to explain or apologize for this situation. No action has been taken to ensure that such discriminatory behavior does not recur.

153.    Compounding the Harvard Administration's mishandling of the assault and battery of Mr. Segev, in May 2024, Jeremy C. Fox, an instructor employed by the Harvard Extension School, contributed to a *Boston Globe* article that minimized the attack on Mr. Segev and defended the attackers.[31]

### iii. Mr. Segev Seeks Redress from the University for the Attack, but Harvard Invents a Bogus "Policy" to Delay and Ultimately Avoid Punishing the Assailants

154.    Although Harvard would have immediately punished students who harassed or bullied—much less physically assaulted—other students, it refused to take any reasonable action to punish the student-employees who maliciously attacked Mr.

---

[31] Mike Damiano, *At Harvard, a Confrontation During a Protest Erupts in Political Controversy*, Bos. Globe (May 26, 2024), https://www.bostonglobe.com/2024/05/26/metro/harvard-confrontation-during-protest-erupts-political-controversy-lands-court/.

Segev. It refused, despite Mr. Segev's complaints and despite the widespread media attention to the attack.

155.    On November 13, 2023, Mr. Segev filed a complaint with HLS, detailing the verbal harassment and physical assault that he endured at the October 18 Demonstration by multiple Harvard students and student-employees, including one who was completing his second year at HLS, Ibrahim Bharmal, and another who was completing his second year at HDS, Elom Tettey-Tamaklo.

156.    On November 15, 2023, Mr. Segev also filed a complaint with HDS detailing the verbal harassment and physical assault that he endured at the October 18 Demonstration.

157.    Mr. Segev included in his complaints the video he recorded, as well as video of his assault from other vantage points. He also included the names of two of his attackers. However, in both instances, Harvard refused to take any action against the perpetrators because Mr. Segev preferred to proceed anonymously. Mr. Longstreth communicated this decision via email to Mr. Segev on December 5, 2023.

158.    Meanwhile, rather than take any direct or immediate action against the two identified attackers, former Harvard President Claudine Gay reported publicly on November 9, 2023, that the "incident is being investigated by the FBI and the HUPD."

159.    Gay continued, heartlessly: "[c]onsistent with our standard practice, once law enforcement's inquiry is complete, the University will address the incident through its student disciplinary procedures to determine if University policies or codes of conduct have been violated and, if so, take appropriate action."

160.    Gay's suggestion that policies and codes may not have been violated is facially absurd. As discussed below, the malicious conduct clearly and obviously violated

41

numerous school policies—not to mention the attack prompted criminal charges.

161.    Moreover, nothing in Harvard's policies states that it cannot or should not address complaints of discrimination, harassment, or violence until a related law enforcement investigation is complete. And there is no such "standard practice," as Harvard has acted swiftly in response to other incidents of violence.

162.    In reality, there is no reason that Harvard could not have disciplined, suspended, or expelled the attackers for violating Harvard school policies. Doing so would in no way interfere with, undermine, or affect any law enforcement efforts to investigate criminal violations at the same time. Harvard's message was clear: discrimination, harassment, or violence is acceptable on campus so long as it is directed at Israelis and Jews.

### iv.    Harvard Launches a Sham, Internal "Investigation" That Goes Nowhere

163.    Rather than expel the offenders immediately, as it would have done had the victim been a member of a "favored" minority group, Harvard launched a sham investigation that ultimately went nowhere. It was designed to make it *appear* to Mr. Segev that Harvard was taking appropriate and reasonable measures, and therefore discourage him from taking other actions, when Harvard was in reality not doing anything.

164.    It is worth noting that the investigation process, if it indeed occurred, appears to be inconsistent with Harvard's supposed "policy" to abstain from addressing an incident until related criminal proceedings have concluded.

165.    On January 3, 2024, Harvard's outside counsel contacted Mr. Segev's attorneys to inform them that Harvard had retained counsel's firm to conduct an

"independent review" of the physical attack against Mr. Segev on October 18, 2023.

166.    On January 5, 2024, attorneys from the firm met with Mr. Segev's attorneys via Zoom. That same day, Mr. Segev's attorneys sent the outside attorneys video footage of the incident in which Mr. Segev was physically attacked.

167.    Without explanation, there was no further movement on the investigation until months later, on April 10, 2024, the night before Representative Elise Stefanik sent a letter to Harvard and made the letter public the same day.

168.    Though Harvard allegedly initiated an external investigation into the physical attack against Mr. Segev, Harvard's outside counsel did not schedule an interview with Mr. Segev until after Representative Stefanik's letter was made public.

169.    After interviewing Mr. Segev in May 2024 and making him re-live the trauma by showing him the video of the attack over and over again, Harvard's outside counsel did not contact nor update Mr. Segev.

170.    In fact, for the *entire duration of the investigation*—which allegedly was completed, though no results have been shared—Mr. Segev was provided no information, despite repeatedly requesting updates.

171.    Because Mr. Tettey-Tamaklo was slated to graduate in May 2024, Mr. Segev's attorneys sent one of the outside attorneys a letter on March 22, 2024, requesting an update on the investigation, including substantive actions taken by the firm or by Harvard University to ensure that the complaint against Mr. Tettey-Tamaklo would be resolved prior to graduation. Mr. Segev received no response.

172.    After it was clear criminal complaints would be filed against Mr. Bharmal and Mr. Tettey-Tamaklo in May of 2024, Mr. Segev's counsel reached out to Harvard's counsel requesting an update on the investigation into his assault.

43

173.    Five days later, on May 13, 2024, Harvard's outside counsel responded with "Unfortunately, we can't comment on the investigation."

174.    Mr. Segev's counsel responded two days later by noting that Mr. Segev would like the investigation completed as soon as possible, particularly since Harvard President Alan Garber had expressed that the disciplinary process for those who set up the illegal encampments would be "evaluate[d] expeditiously."[32]

175.    Harvard's counsel stated that she would "pass along" these thoughts.

176.    Having heard nothing from Harvard's outside counsel for *nine months*, on February 11, 2025, counsel for Mr. Segev contacted the outside investigator and was curtly told again five days later that she "cannot comment on the investigation."

177.    Because the investigation appeared to be going nowhere, Mr. Segev tried to initiate non-anonymous complaints on May 19, 2024, as Harvard had previously told him he would have to do. Yet, rather than open a complaint, Harvard told him it was too late because Harvard had already completed an investigation into the matter and could not share the results of that investigation with him. Yet again, if true, this would mean that the investigation occurred in violation of Harvard's supposed policy of abstaining from investigating incidents until the associated criminal proceedings have concluded.

178.    In short, the sham investigation enabled Harvard to keep Mr. Segev effectively in the dark and to intentionally prejudice his ability to pursue administrative remedies.

---

[32] Alan M. Garber, Update on Encampment in Harvard Yard, HARVARD OFF. OF THE PRESIDENT (May 14, 2024), https://www.harvard.edu/president/news/2024/update-on-encampment-in-harvard-yard/.

**v.    Harvard Tries To Deter Mr. Segev From Vindicating His Civil Rights By Outing Him In Litigation**

179.    Mr. Segev was deeply disturbed by Harvard's complete lack of response and struggled with severe emotional distress. Joining the Louis D. Brandeis Center for Human Rights Under Law, Mr. Segev, as one of five unnamed members of the plaintiff entity Jewish Americans for Fairness in Education (JAFE), sued Harvard for violations of Title VI in May 2024. While the Brandeis Center eventually settled with Harvard on behalf of JAFE in a private settlement in January 2025, Mr. Segev was not satisfied with the terms and did not join in the settlement.

180.    Notably, even after the conclusion of the settlement, which included Harvard agreeing to adopt the International Holocaust Remembrance Alliance's (IHRA) definition of antisemitism, Harvard appears to be violating the terms of that settlement. More specifically, Mr. Segev reported an incident in March 2025 in which fellow HBS student Meera Sachdeva compared Israel to Nazi Germany. Harvard declined to discipline the student, despite her analogy constituting a glaring violation of the IHRA definition of antisemitism, arguing that the incident was not "sufficiently severe or pervasive" as to warrant discipline.

181.    Therefore, Mr. Segev, still experiencing antisemitism as a second-year HBS student, attempted to join the suit of Shabbos Kestenbaum as a pseudonymous plaintiff in March 2025. Similar to Mr. Segev, Mr. Kestenbaum was proceeding forward in a suit against Harvard alone after his co-plaintiff reached a settlement in January 2025 with the University that he believed did not address his injuries specifically.

182.    Mr. Segev's desire to proceed pseudonymously stemmed from his fear of further retaliation, harassment, and discrimination from his peers, should his name

appear on Mr. Kestenbaum's docket. Indeed, *The Harvard Crimson*, a frequent resource for Harvard students, had been actively covering any litigation activity related to Mr. Kestenbaum's suit.

183.    Mr. Kestenbaum moved to file a third amended complaint in March 2025, adding Mr. Segev as a pseudonymous plaintiff.

184.    Harvard opposed Mr. Segev's motion to proceed pseudonymously and asserted to Mr. Segev's lawyers that it was "not aware of any basis" for Mr. Segev to seek anonymity, despite the avalanche of bullying and reputational damage to which Mr. Segev had been subjected after videos of his attack surfaced. In at least one other case, Harvard did not oppose a trans-identifying student's motion to proceed under a pseudonym.[33]

185.    Harvard's opposition to Mr. Segev joining Mr. Kestenbaum's suit pseudonymously was emblematic of Harvard's pattern of callous disregard for Mr. Segev's well-being and safety as a Jewish and Israeli student on Harvard's campus.

186.    Indeed, in its opposition filed on March 28, 2025—which had been filed *after* the Court had initially granted anonymity to Mr. Segev—Harvard cited to three news articles, including the very sentences where Mr. Segev's name had appeared, and unnecessarily included the articles as exhibits. Despite redacting Mr. Segev's name from the articles, Harvard's filing all but ensured that anyone could easily locate his name.

187.    Notably, up to that point, *The Harvard Crimson* had not published Mr. Segev's name. However, shortly after Harvard filed its opposition to Mr. Segev's motion, journalists from the publication emailed counsel for Mr. Segev to inform them that they

---

[33] *See, e.g.,* Complaint, *Doe v. Harvard University et al.,* No. 1:19-cv-10138 (D. Mass. Jan. 22, 2019), ECF No. 1.

would soon publish an article outing Mr. Segev's identity. The email from *The Harvard Crimson*, which attached Harvard's opposition, made it clear that Harvard had achieved its goal of outing Mr. Segev's identity before the Court could rule on his motion for pseudonymity.

188.    Despite counsel's objection and request not to publish his name pending the Court's decision on the motion for pseudonymity, *The Harvard Crimson* published its article and identified Mr. Segev by name.

189.    Harvard's opposition to Mr. Segev's motion to proceed pseudonymously was discriminatory. After October 7, Harvard sought to prevent "doxxing" solely of the pro-Hamas protesters. In response to public protestors being identified, Harvard issued the following statement:

> Harvard University unequivocally rejects hate of all forms and in all its manifestations. The University also condemns the harassment and intimidation of individuals based on their beliefs, including the deliberate targeting and intimidation of members of our community through what is commonly referred to as "doxxing" – sharing online of private identifying information that is not otherwise publicly available. This is reprehensible and appalling behavior and does not represent the values of the Harvard community.

190.    In September 2024, Harvard instituted an anti-doxxing policy to protect the public protesters who had been identified for their disruptive, antisemitic behaviors.

191.    According to Harvard, "Doxing violates two overlapping University policies: the prohibitions against 'intense personal harassment' under the University-wide Statement on Rights and Responsibilities (USRR) and 'bullying' under the Non-Discrimination and Anti-Bullying Policies (NDAB)." Harvard's new policy defines doxxing as publicly sharing an individual's personal information online "in circumstances that a reasonable person would expect to, and does, result in 'harmful

interpersonal aggression' by third parties." Given the online bullying Mr. Segev experienced following his assault, a reasonable person undoubtedly would expect such bullying to increase, should Mr. Segev's name appear prominently on the *Kestenbaum* docket.

192.    In addition to adopting an anti-doxxing policy—which apparently applies only to pro-Hamas protesters and not to Jewish students that have been assaulted, harassed, and discriminated against—Harvard established an Anti-Muslim, Anti-Arab, and Anti-Palestinian Bias Task Force, which published its report the same day as the Anti-Semitism Task Force.

193.    The establishment of the second task force was to suggest that the hatred of Jewish people is somehow nuanced and excusable, a characterization that is afforded to no other hatred. It also was designed to place those harassing Jewish students in a sympathetic light.

194.    For instance, the Anti-Muslim, Anti-Arab, and Anti-Palestinian Bias Task Force contained the word "genocide" eighteen times, despite the fact that there is no genocide in Gaza (rather, Hamas employs human shields against the Israeli military). Many of the accounts included students upset that they had been "doxed" or exposed for their involvement in pro-Hamas activities on campus. Most tellingly, those who submitted responses to the Task Force used their responses to advocate for an economic boycott of Israel as a "recommendation" for dealing with anti-Muslim bias.[34]

195.    Two weeks after Mr. Segev moved to join Mr. Kestenbaum's lawsuit, this Court denied Mr. Kestenbaum's motion to file a third amended complaint, rendering

---

[34] Final Report at 1, 66-67.

Mr. Segev's motion to proceed pseudonymously moot.

196.    Still experiencing severe psychological stress and frustrated by Harvard's callous disregard for the discrimination and harassment he experienced, Mr. Segev attempted to engage directly with the University. On May 1, 2025, Mr. Segev sent a letter to Harvard seeking clarification on when Harvard intended to complete its disciplinary process against his assailants, as Harvard had represented it would both to this Court and to the United States Congress.

197.    In his letter, Mr. Segev reminded Harvard that Mr. Bharmal and Mr. Tettey-Tamaklo were students *and* employees of Harvard, insofar as the former served as a teaching fellow at HLS and the latter as a residential proctor.

198.    In the wake of the October 7 terror attacks, they had a history of abusing their positions of authority, participating in unlawful protests, spreading vicious antisemitism—and assaulting a Jewish student.

199.    As a teaching fellow, Mr. Bharmal emailed all first-year law students with anti-Israel messaging that was unrelated to his teaching role.

200.    Meanwhile, Mr. Tettey-Tamaklo published a video quoting a Nazi theologian and shared a poem with blood libels accusing Israelis of being "vipers [] who siphon the lifeblood of the innocent." He also authored an article in which he feted a terrorist who tried to murder Israeli civilians, including children, by bombing a movie theater.

201.    As Mr. Segev noted, only a few days prior to the May 1 letter, Mr. Tettey-Tamaklo had appeared at an unauthorized protest with a bullhorn.

202.    Harvard did not respond to Mr. Segev.

203.    On May 5, 2025, Mr. Segev sent Harvard a follow-up letter notifying

Harvard that per recent reporting Mr. Bharmal would be receiving a $65,000 fellowship from *The Harvard Law Review* upon graduation in order to work at the Council on American-Islamic Relations (CAIR), thereby indicating that Mr. Bharmal indeed would be graduating. Mr. Segev requested yet again an update on the disciplinary proceedings against Mr. Bharmal and Mr. Tettey-Tamaklo.

204.    Mr. Segev also noted that CAIR, the organization for which Mr. Bharmal was slated to work following his graduation, had a long history of supporting terrorism, including the acts of October 7, and spreading antisemitism. Notably, CAIR was an unindicted co-conspirator in the United States' prosecution of the Holy Land Foundation, which was prosecuted for funneling millions of dollars to Hamas.

205.    Harvard did not respond to Mr. Segev.

206.    On May 22, 2025, Mr. Segev sent a third letter to Harvard, pointing out that his previous two letters had been ignored and requesting *yet again* an update on the status investigation into his attackers.

207.    Finally, on May 28, 2025, Harvard responded by stating that any disciplinary proceedings were "confidential" and that *The Harvard Law Review* is a legally independent corporate entity. Given Mr. Bharmal is slated to begin work shortly at CAIR, it is obvious that he has not been expelled nor is he facing any serious disciplinary consequences.

208.    In sum, after dismissing Mr. Segev's concerns for his own privacy and safety following repeated antisemitic abuse, Harvard refused to provide Mr. Segev *any* update on the status of the investigation into his attack—a full nineteen months after the attack occurred.

209.    Despite Mr. Bharmal and Mr. Segev being both students and employees of

Harvard, Harvard took no substantive action against either of them. To date, the only known repercussion for either is that Mr. Tettey-Tamaklo lost his proctor privileges.

210.    The entire ordeal suggests that one may attack Jews at Harvard with impunity and face no meaningful discipline.

### vi.    While It Uses Tactics to Dissuade and Mislead Mr. Segev From Obtaining Relief, Harvard Actively Obstructs the Criminal Investigation into Mr. Segev's Attackers

211.    While Harvard did everything to delay, obfuscate, and mislead Mr. Segev away from administrative processes, it also actively stalled the investigation and impeded the criminal proceedings by the local authorities. Harvard's intent was to delay until the assailants could graduate and Harvard could sweep the matter under the rug.

212.    Despite Harvard's refusal to take action against Mr. Bharmal and Mr. Tettey-Tamaklo, the Suffolk County District Attorney's Office filed charges against the two attackers in Boston Municipal Court's Brighton Division.

213.    Though the clerk's hearing was initially scheduled to occur on March 26, 2024, the attorney for Mr. Bharmal and Mr. Tettey-Tamaklo successfully advocated for the clerk's hearing to be rescheduled to the much later date of May 8, 2024, thereby ensuring that the matter likely would not be resolved before the end of the school year.

214.    Upon information and belief, Harvard staff and employees worked directly with Mr. Bharmal and Mr. Tettey-Tamaklo's attorney to delay the date of the clerk's hearing.

215.    On May 9, criminal charges were brought against both assailants. Each was charged with Assault & Battery (misdemeanor) under Massachusetts General Laws Chapter 265, Section 13A and with a civil rights violation (misdemeanor) under Massachusetts General Laws Chapter 365, Section 37.

216.    On September 4, at what was supposed to be the arraignment of the assailants, Suffolk County Assistant District Attorney Ursala Knight asked the Court to continue the arraignment on the ground that the Commonwealth of Massachusetts still needed to engage in further investigation because the HUPD had "essentially refused to investigate," which had been a "shock to the Commonwealth."[35]

217.    In seeking a continuance, Ms. Knight emphasized to the court that the Commonwealth had approached Harvard multiple times seeking additional information about other individuals involved in the October 18 assault of Mr. Segev and had received no assistance. Ms. Knight stated, "We have made several requests to [Harvard] to look into this information, and they have been unwilling to follow up with us." Because the Commonwealth did not yet have that information, Ms. Knight did not know whether other individuals may have inculpatory or exculpatory information.

218.    Harvard's refusal to cooperate with a state prosecutor in properly identifying the individuals who attacked Mr. Segev undercut the investigation, blocked justice, and further demonstrates the level of disregard with which Harvard treats antisemitic incidents, and the lack of care it has for its Jewish students.

219.    At the arraignment on November 15, 2024, both assailants pleaded not guilty. Despite the court issuing a "no contact" order with regard to Mr. Segev, Harvard did not ban the assailants from campus (even on a temporary basis).

220.    Another hearing was scheduled for January 17, 2025, during which it was announced that the FBI, as well as the Boston Police Department, were assisting the

---

[35] Collin Anderson, *Harvard University Not Cooperating With DA's Investigation Into Students Charged With Assault of Jewish Classmates*, THE WASHINGTON FREE BEACON, (Sep. 4, 2024), https://freebeacon.com/campus/harvard-university-not-cooperating-with-das-investigation-into-students-charged-with-assault-of-jewish-classmate/.

Suffolk County DA's Office to identify additional attackers of Mr. Segev.

221.    On February 10, 2025, Judge Stephen McClenon, the judge presiding over the matter, issued an order granting the assailant's motion to dismiss the civil rights charge but denying their motion to dismiss the assault and battery charges.

222.    Soon thereafter, Mr. Bharmal and Mr. Tettey-Tamaklo filed a motion for pretrial diversion programming, and on April 28, 2025, Judge McClenon granted their motions, ordering each to perform 80 hours of community service and to attend eight hours of anger management classes in exchange for avoiding a criminal trial and possible conviction.

223.    As noted above, Suffolk County District Attorney Kevin Hayden issued the following public statement in response to the decision:

> Mr. Segev is an entirely innocent victim. He did nothing wrong leading up to this incident and nothing wrong during this incident. He had a Constitutional right to walk across the campus of his school without being accosted or assaulted. As such, we were prepared to go to trial to seek accountability from the two defendants and justice for Mr. Segev.[36]

224.    Harvard actively obstructed the investigation into Mr. Segev's attack by telling the HUPD officers to *halt* their investigation and *not* to cooperate with local authorities.

225.    After one of the officers had made it clear that he was intent on pursuing Mr. Segev's attackers until justice had been served, HUPD swiftly removed him from the investigation.

---

[36] James Borghesani, *Anger Management and 80 Hours of Community Service Ordered for Two Harvard Students Charged in 2023 Campus Assault*, (April 29, 2025), https://www.suffolkdistrictattorney.com/press-releases/items/2025/4/29/anger-management-and-80-hours-of-community-service-ordered-for-two-harvard-students-charged-in-2023-campus-assault.

### vii.    Harvard Not Only Refuses to Punish the Assailants in the End, It Rewards Them and Signals That Antisemitism Is Acceptable On Campus and Commendable

226.    Three weeks after Mr. Bharmal was recorded assaulting Mr. Segev on October 18, Professor Greiner permitted Mr. Bharmal to host a review session for his students, which some Jewish students did not attend because they were afraid of him. Mr. Segev is unaware of any alternative being offered to the Jewish students.

227.    Despite state authorities pursuing assault and battery charges against Mr. Segev's attackers and his attackers ultimately being ordered to complete 80 hours of community service, HLS, HDS, and Harvard University have refused to take any public remedial or disciplinary action. Upon information and belief, HLS, HDS, and Harvard University have not even opened disciplinary proceedings against the HDS and HLS-enrolled employees—as they are required to do under each of their respective codes, policies, and procedures—despite Mr. Segev's timely complaints to the University and HUPD in November 2023.

228.    In April, as mentioned earlier, Mr. Bharmal was awarded a paid public interest fellowship from *The Harvard Law Review*, which selects recipients after a "committee of Harvard Law School and Harvard Law Review alumni in public interest careers chooses finalists from the set of applicants, and a faculty committee interviews the finalists to select fellows."

229.    Mr. Bharmal, despite assaulting a Jewish student, suffered no consequences, was awarded a degree from HLS, and received a paid fellowship upon graduation. In the spring of 2025, he also received glowing profiles across a variety of Harvard webpages, including the HLS Admissions Blog. He also was featured on the HLS events calendar as a student to speak on "courageous lawyering . . . in an era of

54

increased of[sic] repression," and the HLS "Crimmigration Clinic" championed Mr. Bharmal by publishing a self-authored profile on its website.[37]

230.    Meanwhile, Mr. Tettey-Tamaklo served in an honorary role at HDS graduation as class marshal, as he too graduated from HDS after having experienced only a loss of proctor privileges.

231.    Mr. Segev followed the requirements under Harvard's policies and took all necessary steps to report his complaints to the appropriate channels—as laid out by Harvard's policies to ensure its students are protected from the exact situation that Mr. Segev experienced.

## C.    Harvard's Mistreatment of Jews Like Mr. Segev Is Directly Discriminatory and Based on Racist Hypocrisy and Double Standards

### i.    Harvard Has Numerous Policies to Punish and Deter Discrimination and Bullying, Like Mr. Segev Experienced

232.    Harvard has numerous policies designed and intended to protect students from the exact type of discrimination, retaliation, harassment, and violence that Mr. Segev experienced. Those policies include: (i) the "Harvard University Non-Discrimination Policy"; (ii) the "Harvard University Anti-Bullying Policy"; (iii) the "University-Wide Statement on Rights and Responsibilities"; (iv) the "Statement of the President and Deans on University Rights and Responsibilities"; (v) various Harvard Student Handbooks; (vi) the Protest Rules; and (vii) Harvard's Student Organization Policies.

233.    These statements, policies, and handbooks set forth Harvard's purported commitment to treating all members of the community with respect, to providing an

---

[37] Ben    Badejo    (@BenTelAviv),    X    (May    9,    2025,    11:34    AM) https://x.com/BenTelAviv/status/1920864864609661061.

environment conducive to learning, and to ensure equal access to rights, privileges, and opportunities without regard to race, color, religion, creed, national origin, ancestry, or any other legally protected basis.

234. The statements, policies, and handbooks further affirm that discrimination or harassment on the basis of any of these characteristics is inconsistent with Harvard principles and policies, and warrant punishment and disciplinary action.

235. On September 1, 2023, Harvard adopted a University-wide Non-Discrimination Policy (the "Non-Discrimination Policy"), which applies to alleged discrimination "by any member of the Harvard community," both on- and off-campus (including on social media), that "may have the effect of creating a hostile or abusive work or learning environment for a member of the University community."

236. The Non-Discrimination Policy states that "Harvard University is committed to the principles of equal opportunity in education" and that discrimination based on race, color, national origin, ancestry, or religion, among other protected categories, "is unlawful and is prohibited by this Policy."

237. The Non-Discrimination Policy prohibits "discriminatory disparate treatment" and "discriminatory harassment" on the basis of race, color, national origin, ancestry, religion, or creed, among other protected classes.

238. "Discriminatory disparate treatment" is defined as "singling out or targeting an individual for less favorable treatment because of their protected characteristic," which "unreasonably interfere[s] with or limit[s] the student's ability to participate in or benefit from the institution's programs and activities."

239. Harvard defines "discriminatory harassment" as "unwelcome and offensive conduct that is based on an individual or group's protected status" that

56

interferes with "a student's academic performance or ability to participate in or benefit from academic/campus programs and activities."

240. The Non-Discrimination Policy further provides the following examples of "[d]iscriminatory disparate treatment":

- Imposing more severe discipline on a student or employee because of their protected characteristic; and
- Giving a negative performance evaluation or grade/academic assessment because of an individual's protected characteristic.

241. The Non-Discrimination Policy also sets forth governing principles, including that all those at Harvard "with responsibility for implementing [the policy] will discharge their obligations with fairness, rigor, and impartiality," as well as timeliness and transparency, and sets forth procedures, including specified timeframes for reviewing, investigating, and acting upon complaints of violations.

242. When a formal complaint is made, Harvard normally will investigate, and those found to have violated the Non-Discrimination Policy will face sanctions and remedial measures, *including suspension, mandatory coaching and training, or termination.*

243. Adopted on September 1, 2023, Harvard's University-wide Anti-Bullying Policy (the "Anti-Bullying Policy") states that "Harvard University is committed to cultivating a community that is open, welcoming, and inclusive, and that supports all community members in pursuit of the University's mission of learning, teaching, research, and discovery." As such, "[b]ullying, hostile and abusive behavior, and power-based harassment directly threaten the ability of community members to engage in the free exchange of ideas and pursue their educational and professional goals . . . [and] are prohibited at Harvard."

244. The Anti-Bullying Policy defines "bullying" as "harmful interpersonal aggression by words or actions that humiliate, degrade, demean, intimidate, or threaten," which is "sufficiently severe or pervasive, and objectively offensive, that it creates a[n] . . . educational[] or living environment that a reasonable person would consider intimidating, hostile, or abusive and denies the individual an equal opportunity to participate in the benefits of the workplace or the institution's programs and activities."

245. The Anti-Bullying Policy provides the following examples of bullying:

- Abusive expression directed at an individual or individuals, such as derogatory remarks, epithets, or ad hominem attacks that are outside the range of commonly accepted expressions of disagreement, disapproval, or critique in an academic community and professional setting that respects free expression.
- Unwarranted physical contact or intimidating gestures directed at an individual or individuals. Examples include: [1] A physical, verbal, or written act toward another person, which causes them reasonably to fear for their safety or the safety of others; [2] Invading personal space after being asked to move or step away.

246. The Anti-Bullying Policy promises that Harvard will "respond promptly to reports of bullying and . . . take appropriate action to prevent and respond to behavior that violates the Policy." Therefore, when a formal complaint is made, Harvard normally will investigate, and those found to have violated the Anti-Bullying Policy will face sanctions and remedial measures, including suspension, mandatory coaching and training, or termination.

247. Harvard University's "Statement on Rights and Responsibilities"—adopted on an interim basis in 1970 and voted to remain in effect indefinitely in 1970—asserts that "[b]y accepting membership in the University, an individual joins a community ideally characterized by free expression, free inquiry, intellectual honesty,

respect for the dignity of others, and openness to constructive change."

248.    Moreover, the Statement on Rights and Responsibilities declares that "it is the responsibility of all members of the academic community to maintain an atmosphere in which violations of rights are unlikely to occur and to develop processes by which these rights are fully assured. In particular, it is the responsibility of officers of administration and instruction to . . . give full and fair hearing to reasoned expressions of grievances; and to respond promptly and in good faith to such expressions and to widely expressed needs for change."

249.    The Statement on Rights and Responsibilities also provides that intense personal harassment and the unauthorized occupation of buildings violate Harvard policy, stating that "[i]t is implicit in [its] language . . . that intense personal harassment of such a character as to amount to grave disrespect for the dignity of others be regarded as an unacceptable violation of the personal rights on which the University is based."

250.    On January 19, 2024, Harvard released additional guidance on the Statement on Rights and Responsibilities, including that "unless a particular School makes an explicit exception, demonstrations and protests are ordinarily not permitted in classrooms and other spaces of instruction; libraries or other spaces designated for study, quiet reflection, and small group discussion; dormitories, residence halls, or dining halls where students live and take their meals; offices where the work of the University is carried out; or other places in which demonstrations and protests would interfere with the normal activities of the University."  The guidance also makes clear that "blocking ingress or egress to campus buildings, classrooms, administrative offices, or other spaces is forbidden, as is blocking or otherwise interfering with the free flow of vehicular, bicycle, or pedestrian traffic," and "conduct such as assaulting, threatening,

or intimidating another person or damaging, defacing, or removing a properly posted sign is not permitted." And "community members may not protest a speech or event in a manner that interferes with the right of the speaker(s) to be heard or of the audience to hear them."

251.    Harvard University's "Statement of the President and Deans on University Rights and Responsibilities"—adopted in 2002 and appended to the University-Wide Statement on Rights and Responsibilities—affirms Harvard's "commitment to ensuring that all members of the University are able to carry out their normal duties and activities in support of the University's mission without interference or constraint by others." This statement "emphasize[s] the serious nature of building occupations that interfere with the ability of members of the University to carry out their normal duties and activities and the serious consequences that should follow from such interference," including being "subject to suspension" or an appropriate sanction.

252.    Moreover, this statement notes that Harvard "believe[s] it important, when a building occupation or similar acts involve participants from different Schools, that steps be taken toward coordination in the approach to discipline."

253.    Harvard's constituent schools also promulgate student handbooks, which set forth misconduct policies and procedures. For instance, the Harvard College and HDS handbooks provide that the schools retain broad rights to protect the Harvard community "as it deems necessary in extraordinary circumstances to protect the health and safety of the Harvard community," including "conditions posing broad threats to community health and safety or significantly disrupting campus life or learning."

254.    The handbooks also adopt versions of Harvard's Non-Discrimination Policy. For instance, HDS's handbook "prohibit[s]" and declares "unlawful and contrary

to Harvard University[] policy" acts that "discriminate on the basis of race, color, . . . religion, creed, . . . [or] national or ethnic origin." Meanwhile, the HBS handbook states unequivocally that HBS adheres to the University-wide Non-Discrimination Policy and Anti-Bullying Policy. The HLS handbook provides notice of the Harvard Non-Discrimination Policy and confirms that all "students, faculty, staff," and others at HLS are bound by it and that "[s]tudents [and] faculty . . . agree to respect the rights, dignity, and differences of others . . . and accept personal responsibility in these efforts."

255.    While these unambiguous statements purportedly signal Harvard's commitment to prohibiting discrimination and harassment across its various schools, the reality is that Harvard has treated Jews as unworthy of the respect and protection it affords other groups.

256.    Several constituent schools have adopted protest policies in addition to the Statement on Rights and Responsibilities, including the Faculty of Arts and Sciences Free Speech Guidelines, the Harvard Public Health Guidelines for Open Debate and Protest, the Harvard Law Protest and Dissent Guidelines, and the Harvard Divinity Statement of Community Values ("Protest Rules").

257.    The Faculty of Arts and Sciences Free Speech Guidelines, "intended to supplement and clarify" the Statement on Rights and Responsibilities and to "inform students of the acceptable limits of protest," define prohibited "disruption" of a campus event as "any repeated or continuous action which effectively prevents members of the audience from adequately hearing or seeing the event" and provide that "[i]n cases of obstruction [of others' 'freedom of movement']. . . the offenders should be punished."

258.    The Free Speech Guidelines provide, among other things, that "act[s] or threat[s] of physical violence" are "regarded as a complete lack of respect for the deepest

values that unite the [Harvard] community" and "[r]acial" and "intense personal harassment," as well as "[b]ehavior evidently intended to dishonor such characteristics as race [or] ethnic group," are "contrary to the pursuit of inquiry and education" and constitute "grave disrespect for the dignity of others" which will be "punished."

259.    Harvard's constituent schools have adopted similar policies. For instance, the HLS handbook warns, among other prohibitions, that students who "s[i]t in or obstruct[] access to administrative offices, faculty offices, and other school facilities as a form of protest"—conduct previously sanctioned by a "reprimand"—may now face "significant disciplinary sanction."

260.    The HLS handbook also incorporates the HLS Protest and Dissent Guidelines, which provide, among other things, that student "dissenter[s]" are warned that it is not "acceptable" to impede access to a speaking event, that "[u]sing or threatening force or violence, such as defacing a sign or assaulting a speaker or a member of the audience, is never permitted," and that "interference with freedom of movement or with freedom from personal force or violence is a serious violation of personal rights." These policies also provide that "any form of protest that disrupts the conduct of a[] class would violate the University-Wide Statement of Rights and Responsibilities' prohibition against interference with 'the performance of the normal duties and activities' of [Harvard]," that "[w]hen a meeting is closed, dissent by non-attendees is limited to activity outside the meeting that does not impede access to the meeting or substantially interfere with the communication inside," and "[c]hanting or making other sustained or repeated noise in a manner which substantially interferes with the speaker's communication is not permitted."

261.    The Public Health Guidelines for Open Debate and Protest provide, among

other things, that expression is not protected when it violates the Non-Discrimination Policy and that "[a]ny violation[]" by students, faculty, or other speakers constitutes "grounds for appropriate disciplinary action."

262.    The HDS Statement of Community Values provides, among other things, that HDS is committed to ensuring "that all may participate freely within a climate of openness, trust, and sensitivity" and that students are held accountable "for the impact of [their] actions on our community, our environment, and the world."

263.    Harvard also has policies regulating student organizations.

264.    These are codified in Harvard's Student Organization Resource Guide and Harvard's handbooks (collectively, the "Student Organization Policies"), which confirm the Non-Discrimination Policy applies to Harvard-recognized student organizations— those that have registered with and are supported by and receive benefits from Harvard in exchange for agreeing to follow Harvard's policies. These policies provide that "Harvard [] does not tolerate any behavior that constitutes harassment on the basis of . . . any [] characteristic protected under applicable federal or state law" and that student organizations "may not discriminate based on race, color, national or ethnic origin, [or] religion."

265.    The Student Organization Policies also provide that unrecognized student organizations are not permitted "to conduct any activity at Harvard even though their activities involve Harvard" students, except under "special circumstances," that Harvard will not provide "access, support, or benefits" to unrecognized student organizations, and that students may not use the "Harvard" name or marks in organizations' activities without permission from a dean or the provost.

266.    Harvard nevertheless regularly permits unrecognized student groups such

as Harvard Boycott, Divestment, Sanctions ("Harvard BDS") and Harvard Afro to conduct disruptive antisemitic protests inside Harvard buildings and on Harvard grounds, while using Harvard's name without consequence.

267.   These unrecognized groups have extensively engaged in discrimination against, and harassment of, Jewish and Israeli students in violation of numerous Harvard policies by holding unauthorized events in which they recruit hundreds of students to interrupt classes with calls for "globaliz[ing] the Intifada" and violence against Jews and Israelis, among other disruptive and harassing conduct. Harvard seemingly has not taken action to prevent these organizations from regularly harassing Jewish and Israeli students in violation of Harvard's policies.

### ii.    Harvard Applies Those Policies Vigorously to Protect Other Students, but Not Jews

268.   The policy assurances have proven false, but only for certain groups. Harvard refuses to apply these policies in a non-discriminatory manner to protect Jewish students and prevent antisemitism on campus. Instead, it selectively enforces its own rules, deeming Jewish victims unworthy of the protections it readily affords non-Jewish ones. This discriminatory double standard has created and exacerbated Harvard's hostile educational environment and the antisemitic abuse and harassment that Mr. Segev and other Jewish students have been forced to endure at Harvard.

269.   Rather than protect Jewish students, Harvard has required that they limit or conceal their activities.

270.   For example, as Harvard Chabad Rabbi Hirschy Zarchi revealed, Harvard required that he remove the Chabad Hanukkah menorah from the campus at night so that it would not be vandalized. Rather than ensuring the safety and success of the

Seasons of Light celebration and making it unequivocally clear that vandalizing the menorah was unacceptable and would be met with harsh punishment, Harvard addresses antisemitism by canceling events that include celebrations of Jewish culture and warning celebrants to hide Jewish symbols.

271.    At the same time Jewish students were being cautioned by Harvard to abandon or conceal their identity, students celebrating the October 7 massacre and advocating death to Israelis and Jews were free to do so on campus and social media, undeterred and unpunished by Harvard.

272.    Harvard's invocation of free expression principles to justify permitting antisemitic harassment is both hypocritical and false—especially since Harvard ranks last in free speech out of the 248 colleges evaluated by the Foundation for Individual Rights and Expression (FIRE). Harvard protects speech only when it advances positions that Harvard supports, while Harvard punishes speech with which it disagrees.

273.    As Professor Bernstein previously noted when summarizing FIRE's research, "[S]ince 2019 Harvard administrators, faculty, and students have attempted to silence twenty-two scholars' speech through petitions, investigations, and disciplinary actions.  Harvard has also sanctioned at least six students for their expression during a campus controversy."[38]

274.    Harvard previously asked students to remove a flag of Nicki Minaj in a bikini that had been hanging in a window because some in the community might find it "offensive."[39]

---

[38] David L. Berstein & David E. Bernstein, *Supporting Free Speech and Countering Antisemitism on American College Campuses*, HARVARD J. L. & PUB. POL'Y Per Curiam, No. 11, 22 (2025).

[39] *Harvard University: Students Requested to Remove Nicki Minaj Flag from Suite Window*, https://www.thefire.org/cases/harvard-university-students-requested-remove-nicki-minaj-flag-suite-

275.    In one extreme instance, Harvard fired Indian professor Subramanian Swamy for writing a pro-India and anti-Islamic terrorism piece for an Indian outlet, *The Indian Daily News & Analysis.*[40]

276.    Harvard's double standard is apparent when one compares Harvard's failure to discipline anti-Jewish harassment with its warning to freshmen—during the Title IX training—that "sizeism," "fatphobia," "cisheterosexism," "racism," "transphobia," "ageism," and "ableism" are prohibited because they "contribute to an environment that perpetrates violence." Indeed, Interim President Garber has acknowledged this double standard exists, describing the "social shunning" of Jewish students and their complaints "that in some classes, only certain points of view on controversial issues are presented and seen as welcome."

277.    Harvard also has no problem censoring controversial speakers or discussions—unless they espouse antisemitic views, in which case Harvard insists it is obligated to permit them on free expression grounds.

278.    In 2021, for example, Harvard School of Engineering and Applied Sciences canceled a course on a policing strategy involving military tactics after student organizations expressed concerns about the subject matter.

279.    In 2022, the Harvard English Department disinvited Dr. Devin Buckley from speaking on campus because she is on the board of an organization that opposes incarcerating biological males with biological females or permitting them to participate in women's sports. But, as alleged above, Harvard readily permitted El-Kurd and Hill to

---

window (last visited July 16, 2025).

[40]Adam Kissel, *Harvard Faculty Fires Economics Professor Over Political Article Published in India,* (Dec. 8, 2011) https://www.thefire.org/news/harvard-faculty-fires-economics-professor-over-political-article-published-india.

appear on campus spewing anti-Jewish rhetoric, Holocaust denial, and calls for Israel's extermination.

280.  Harvard also interferes with free expression without hesitation. In early March 2025, Harvard notified Mr. Segev and his co-plaintiff that it would collect and scrutinize the email accounts and personal communications of Mr. Segev and his co-plaintiff—even while simultaneously opposing their ability to join Mr. Kestenbaum's suit against Harvard.

281.  When bigotry impacts protected minority groups other than Jews, Harvard has issued forceful condemnations.

282.  For example, in 2016, HLS abandoned its longstanding shield because it displayed the family crest of Isaac Royall, Jr., a slaveholder. HLS leadership oversaw a public campaign to denounce the shield as a painful reminder of slavery, including forming a special committee, soliciting community involvement, providing regular updates, and seeking approval from Harvard's governing body to retire the shield.

283.  That same year, Harvard changed the title of "house masters" to "faculty deans" because, it said, the former evoked slavery. In 2022, Harvard released "Harvard & the Legacy of Slavery," a 132-page report on Harvard's racist history that provided recommendations for combating its institutional racism and committed $100 million towards amelioration efforts.

284.  Neither the recommendations in the "Harvard & the Legacy of Slavery" report, nor then-President Lawrence S. Bacow's announcement of a plan to "address the persistent corrosive effects of those historical practices" identified therein, mentions an exception for "freedom of expression." Yet Harvard now invokes free expression principles as a pretext to retroactively justify tolerating antisemitism and marginalizing

its Jewish community.

285.   For example, in Harvard's November 9 statement announcing the Antisemitism Advisory Group—as in many of its other statements concerning Hamas's October 7 terrorist attack and its aftermath— President Gay emphasized that Harvard is "at [its] strongest when [its members] commit to open inquiry and freedom of expression as foundational values of [Harvard's] academic community." Even though the Antisemitism Advisory Group was made to be powerless, over one hundred faculty members *still* signed a November 13 letter criticizing Harvard's decision to create it as an attack on "intellectual freedom." Harvard's faculty want to be free to disparage Jews, just not other minorities.

286.   Harvard has gone to great lengths to make its campus more "inclusive" over the last few years. Harvard's OEDIB, formed in 2021 as a "relaunch[]" of its 2018 precursor office, for example, purportedly strives "to guide Harvard's culture toward inclusive excellence." According to its website, "OEDIB views diversity, equity, inclusion, and belonging as the pathway to achieving inclusive excellence and fostering a campus culture where everyone can thrive." Jewish students, however, are excluded from those efforts.

287.   Harvard has selectively taken forceful stands on global conflict and social justice issues that it deems worthy. As a recent study by the AMCHA Initiative concluded, "there is a flagrant double standard in how the vast majority of school leaders treat Jewish students as compared to members of other student minority groups in the aftermath of group trauma."

288.   Harvard promotes that double standard through its conduct. For example, Harvard has regularly issued numerous strong statements and sponsored numerous

68

events condemning racist police killings and Russia's invasion of Ukraine.

289.    Harvard's response to Hamas's October 7 massacre was quite different. Rather than cancel its partnership with offending foreign institutions, as the Davis Center for Russian and Eurasian studies did at the start of Russia's invasion of Ukraine, Harvard's FXB Center maintains its partnership with Birzeit University, which is inextricably intertwined with Hamas, and has recently initiated a new partnership with another antisemitic Palestinian institution, Dar al-Kalima University.

290.    When asked during the House Antisemitism Hearing about her denial of a request to fly Israel's flag in Harvard Yard following October 7, despite then-President Bacow's earlier decision to fly Ukraine's flag, President Gay merely demurred that the Ukrainian flag decision was "made by [her] predecessor as an exception to a long-standing rule."

291.    Harvard's commitment to DIB and anti-racism initiatives does not include protecting or supporting Jewish students. Harvard's DIB efforts deem Jews to be "oppressors," rather than "oppressed," which explains why anti-Israel and anti-Jewish hate speech and harassment on campus is treated far differently than similar conduct against other groups.

292.    Indeed, the Presidential Task Force Report noted there is a "widespread sentiment" that Harvard treats anti-Israel and anti-Jewish discrimination differently than hostility towards other minority groups—namely, Harvard administrators do not consider either form of discrimination to be a "serious form of bias within their purview," despite both being recognized under Title VI of the 1964 Civil Rights Act.[41]

---

[41] Final Report at 122.

293.   As Harvard Chabad Rabbi Zarchi has noted, Harvard has a "beautiful culture" where community members "don't remain silent when we experience or witness the slightest form of discrimination," but it is a "double culture in which, when it comes to matters of the Jewish community, there's nothing being said."

294.   Harvard Medical School Professor Gabriel Kreiman recently echoed this sentiment when he told the *Washington Free Beacon* on March 19, 2024, that Harvard's "current version of DEI is full of double standards and is in many cases almost openly anti-Semitic." Professor Kreiman organized an Israel solidarity mission and expressed that many Harvard faculty members were hesitant to participate for concerns of "being harassed or attacked or losing [career] opportunities." Others only joined on the condition of anonymity because of similar fears.

295.   Harvard regularly disciplines faculty members who appear to support discrimination or harassment against groups, other than Jews. As noted above, in 2011, Harvard removed courses taught by Professor Subramanian Swamy after he wrote an op-ed advocating that to "negate the political goals of Islamic terrorism in India," India should "[e]nact a national law prohibiting conversion from Hinduism to any other religion," "[r]emove . . . 300 masjids [mosques]," and "declare India a Hindu Rashtra [nation] in which non-Hindus can vote only if they proudly acknowledge that their ancestors were Hindus."

296.   Professor Eck, who would later sign the November 13, 2023, faculty letter attacking President Gay's statement against antisemitism, called for Professor Swamy's discipline, arguing that his "op-ed clearly crosses the line by demonizing an entire religious community and calling for violence against their sacred places," and that "[t]here is a distinction between unpopular and unwelcome political views."

70

297.    In 2020, Professor David Kane invited Charles Murray, a libertarian political scientist and sociologist who currently serves as a Scholar at the American Enterprise Institute, to give an online lecture. Backed by student campaigns against Professor Kane, then-Dean Gay announced an investigation into Kane and temporarily removed him from his position before he was ultimately ousted from Harvard.

298.    Starting in March 2023, Harvard Public Health Professor Tyler VanderWeele faced extensive scrutiny after X users resurfaced his 2015 participation in an *amicus* brief urging the Supreme Court not to set forth a federal constitutional view on gay marriage. Harvard's response was swift and decisive. Following student complaints, Professor VanderWeele's department hosted "listening sessions," and the Dean of Education and Chief DIB Officer made him participate in a "restorative practices process" to explain his views to the community. Harvard Public Health's deans and administrators sent multiple emails to department chairs, Harvard's Council on Academic Freedom (a faculty organization devoted to promoting free inquiry, intellectual diversity, and civil discourse), and students, noting students' feelings of harm and betrayal and setting eight "listening sessions."

299.    Harvard Public Health administrators sent more emails to large lists of community members, referring to Professor VanderWeele's views as "reprehensible," having "cause[d] deep hurt, undermine[d] the culture of belonging, and ma[d]e other members of the community feel less free and less safe," and as being "in conflict with our . . . stated goals of advancing Equity, Diversity, Inclusion, and Belonging as well as our commitment to sound public health policy." The Harvard Public Health Dean defended his remedial approach as necessary to avoid upsetting the students.

300.    Similarly, on November 28, 2023, Dr. Joan Donovan, an expert on social

71

media disinformation, submitted a whistleblower declaration to Harvard, DOE, and the Massachusetts Attorney General's Office, accusing Harvard of terminating her position as an HKS research director because she sought to publish internal Facebook messages that purported to show Facebook's knowledge of the public harm it allegedly causes. Dr. Donovan alleged that when Harvard learned of her plan, it was processing its largest donation ever: $500 million from the founder of Facebook's philanthropic organization.

301.    Harvard thereafter began to systematically restrict Dr. Donovan and her work until ousting her in August 2023. Dr. Donovan accused Harvard of stifling her free speech and abusing its commitment to academic freedom in order to protect Facebook, as Dean Elmendorf told her: "I want you to know that you have no academic freedom. I want to remind you that you're staff here."

302.    But Harvard does nothing to protect Jews in response to complaints concerning its faculty, including Harvard Public Health professors' antisemitic coursework and tweets, or Professors Wispelwey's and Krieger's exclusion of Jewish students from the benefits of class.

303.    Professor Wispelwey went so far as to co-author an article, "As Genocide Rages, Doctors Must Choose: Care or Collaborationism," published on November 25, 2023, in which he argues that "we should refuse to nuance or debate preventable atrocity or to permit the fantasy of a middle ground for those who wish to abstain from 'taking a side.' The only ethical stance for physicians—or anyone else—is to demand a permanent ceasefire, an immediate end to ethnic cleansing in both Gaza and the West Bank, and the dismantling of the apartheid system that ensures an unending stream of both perpetual and punctuated violence."

304.    Even after receiving countless reports through Harvard's anonymous bias

reporting hotline, including one against Harvard FXB Center's Visiting Scholar Sawsan Abdulrahim—who tweeted a graphic glorifying a Hamas terrorist paraglider a day after Hamas's massacre and who continues to tweet messages glorifying the Intifada— Harvard continues to do nothing.

305.    Nor has Harvard acted to protect Jewish students from Professor Johnson, the former faculty advisor of PSC who, in addition to his active participation in many students' acts of discrimination and policy violations, was the first signatory of the November 13 faculty letter, signed a 2022 statement supporting BDS, and signed a 2014 letter urging speakers to avoid the University of Illinois which had rescinded an offer to a professor because of his antisemitic tweets.

306.    Harvard does not hesitate to discipline students who engage in discrimination or otherwise violate its policies when the targets are not Jews.

307.    For example, while Harvard ejected students who stormed University Hall during a 1969 building takeover in protest of the Vietnam War and arrested many of the participants, the students who took over University Hall in November 2023 have faced no true consequences; in fact, they were fed with burritos and candy.

308.    In 2016, Harvard canceled the remainder of one of its men's soccer team's seasons for producing sexist "scouting reports" rating female soccer recruits.

309.    In 2018, Harvard placed a Christian student group on administrative probation for asking a female student leader to resign after she started dating another woman.

310.    In 2019, Harvard rescinded the acceptance of a mass-shooting survivor because of his past use of racial slurs.

311.    In 2020, Harvard dismissed three freshmen for hosting a party in their

campus house in violation of COVID-19 social distancing rules.

312.    And in 2022, Harvard warned its freshmen class that "sizeism" and "fatphobia," among other harmful discriminatory behavior, perpetuate "violence" in violation of Harvard policy.

313.    On January 23, 2023, HLS Deans Ball and Monroe sent out an email to all HLS students informing them about a "security incident that occurred" on campus that day, where an "individual affiliated with [HLS] entered our campus and is reported to have punched a student while also uttering a homophobic slur." The deans demonstrated Harvard's ability to take swift action when they told all students that "[t]he individual is no longer at large and is barred from our campus," further noting that "[w]e condemn unconditionally all violence, hatred, and homophobia."

314.    On March 1, 2024, climate protesters disrupted a talk by Senator Joe Manchin at a Harvard Institute of Politics event. According to a Harvard spokesperson, "[a] Harvard University police officer ordered the protesters to leave the Kennedy School campus." Yet Harvard and HUPD have done virtually nothing to prevent antisemitic students and faculty from disrupting events and academic activities. For instance, on October 19, 2023, HUPD officers observed, but took no action against, protesters, including non-HUID cardholders, who bypassed card scanners and infiltrated a Harvard Law building to engage in an antisemitic takeover.

315.    Meanwhile, Harvard tolerates not just the incitement of violence against Jewish and Israeli students, but *actual violence*. Harvard has not taken any meaningful disciplinary action against any students for their repeated use of antisemitic tropes, participation in antisemitic harassment and intimidation, or general violence towards Jewish students.

316.    For example, though Harvard purportedly began to issue disciplinary notices to students involved in the Harvard Yard encampment, it soon capitulated, with the president announcing that constituent schools should begin reinstating demonstrators who had been placed on involuntary leave, that Harvard would expedite Administrative Board hearings in line with "precedents of leniency," and that HOOP would be offered meetings with Harvard's governing boards about divestment from Israel.

317.    The same formula has been applied when dealing with Mr. Segev's attackers. In fact, Harvard has *obstructed* local authorities from locating additional attackers and generally refused to cooperate with local officials.

**D.    Numerous Reports, Articles, Investigations, and This Court's Decision Find Harvard in Violation of Law for Antisemitic Discrimination**

318.    Harvard's antisemitic discrimination, indifference to Jewish students, and blatant double standards have been well-documented. Below are some of the most important examples:

**i.    Judge Stearns Holds That Harvard "Failed Its Jewish Students"**

319.    In January 2024, Shabbos Kestenbaum, a Jewish student at HDS, and the organization Students Against Antisemitism, Inc.—a group of five unnamed Jewish students—sued Harvard in the District Court of Massachusetts alleging both direct discrimination and a hostile educational environment in violation of Title VI, as well as a breach of contract claim and implied covenant of good faith and fair dealing.

320.    In August 2024, Judge Stearns denied the motion to dismiss the hostile environment claim, the breach of contract claim, and the implied covenant claim,

asserting that "the facts as pled show that Harvard failed its Jewish students."[42] He noted that "in many instances," Harvard simply did not address the "the eruption of antisemitism" on its campus.[43] "To conclude that the SAC has not plausibly alleged deliberate indifference would reward Harvard for virtuous public declarations that, for the most part, according to the allegations of the SAC, proved hollow when it came to taking disciplinary measures against offending students and faculty."[44]

321.    In May 2024, the Louis D. Brandeis Center for Human Rights Under Law, along with the plaintiff entity Jewish Americans for Fairness in Education, filed suit on behalf of four unnamed students, including Mr. Segev, alleging that Harvard had permitted Jewish and Israeli students to be subjected to unmitigated antisemitic bullying, harassment, and discrimination.

322.    There, too, this Court found that the allegations, as pleaded, indicated that Harvard had behaved with deliberate indifference towards reported antisemitic incidents. "To conclude that the mere act of launching an investigation without any further follow-through necessarily defeats a deliberate indifference claim, would be to prioritize form over function."[45]

323.    In both instances, the Court's determination was clear and unequivocal: plaintiffs sufficiently pleaded a hostile educational environment.

324.    The environment to which Mr. Segev was subjected is no different, and most certainly explains the gross mistreatment he received at the hands of Harvard

---

[42] *Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297, 310 (D. Mass. 2024).

[43] *Id.*

[44] *Id.*

[45] Memorandum and Order on Defendant's Motion to Dismiss at 15, *Louis D. Brandeis Ctr. For Hum. Rights Under L. v. President and Fellows of Harvard College* (D. Mass. Nov. 5, 2024), ECF No. 73.

administrators.

### ii. Harvard Investigation Finds that Professor Discriminated Against Jews, but Harvard Refuses to Discipline Him

325.   In March 2023, as confirmed by an independent investigation commissioned by Harvard, HKS Professor Marshall Ganz—who has long railed against what he calls the "Israeli regime," "Jewish supremacy in Israel," and Israeli "apartheid"—intentionally discriminated against three Jewish-Israeli students enrolled in his *Organizing: People, Power, Change* course, the stated goal of which was for "students [to] learn to work as leadership teams to reach out to constituents to design an organizing campaign."

326.   In response to a letter from the Brandeis Center asserting that Harvard had violated Title VI based on Professor Ganz's conduct, Harvard initiated an investigation led by the law firm Kurker Paget. Kurker Paget issued its findings in June 2023, concluding that Ganz violated Harvard's Statement on Rights and Responsibility and finding that: he subjected students to anti-Israel and antisemitic bias and discrimination on the basis of their identities as Jewish Israelis; silenced the students' speech; treated them differently and denigrated them on the basis of their Israeli national origin and Jewish ethnicity and ancestry; prioritized others' concerns over theirs; and interfered with their ability to participate in and benefit from an educational program.

327.   On June 15, 2023, HKS Dean Douglas W. Elmendorf accepted Kurker Paget's "findings of fact and conclusions regarding [Professor Ganz's] violations of School policies," and acknowledged that Harvard "need[s] to ensure that the School fulfills the[] commitments [in the Statement of Rights and Responsibilities] and that the violations of policies that occurred this spring are addressed fully and do not recur."

Dean Elmendorf stated that he was "convening a small group of faculty members at the School to advise" him, and he "expect[ed] that this process of consultation will take only a few weeks, and then I will decide how to proceed."

328.   But after more than four months of Harvard's silence and failure to discipline Ganz, the Brandeis Center sent another letter on October 30, 2023, to Diane Lopez, the Vice President General Counsel for Harvard University, demanding immediate action. The letter notified Ms. Lopez of Harvard's failure to take any remedial action with respect to HKS Members, despite the Investigative Report that had been issued four months earlier.

329.   Further, the letter highlighted the acute danger of failing to address the discrimination in the context of the antisemitism and anti-Israel discrimination that had just erupted on campus in Fall 2023. As the letter explained, Harvard's response to the Hamas terrorist attacks was woefully insufficient, and Harvard had made no real effort to protect Jewish students on campus or to condemn the antisemitic protests.

330.   Ms. Lopez responded a week later, in a letter dated November 7, 2023. In the letter, Ms. Lopez offered bland and cursory statements about Harvard's general "commitment" to a safe environment for "all students," and she provided a list of resources for students who have experienced discrimination.

331.   Ms. Lopez assured the three students that Harvard "has and continues to comply with all applicable laws and regulations"—despite the Investigative Report's finding to the contrary, and Harvard's subsequent failure to remedy the violations found in the Investigative Report. The letter also did not describe any specific remedial action that Harvard had taken or would undertake with respect to the three students or Professor Ganz—except to say that, in general, it "has undertaken a number of these

measures, as well as others that the School is not permitted to disclose under its personnel policies."

332.    Despite accepting the findings of the Kurker Paget investigation, Harvard has still taken no disciplinary action against Professor Ganz, who remains a lionized figure on campus.

### iii.    The House Education Committee Announces Investigation, Finds Antisemitism

333.    On December 5, 2023, President Gay, along with the presidents of Massachusetts Institute of Technology ("MIT") and University of Pennsylvania ("Penn"), testified at the House Antisemitism Hearing. President Gay did not consult the Antisemitism Advisory Group when preparing for her testimony.

334.    At the hearing, President Gay's repeated refusal to acknowledge that calling for the genocide of the Jewish people on campus is against Harvard policy shocked people across the nation. Representative Elise Stefanik asked President Gay: "[D]oes calling for the genocide of Jews violate Harvard's rules of bullying and harassment?" President Gay responded, "it depends on the context." Representative Stefanik asked several more times whether calling for genocide of the Jewish people violates Harvard's policies, yet each time President Gay refused to give a definitive answer, offering falsely that "antisemitic rhetoric, when it crosses into conduct that amounts to bullying, harassment, intimidation, that is actionable conduct, . . . we do take action."

335.    President Gay also testified that she understood the meaning of the phrases "globalize the Intifada" and "from the river to the sea," calling them "hateful speech [that is] personally abhorrent" to her, but not necessarily to Harvard.

336.    Representative Stefanik asked President Gay about multiple protests and rallies on Harvard's campus where students were permitted to engage in such chants as "there is only one solution, Intifada revolution" and "globalize the Intifada," without any repercussions. President Gay admitted to hearing "that thoughtless, reckless and hateful language on our campus," and admitted "it is at odds with the values of Harvard," but refused to say such "hateful" incitements to violence were contrary to Harvard's policies.

337.    Similarly, when asked if Harvard would want an "avowed Neo-Nazi" or someone who "has called for the elimination of the state of Israel" as part of the Harvard community, President Gay repeated that such a person is "not consistent with Harvard values" and admitted that such conduct is "antisemitism," but added, "we allow a wide berth for free expression." Yet, in practice, Harvard only allows a wide berth for antisemitism, but not other forms of hateful "expression."

338.    Representative James Comer asked President Gay about Harvard's acceptance of funding from "sources that support Hamas or have links to terrorist organizations, like Qatar, Lebanon, and the Palestinian Authority." President Gay testified that "Harvard has policies that govern the acceptance of gifts and contracts beginning with respecting federal law . . . then we go further and only accept gifts that align with our mission."

339.    Apparently, it is consistent with Harvard's mission to accept gifts from Qatar, where same-sex activity is criminalized and the government permits and utilizes indentured servants and exploits migrant workers—thousands of whom died building the infrastructure for the 2022 FIFA World Cup.[46]

---

[46] Juliana Kim, *FIFA Should Pay Workers Harmed in Building World Cup Venues, Its Committee Report Says*, NPR (Nov. 30, 2024), https://www.npr.org/2024/11/30/nx-s1-5211297/soccer-qatar-world-cup-saudi-arabia-human-

340.    President Gay's December 5 testimony at the House Antisemitism Hearing caused enormous public backlash. That night, Harvard Hillel President Jacob M. Miller and Campus Rabbi Getzel Davis wrote that "President Gay's failure to properly condemn this speech calls into question her ability to protect Jewish students on Harvard's campus," and that she "fail[ed] to reassure us that the University is seriously concerned about the antisemitic rhetoric pervasive on campus."

341.    On December 8, 2023, seventy-four members of Congress wrote to the boards of Harvard, MIT, and Penn, demanding that they remove their presidents from office over their failures to act against antisemitism. The Harvard letter noted that "[a]ntisemitism has been allowed to fester on campuses for years, and in the wake of the October 7th attack, the world is witnessing the consequences." It also cited President Gay's testimony as "show[ing] a complete absence of moral clarity and illuminat[ing] the problematic double standards and dehumanization of the Jewish communit[y] that [President Gay] enabled." The letter also recognized that Jewish and Israeli students do not feel safe at Harvard: "It is hard to imagine any Jewish or Israeli student, faculty, or staff feeling safe when [President Gay] could not say that calls for the genocide of Jews would have clear consequences on [Harvard's] campus."

342.    On December 12, 2023, Harvard's governing body issued a "unanimous" statement "reaffirm[ing] [its] support for President Gay's continued leadership of Harvard University" because of its "confidence that President Gay is the right leader to help our community heal and to address the very serious societal issues we are facing."

343.    Despite its unwavering confidence in President Gay, Harvard's governing

rights#:~:text=A%202021%20investigation%20by%20The,and%20others%20were%20ruled%20suicides.

81

body admitted that her "initial statement should have been an immediate, direct, and unequivocal condemnation" of Hamas. And it promised that it is "united in [its] strong belief that calls for violence against our students and disruptions of the classroom experience will not be tolerated." Yet calls for violence against Harvard's Jewish and Israeli students are amplified across campus regularly, and those responsible often disrupt classes and other educational programming without repercussion.

344.    President Gay ultimately resigned on January 2, 2024, once allegations that she plagiarized academic papers surfaced.

345.    Interestingly, Harvard's email announcing President Gay's resignation condemned attacks against President Gay "in the strongest possible terms," even though it has not used similar language to condemn the antisemitism plaguing campus. Provost Garber succeeded Gay as Interim President, and is now President.

346.    On January 9, 2024, the House Committee sent a letter to Harvard that required Harvard to produce materials relating to antisemitism in its community.  In issuing its demand letter, the House Committee cited its "grave concerns regarding the inadequacy of Harvard's response to the antisemitism on its campus," something that "has been pervasive at Harvard since well before the October 7, 2023 terrorist attack." The House Committee flagged two of the "numerous statements that further called into question the university's willingness to seriously address antisemitism":

> When asked whether calling for the genocide of Jews would violate Harvard's code of conduct, Dr. Gay replied that "it depends on the context." When questioned if she could look a Jewish student's family in the eyes and "tell them their son or daughter would be safe and feel safe and welcome on your campus," Dr. Gay repeatedly refused to answer the question directly.

347.    Yet Harvard failed to produce any substantive documents, instead

providing several redacted documents the House Committee described as "useless," and thousands of pages of publicly available documents. After Harvard did not meet the first deadline, on February 7, 2024, the House Committee sent a second letter to Harvard, giving Harvard until February 14, 2024, to produce the requested documents or face a subpoena.

348.    On January 10, 2024, the House Committee on Ways and Means ("Ways and Means Committee") also sent Harvard a letter explaining that Harvard's "actions, inconsistencies, and lack of a substantive response raise several questions, including whether [it is] fulfilling [its] educational purposes as required to receive 501(c)(3) tax-exempt status, and whether [it is] adequately protecting Jewish students from harassment and acts of violence in compliance with antidiscrimination laws." It pointed not only to former President Gay's testimony at the House Antisemitism Hearing, but to the many signs of Harvard's antisemitic environment. For example, it discussed Harvard's double standard:

> It is also perplexing given how your institutions have had no problem condemning other behavior in the past. For example, the University of Pennsylvania had no problem issuing a warning threatening action against students for violating its antidiscrimination policy by failing to use their classmates' preferred pronouns. Students at Harvard University were told that similar conduct could violate its harassment policies as well. In addition, Harvard disinvited a feminist philosopher last year for comments critical of transgender ideology, and former President Gay's institution fired a political science instructor for inviting renowned social scientist Charles Murray to speak at their class. . . .

The Ways and Means Committee continued:

> You have found your voices before on numerous other topics, but not on this one. If antisemitic speech crosses the line into unprotected conduct, it must be punished severely. If disgusting antisemitic speech remains in the protected category, it should be condemned, not coddled. Your words and actions matter. Condemning barbaric

terrorism against Israel and disgusting antisemitism should not be difficult. Protecting Jewish students on campus as you protect other students, should not be a challenge. This is not that hard.

349.    The Ways and Means Committee requested certain information including, but not limited to, how Harvard "evaluates the difference between free speech and harassment, threats, and incitement," whether Harvard's "diversity, equity, and inclusion departments serve Jewish students on campus," and what, if anything, Harvard is doing "to address the poor ratings [it has] received from [the Foundation for Individual Rights and Expression] on protecting free speech on campus."

350.    On February 16, 2024, the House Committee Chairwoman Virginia Foxx issued a statement announcing that Harvard's failure to comply with the committee's document requests forced the House Committee to subpoena Interim President Garber, the Senior Fellow of Harvard's governing body, and the chief executive officer of Harvard's endowment. This marks the first time the House Committee has ever subpoenaed a university. Chairwoman Foxx noted that while Harvard was stonewalling Congress, its "Jewish students continue[d] to endure the firestorm of antisemitism that has engulfed its campus" and reminded Harvard that if it "is truly committed to combating antisemitism, it has had every opportunity to demonstrate its commitment with actions, not words"—a fact Mr. Segev has spent months trying to impress upon Harvard, to no avail.

351.    On March 21, 2024, the Ways and Means Committee sent another letter to Harvard concerning its failure to protect Jewish students and the "hostile environment for Jews on Harvard's campus stemming from antisemitic rhetoric and discrimination" that "has gone unaddressed for years." It noted that, as many Americans knew, especially Jewish Americans, "these eruptions [] reveal[ed] a culture of antisemitism

that developed and grew beneath the surface for decades." Among other requests, it asked Harvard to "explain the choice, including key stakeholders who were consulted and the decision-making process, to appoint Derek J. Penslar as co-chair of Harvard's antisemitism task force."

352.    On May 16, 2024, the House Committee on Education in the Workforce released an "Investigative Update" detailing "major flaws" in Harvard's response to antisemitism, including that Harvard received, but did not act on, its Antisemitism Advisory Group's December 2023 recommendations and findings, which identified areas of serious concerns about Harvard's antisemitism problem.

### iv.    Harvard Creates Powerless Antisemitism Advisory Group, With Many Members Resigning in Protest

353.    President Gay's congressional testimony also revealed that Harvard intentionally made the Antisemitism Advisory Group powerless, which was also later revealed through contemporaneous meeting notes and the House Committee's investigative report released in May 2024 based on Harvard's internal documents and an interview with member Dara Horn—materials Harvard had not made public. Ex. B. By the time of Gay's testimony, the Antisemitism Advisory Group and Harvard leadership fully understood the scope of the antisemitism at Harvard. For example, at its first meeting on October 23, 2023, then-Provost Garber noted that the "shunning of Israeli students" was a "pervasive problem" at Harvard and possibly other schools even before October 7. In November 2023, the Antisemitism Advisory Group met and discussed antisemitic incidents, including that a student wearing a yarmulke was "spat upon," but "had not received answers from Harvard reporting channels or from" HUPD; that a professor told an Israeli student she was making people "uncomfortable" because

she was from Israel (the student filed two complaints with Harvard); and that a Jewish student was "chased" and "screamed at by a Resident Tutor."

354.   The Antisemitism Advisory Group found that for each incident, Harvard had taken no action.  The group was also included on many emails reporting antisemitic discrimination and harassment.  But members of the Antisemitism Advisory Group were not empowered to do anything about it.  Over the course of its short tenure, the group identified numerous concerns, including the "dramatic decline in Jewish enrollment" at Harvard, Harvard's failure to share "information on disciplinary outcomes publicly," the "importance of condemning antisemitic rhetoric," the need to investigate the potential influence of funders of terrorism on Harvard, the "need to address masked protest," and more generally, Harvard's inadequate response to antisemitic incidents.  Harvard refused the group's request to share information publicly on disciplinary actions taken in response to antisemitic incidents, citing privacy concerns, despite the group explaining to the president and provost that there were ways—such as those Harvard uses to report Title IX violation—to offset privacy concerns while still informing the community that serious action was being taken.

355.   On November 5, 2023, more than half of the Antisemitism Advisory Group's members wrote to then-President Gay and then-Provost Garber, calling out Harvard's "deeply unsatisfactory" response to "widespread harassment of our Jewish students across schools," requesting immediate and longer-term remedial measures, and warning that if action was not taken, the members would resign from the group. A day later, President Gay joined the group's meeting with Harvard Corporation Senior Fellow Penny Pritzker and Provost Garber, pleading with the members to refrain from "resigning en masse."  The next day, she released a statement on antisemitism to stave

off mass resignations and embarrassment.

356.    On November 13, 2023, over 120 Harvard professors posted a public letter to President Gay, titled "Harvard Faculty Response to 'Combating Antisemitism'" framing Harvard's Antisemitism Advisory Group appointed by President Gay as an assault on academic freedom. The signatories include Professor Diana L. Eck, who previously demanded an Indian professor's courses be canceled because of his "call[] for violence against" mosques; Professor Walter Johnson, the most recent faculty advisor for Harvard PSC, who regularly participates in disruptive student groups' activities; and HDS Professors Rantisi and Omer, who had previously signed the October 11 RPL statement defending Hamas's terrorist attack. Reflecting Harvard's antisemitic environment, the faculty letter:

- Stated the professors were "profoundly dismayed" by President Gay's November 9 "Combating Antisemitism" message;

- Demanded Harvard resist calls to suspend and/or decertify Harvard PSC, even though it has regularly engaged in activities that violate numerous Harvard policies and is a key instigator of campus antisemitism;

- Defended students' use of the antisemitic "from the river to the sea," as "complicated" and worthy of protection; and

- Omitted any mention of the deliberate targeting of Jewish civilians for murder, rape, torture, and kidnapping or the intense discrimination, harassment, and violence Jewish students face on campus.

357.    One of President Gay's promises in her November 9 statement—that the Antisemitism Advisory Group would work with Harvard's constituent school deans—was never fulfilled. In fact, at the one meeting that took place with school deans, at which the deans outlined their schools' approaches to antisemitic incidents, Horn found "extremely disturbing" that several of the deans "didn't really seem disturbed" by the

antisemitic events they described. Members of the group were not given any opportunity at this meeting to respond substantively to the deans' presentations, and a promised second meeting with the deans was never scheduled.

358. President Gay's testimony at the House Antisemitism Hearing made clear to members of the Antisemitism Advisory Group that they would never be taken seriously by Harvard's leadership. On December 7, 2023, two days after the hearing, the group met, noting how "troubl[ing]" it was that President Gay had not asked them for advice before her testimony. They also found the testimony itself to be "extremely disappoint[ing]," as Horn put it, because President Gay did not acknowledge the "pervasive" and "systemic" scope of antisemitism and merely presented it "as though this were about . . . this difficult line with rallies and free speech, and that sort of there were maybe some individual incidents where things had crossed a line." That day, Rabbi David Wolpe, rabbinic fellow for the Anti-Defamation League and visiting scholar at HDS, resigned from Harvard's Antisemitism Advisory Group, stating:

> Without rehashing all of the obvious reasons that have been endlessly adumbrated online, and with great respect for the members of the committee, the short explanation is that both events on campus and the painfully inadequate testimony reinforced the idea that I cannot make the sort of difference I had hoped.

> However, the system at Harvard along with the ideology that grips far too many of the students and faculty, the ideology that works only along axes of oppression and places Jews as oppressors and therefore intrinsically evil, is itself evil. Ignoring Jewish suffering is evil. Belittling or denying the Jewish experience, including unspeakable atrocities, is a vast and continuing catastrophe. Denying Israel [] self-determination as a Jewish nation accorded unthinkingly to others is endemic, and evil.

359. Rabbi Wolpe elaborated on CNN: "I resigned because I came to the conclusion that I was not going to be able to make the kind of changes that I thought

Harvard needed" through the Antisemitism Advisory Group, which he described as having "accountability without authority."

360.    On December 20, Rabbi Wolpe stated that Jewish students are the target of a "deliberate attempt" at intimidation, and that Harvard has "no sense of urgency, no sense of anger, no sense of disgust" regarding the "crisis" of "so many incidents of antisemitism" on campus. During a December 22 podcast, he stated that he could not keep giving "legitimacy to an enterprise" that was "fruitless," as the committee was not going to "make a change" while Harvard's antisemitism "crisis" was "getting worse, not better."

361.    As would be revealed in the House Committee's May 2024 report, on December 18, 2023, Horn and the other remaining members of the group presented Harvard's president and provost with detailed findings and recommendations that Harvard did not make public.  Its recommendations included renewed commitments towards holding student groups accountable for violating university rules and protecting shared learning environments; rectification of "selective or unequal" enforcement of university policy; a "zero tolerance" policy for disruptions of learning environments; a review of Harvard's Office for Equity, Diversity, Inclusion, and Belonging ("OEDIB")'s inadequacy in addressing antisemitism; a review of the "academic rigor" of programs with antisemitic content; and otherwise countering antisemitic rhetoric on campus. Harvard failed to act on these recommendations.  Also included was a recommendation to "[i]nvestigate the flow and impact of external 'dark money' (from  Iran, Qatar, or individuals, or entities associated with terrorist groups as identified by the State Department) to Harvard" thus "ensur[ing] free and rigorous inquiry and independence of the university from outside control by donors, regardless of their identities, or

disruption of activities and mission of the university by outside actors." Provost Garber told the group that he would have Harvard's Office of General Counsel investigate this particular issue, but the results of any such investigation, if any occurred, were not communicated to the group.  Only in response to the House Committee's questioning regarding Harvard's foreign funding did Harvard's counsel answer generically that "no issues were identified."

362.    In a February 15, 2024, piece in *The Atlantic*, Horn publicly clarified what changes Harvard needs to make to address antisemitism, which tracked what the Antisemitism Advisory Group had told Harvard privately months before, including:

> [E]nforcing existing codes of conduct regarding harassment; protecting classroom buildings, libraries, and dining halls as zones free from advocacy campaigns (similar to rules for polling places); tracking and rejecting funding from entities supporting federal designated terror groups (a topic raised in recent congressional testimony regarding numerous American universities); gut-renovating diversity bureaucracies to address their obvious failure to tackle anti-Semitism; investigating and exposing the academic limitations of courses and programs premised on anti-Semitic lies and expanding opportunities for students to understand Israeli and Jewish history and to engage with ideas and with one another.

### v.    President Garber and Presidential Task Force Find Shocking Antisemitism

363.    On January 19, 2024, Interim President Garber announced the creation of the Presidential Task Force on Combating Antisemitism ("Antisemitism Task Force") and the Presidential Task Force on Combating Islamophobia and Anti-Arab Bias. President Garber cited a "need to understand why and how" the "[i]ncidents of bias and hate against Jews and against Muslims, Palestinians, and other people of Arab descent have risen across the country."  He assigned two co-chairs to lead each task force: Professors Derek J. Penslar and Raffaella Sadun for the Antisemitism Task Force, and

Professors Wafaie W. Fawzi and Asim Ijaz Khwaja for the Islamophobia task force. Garber decommissioned President Gay's Antisemitism Advisory Group, which was shuttered without making any public recommendations for addressing Harvard's antisemitism epidemic.

364.    Much like its predecessor, the new Antisemitism Task Force's mandate did not include implementing any measures to combat antisemitism.  The newest iteration featured as one of its leaders Professor Penslar, whose appointment triggered an immediate public outcry, as he had publicly minimized antisemitism at Harvard and engaged in antisemitic canards regarding Israel.  In 2022, well before October 7 and Penslar's appointment as co-chair, Penslar's teachings were analyzed in determining what Harvard teaches its students to "excuse mainstream Palestinian Arab terrorism"— including referring to Hamas attacks as Palestinian "resistance" efforts instead of acts of terror.  In his 2023 book, *Zionism: An Emotional State*, Penslar stated that "veins of hatred run through Jewish civilization."  In August 2023, Penslar signed a letter claiming that "Jewish supremacism has been growing for years" in Israel and that Israel's "long standing occupation . . . has yielded a regime of apartheid."  Penslar also led the December 2023 faculty letter in support of then-President Gay after her congressional testimony.  At a December 4, 2023, event at Harvard, Penslar advocated for using the term "settler colonialism" to define Zionism.

365.    On January 30, 2024, former Harvard President Summers published a statement on X outlining the reasons Penslar was unfit to lead the Antisemitism Task Force.  Summers explained how he had "lost confidence in the determination and ability of the Harvard Corporation and Harvard leadership to maintain Harvard as a place where Jews and Israelis can flourish."  And in its March 21 letter, the Ways and Means

Committee requested information concerning how Harvard selected Penslar, citing how this appointment "only increased[] concerns" about Harvard's approach to protecting Jewish students: "Appointing someone who has previously called Israel a 'regime of apartheid' and called on Congress to restrict aid to Israel is an odd way to combat antisemitism on campus." Despite clear evidence that Penslar is unsuitable to lead the Antisemitism Task Force, Penslar remains co-chair.

366.    On February 1, 2024, Harvard Interim President Garber admitted that Harvard has "a very serious [antisemitism] problem." Former Antisemitism Advisory Group member Ms. Horn admitted the same, claiming that the problem is "clear from the avalanche of documentation deposited at [her] feet."

### vi.    The Federal Government Finds Harvard in Violation of Title VI Based on an "Institutional-Level Acceptance of Antisemitism"

367.    On March 10, 2025, the U.S. Department of Education's Office for Civil Rights (OCR) sent letters to 60 colleges and universities announcing Title VI investigations, "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus."[47] According to the Secretary of Education, "Jewish students studying on elite U.S. campuses continue to fear for their safety amid the relentless antisemitic eruptions that have severely disrupted campus life."[48] Harvard was one of the schools under investigation.

368.    In April 2025, the Acting General Counsels for HHS and the U.S.

---

[47] *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, U.S. DEP'T OF EDUC. (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment.

[48] *Id.*

Department of Education, respectively, as well as the Commissioner of the Federal

Acquisition Service, presented Harvard with a series of provisions to assist the

University in meeting its obligations under Title VI. One of those provisions included

expelling the students who attacked Mr. Segev:

> Harvard must investigate and carry out meaningful discipline
> for all violations that occurred during the 2023-2024 and
> 2024-2025 academic years, including the Harvard Business
> School protest of October 2023, the University Hall sit-in of
> November 2023, and the spring encampment of 2024. This
> must include permanently expelling the students involved in
> the October 18 assault of an Israeli Harvard Business School
> student, and suspending students involved in occupying
> university buildings, as warranted by the facts of individual
> cases.[49]

369.    Harvard did not agree to the proposed provisions.

370.    In June 2025, following an investigation, HHS notified Harvard that it was

in violation of federal civil rights law on the basis of its treatment of Jewish and Israeli

students. Specifically, as HHS's letter explained, Harvard had engaged in deliberate

indifference by ignoring the treatment that its Jewish and Israeli students faced.[50]

371.    HHS confirmed it uncovered a "pattern of . . . direct student-on-student

harassment; targeted harassment by student groups; exclusion from campus spaces; and

institutional-level acceptance of antisemitism."[51] Mr. Segev's assault was referenced as

one incident indicative of the "hostile environment created for Jewish and Israeli

---

[49] Letter from Gen. Serv's Admin., Dep't of Health and Hum. Serv's, and U.S. Dep't of Edu. To Pres. Alan Garber (April 11, 2025), https://www.harvard.edu/research-funding/wp-content/uploads/sites/16/2025/04/Letter-Sent-to-Harvard-2025-04-11.pdf.

[50] Natalie Andrews and Douglas Belkin, *Harvard Violated Students' Civil Rights, Trump Administration Finds*, THE WALL STREET JOURNAL, (June 30, 2025), https://www.wsj.com/us-news/education/harvard-violated-students-civil-rights-trump-administration-finds-4a0ed7aa.

[51] Dep't of Health and Hum. Serv's, Office for Civ. Rts., *Notice of Violation*, (June 30, 2025), 1, 4, https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-violation.pdf.

students at Harvard."

> On October 18, 2023, hundreds of Harvard students and affiliates staged a "die-in" at Harvard Business School, in violation of university rules, to demand an end to violence in Gaza. When an Israeli Jewish student attempted to film the attendees, protestors tried to remove him and yelled "shame" as he left. Videos of the incident appear to show the student being pushed, resulting in two Harvard students being charged with assault and battery and one of them being relieved of his proctorial duties at Harvard College.[52]

372.    HHS recognized that this environment had deprived Jewish and Israeli students of the educational benefits and opportunities they were supposed to be afforded.

> Jewish and Israeli students were denied educational opportunities and benefits by protestors' severe, persistent, and objectively offensive harassment. Indeed, Harvard's 2025 Task Force Report collected numerous student accounts describing how Jewish and Israeli students were barred from accessing certain University resources, developed anxiety, and experienced physical assault on campus.[53]

373.    HHS also identified Harvard as possessing actual knowledge of the hostile environment, insofar as the Administration formed an Anti-Semitism Advisory Group, sought added security around its buildings, faced multiple lawsuits from Jewish and Israeli students, and was subjected to congressional investigation.

374.    Furthermore, HHS found that Harvard exercised the requisite level of control to be held responsible for the hostile environment, for Harvard "exercised substantial control over both the students who committed harassment and the context in which the harassment occurred because the harassment at issue in this finding occurred on school property and was committed by Harvard students."

---

[52] *Id.* at 13

[53] *Id.* at 18.

375.   Lastly, HHS determined that Harvard was deliberately indifferent to the suffering of its Jewish and Israeli students.

376.   This deliberate indifference manifested in a variety of ways, including via a failure to establish effective reporting and remediation.

> To effectively remediate discrimination on campus, a school must have a recognized, clear, and transparent process for students to report discrimination and for the university to effectively address it. Yet, the Task Force listening sessions revealed Harvard's complaint process to be the opposite: "At present students suffer from a lack of transparency, clarity, and clear process for the submission of complaints of antisemitic or otherwise hostile behavior." In fact, "[c]oncerns about opaque processes for reporting complaints and seemingly inconsistent disciplinary responses were among the most common issues raised during the [Task Force] listening sessions."

377.   In addition to its lack of an effective mechanism for addressing and resolving complaints of antisemitism, Harvard also simply failed to punish those who engaged in discrimination and/or harassment.

> Harvard failed to take reasonable measures to address antisemitism through its uneven, and at times contradictory, implementation of discipline when students and faculty violated university policy. OCR's investigation finds Harvard's inconsistent discipline to meet the First Circuit's description of actions "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Fitzgerald [v. Barnstable]*, 504 F.3d [165], 175 [(1st Cir. 2007)].

378.   Adding to Harvard's general dysfunction, HHS cited at least *five* different instances in which Harvard actually reversed its punishment of bad actors, most notably encampment protesters.

379.   Lastly, HHS pointed to Harvard's failure to control its protests as further evidence of Harvard's deliberate indifference towards the plight of its Jewish and Israeli students.

> Harvard University failed to enforce its own restrictions on student

95

protest activity—particularly those governing the time, place, and manner of demonstrations. As early as January 2024, Harvard University began updating its event policies to reflect an awareness of the need for greater control over campus demonstrations. ...

Despite these claimed reforms, Harvard University failed to consistently or meaningfully enforce the time, place, and manner restrictions throughout the 2023–2025 academic years. Unauthorized protests—including those held inside academic buildings, residence halls, libraries, and during official university events—repeatedly disrupted classes, forced building evacuations, and created what many Jewish students described as an environment of fear and exclusion. Protestors set up encampments, staged walkouts, blocked access to buildings, vandalized property, and engaged in speech that glorified violence against Jews. For example, after the January 2024 clarification of policies, there continued to be posting of antisemitic signs and posters, die-ins, and an encampment which some reported as engaging in disruptive behaviors, including chanting slogans and loud music that disrupted students studying for final exams. Most disturbingly during the encampment, Jewish students noted being confronted, followed, surveilled, and verbally harassed.

380.    Each of those failures outlined by HHS that comprised Harvard's deliberate indifference—failure to appropriately address complaints of discrimination, failure to properly punish bad actors, and failure to control its protests—were evident in Mr. Segev's case, as described below.

### vii.    HJAA Disturbing Report Shows Jewish Students Fear for Safety and Well-Being at Harvard

381.    In May 2024, HJAA researched and authored its own report on the explosion of antisemitism at Harvard. The report, "The Soil Beneath the Encampments: How Israel and Jews Became the Focus of Hate at Harvard," was based on interviews with fifty Jewish Harvard community members. As set forth in the report, students described having been: kicked out of class for being Israeli; turned away from campus events for being recognized as a Jew; targeted by a teaching fellow saying Jews are contributing to the current "Holocaust"; compelled to hide their true beliefs in class for

fear of retaliation by peers or professors grading them; subjected to having their mezuzahs torn down from their dormitory doors; attacked for wearing religious items or compelled to stop wearing them; and subjected to such calls as "Zionists should be slain. Many stated that they were "scared to be a Jew here right now."[54]

382.    HJAA reported[55] that the protesters are "repeating what they are taught in classrooms and at department-sponsored events," where Israel is described as "the last remaining colonial settler power embodying the world's worst evils: racism, apartheid, and genocide." HJAA described the "unchecked antisemitism" on Harvard's Sidechat social media platform, such as "Gas the Jews," and reported that Harvard "has repeatedly ignored Jewish students' complaints despite clear violations of Harvard's non-discrimination and anti-bullying policies." Forty-one of the forty-two students HJAA interviewed "discussed feeling alienated and excluded, if not outright harassed," and the few faculty members willing to be interviewed by HJAA reported that they were, as HJAA described it, "even more afraid of speaking with us on the record; they said it could get them fired or undermine a promotion."[56]

383.    The report[57] described Harvard "repeatedly ignor[ing] Jewish students' complaints despite clear violations of" policy, so that there were "few to no consequences for the perpetrators of [antisemitic] hate speech and bullying," and an example of Harvard's double standard, when HLS sent an email the same day a "gay law school

---

[54] Harvard Jewish Alumni Alliance, *The Soil Beneath the Encampments: How Israel and Jews Became the Focus of Hate at Harvard* (May 2024), 1, 5, https://harvardjewishalumni.org/wp-content/uploads/2024/08/Final-HJAA-Report.The_Soil_Beneath_the_Encampments.pdf.

[55] *Id.*

[56] *Id.*

[57] *Id.*

student was assaulted by another law school student" announcing that the attacker had been suspended, but Harvard failed to do the same thing when a Jewish student was assaulted by another student. The report quoted students on the "psychological effects" of the antisemitic rallies at Harvard, where repeated shouts of "Globalize the Intifada," and "there is only one solution, Intifada revolution," led them to feel that other students "want dead Jews," and that they could not go into Harvard Yard or to Widener library because of a "stampede of people" shouting for death to Jews. Students recounted having to "be in class with someone who posted the day before that they are supportive of the murder and rape of my people." Students talked about their intense fear at Harvard: "I am scared to be a Jew here right now"; "I feel more safe in Israel than here"; "It's pretty scary to walk around campus knowing someone who is comfortable physically assaulting a religious Jew is potentially still on campus"; "I was afraid to leave my [Harvard Yard dormitory] because there were people outside chanting [] 'Globalize the Intifada.'"

### viii.   Many   Other   Outside   Observers   Recognize   Harvard's Antisemitism

384.    As Professor Summers stated in a November 15, 2023 *Washington Post* op-ed titled "The Cancer of Antisemitism is Spreading. Colleges Must Take the Right Stand," Harvard was in "a moment of moral and mortal peril"; "Harvard . . . h[as] not been swift" in its response to antisemitism, a "cancer—a lethal adversary best addressed as rapidly, thoughtfully and aggressively as possible"; Harvard's "[d]ouble standards" are "unacceptable," and no honest observer could say that its "responses to antisemitism have paralleled in vigor or volume the responses to racism or other forms of prejudice"; and "singling out Israel with calls for its annihilation is Jew hatred."

385.    "The vitriol coming out of America's most famous university is

intolerable," freshman Charlie Covit, who is Jewish, told *Jewish News Syndicate* about the February 12 protest. "On the same day that Harvard hosted Francesca Albanese, a U.N. special rapporteur banned from Israel for her justification of Hamas's attack on Oct. 7, hundreds of students, mostly masked, gathered on the iconic Widener Library steps to chant in Arabic, 'from water to water, Palestine will be Arab.'"

386.    Notably, HKS had hosted the UN's special rapporteur on the occupied Palestinian territories Francesca Albanese in February 2024 to discuss the situation in Gaza. She has since been sanctioned by the U.S. Government for her long history of "virulent antisemitism and support for terrorism," as well as for her misrepresentation of her legal qualifications. She had previously blamed Israel for Hamas's terror attack on October 7, 2023, and compared Israeli Prime Minister Benjamin Netanyahu to Adolph Hitler.

387.    As Johanna Berkman of *The Free Press* wrote in May of 2025 in her article titled, "Attacking Jews at Harvard Doesn't Just Go Unpunished. It Gets Rewarded," "Instead of discipline, the students behind an attack that went viral got a fellowship, accolades—and a commencement spotlight."[58]

388.    Investor and Harvard alum Bill Ackman has opined that, following the October 7 terror attacks, "[A]ntisemitism exploded [at Harvard] as protesters who violated Harvard's own codes of conduct were emboldened by the lack of enforcement of Harvard's rules, and kept testing the limits on how aggressive, intimidating, and disruptive they could be to Jewish and Israeli students, and the student body at large. Sadly, antisemitism remains a simmering source of hate even at our best universities

---

[58] Johanna Berkman, *Attacking Jews at Harvard Doesn't Just Go Unpunished. It Gets Rewarded*, THE FREE PRESS, (May 21, 2025), https://www.thefp.com/p/attacking-jews-at-harvard-doesnt

among a subset of students."[59]

## E. Despite "Virtuous Statements," Harvard Has Continued to Permit Virulent Antisemitism

389.    As Judge Stearns noted in his August 2024 order denying in part Harvard's motion to dismiss, Harvard's "virtuous public declarations . . . proved hollow when it came to taking disciplinary measures against offending students and faculty."[60] This observation remained true throughout the spring semester, as antisemitism at Harvard continued to fester.

390.    After returning from winter break in January 2025, Harvard medical faculty called out of work to hold a rally in support of Hamas Colonel Hussam Abu Safiya, a doctor arrested by the IDF for his role as a Hamas leader. To thunderous applause, one speaker declared, "Zionism has turned many Jews into Nazis."

391.    On International Holocaust Remembrance Day in late January 2025, PSC and former student encampment leaders held an unsanctioned protest against "Israel's Holocaust in Gaza" and passed out flyers comparing Israel to Nazi Germany.

392.    Harvard has continued to invite antisemitic speakers to campus, including Muhammad Shehada, who proudly posted with Hamas leader and October 7 architect Ismail Haniyeh, who previously denied the sexual violence against Jewish women on October 7 and praised incendiary balloons fired by Hamas towards southern Israel. Another invited speaker, Aseel Mousa, mocked an elderly Jewish hostage taken by Hamas on October 7 and posted on X how she hoped Hamas would continue its assault into Israel following October 7. Harvard's Center for Human Rights at HKS invited her

---

[59] Bill Ackman, *How to Fix Harvard*, THE FREE PRESS, (Jan. 3, 2024), https://www.thefp.com/p/bill-ackman-how-to-fix-harvard.

[60] *Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297, 310 (D. Mass. 2024).

to speak earlier this year.

393.    Meanwhile, a March career fair at Harvard included the Council on American-Islamic Relations (CAIR), whose executive director Nihad Awad said he "was happy" on October 7 to see people "breaking the siege" and that Israel is "an occupying power that does not have the right to self-defense." As noted above, CAIR—for whom one of Mr. Segev's assaulters is slated to work using funds from *The Harvard Law Review*—was an unindicted conspirator in the infamous Holy Land Foundation case, one of the largest anti-terrorism funding cases ever prosecuted in the United States.

394.    On April 26, 2025, more than a hundred protesters, including those from HOOP and Jews 4 Palestine, gathered in Cambridge Common. One speaker shouted, "Harvard's Zionism and Trump's fascism are not at odds. They are two sides of the same coin." Four protesters climbed Johnston Gate to hang two banners condemning Harvard. One read, "Harvard: you can't be Zionist and Anti-Fascist." Though police and security were gathered around, not one tried to stop the protesters from defacing the front gates.[61]

## F.    Harvard's Institutional Antisemitism and Illegality Has Severely Injured Mr. Segev

395.    Mr. Segev is acutely aware that Harvard views and treats him and other Jewish students as second-class citizens due to their Jewish identities.

396.    Because of Harvard's persistent refusal to comply with its obligations to stop discrimination and harassment against Jewish students, Mr. Segev was deprived of the benefits that non-Jewish students enjoy, including, but not limited to, physical

---

[61] Graham Lee and Cam N. Srivastava, *At Rally in Harvard Square, Protesters Accuse Harvard of Complicity with Trump*, THE HARVARD CRIMSON, (April 26, 2025), https://www.thecrimson.com/article/2025/4/26/palestine-trump-harvard-protest/.

protection; emotional support; a sense of inclusion and belonging; participation in educational, extracurricular, and Harvard-sanctioned social activities; the ability to freely express his Jewish identity in class, in written coursework, and on campus; and his right to express his support for and attachment to Israel, his ancestral homeland, where many, including Mr. Segev and other Jewish Harvard students, have friends and family. In fact, Mr. Segev himself has Israeli citizenship.

397.    Harvard's actions and inactions have led to discriminatory and disparate treatment of Mr. Segev.

398.    Students, along with Harvard faculty members, have been able to taunt, demonize, assault, harass, intimidate, ostracize, and discriminate against Mr. Segev and other Jews with impunity.

399.    Mr. Segev did not feel physically safe on Harvard's campus or in its classrooms and other facilities and avoided certain areas of campus.

400.    As Antisemitism Advisory Group member Horn has acknowledged, since October 7, "Jewish students [at Harvard] could no longer expect to be able to study in the library, eat in dining halls, or attend class without being repeatedly told by their classmates sometimes through a bullhorn, that Jews are genocidal murderers deserving of perpetual intifada." Horn has further admitted that "[t]he mountain of proof at Harvard revealed a reality in which Jewish students' access to their own university (classes, teachers, libraries, dining halls, public spaces, shared student experiences) was directly compromised."

401.    As a result, Mr. Segev justifiably feared harassment, discrimination, and intimidation, on any given day, from Harvard professors, leadership, and fellow students as a function of Harvard's deliberate indifference.

402.    In addition, Mr. Segev was often unable to focus, study, or perform his coursework to the best of his ability, thereby inhibiting his ability to take full advantage of his Harvard education and classroom activities.

403.    During his time at Harvard, Mr. Segev's Jewish identity made him a target for harassment, physical violence, and other acts of antisemitism perpetrated by students and faculty members.

404.    Mr. Segev feared for his safety on campus following the attack at the October 18 Demonstration and Harvard's refusal to properly punish those involved or even assist local authorities in doing so. He rightfully lost any confidence in Harvard's capacity to address antisemitism as the outside counsel's investigation approaches its nineteenth month with over a year without meaningful communication.

405.    Other Jewish students have reported feelings of isolation as a function of their Jewish identities. Some have felt increasingly vulnerable and threatened due to the incessant disruptions from pro-Hamas contingencies on campus that have felt emboldened to act with impunity. Some have reported missing extensive amounts of class in an attempt to avoid campus entirely.

406.    These students have had to spend their time at Harvard fearing for their physical safety, enduring anti-Jewish abuse and harassment, and communicating with Harvard administrators over antisemitism that Harvard is doing nothing to stop. They have been unable to focus on their coursework or otherwise enjoy their Harvard experience.

407.    Harvard's actions and inactions described above not only deprived Mr. Segev of his right to the educational and extracurricular opportunities afforded other students—which have led and will continue to lead to academic, social, and professional

consequences—but also continues to severely impact Mr. Segev's health, mental well-being, and sense of security.

## COUNT I

### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

### (Deliberate Indifference to Hostile Environment; Harvard)

408.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully stated herein.

409.   Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance, and protects all students, including Jewish students, in such programs or activities.

410.   Since at least September 2004, it has been the policy of the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), the agency responsible for enforcing Title VI, to investigate claims against universities related to antisemitism.

411.   In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and must address "anti-Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."

412.   OCR further clarified that schools must take "immediate and appropriate

action to investigate" harassment claims and "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

413.   The Obama, Trump, and Biden administrations have confirmed the urgent need to combat antisemitism in educational institutions. During President Obama's administration, in June 2010, the State Department's Office of the Special Envoy to Monitor and Combat Antisemitism, which is tasked with developing and implementing policies and projects to support efforts to combat antisemitism, adopted a working definition of antisemitism developed by the European Monitoring Center on Racism and Xenophobia and adopted contemporary examples of antisemitism, which include ways that antisemitism manifests itself "with regard to the State of Israel":

- "Using the symbols and images associated with classic anti-Semitism  to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Blaming Israel for all inter-religious or political tensions";

- "Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right to exist."

414.   In December 2019, President Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the Executive Branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprised of thirty-five countries.

415.    On January 4, 2023, DOE, citing the "rise in reports of anti-Semitic incidents," released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which reiterates that Title VI protects "students who experience discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

416.    In May 2023, President Biden released the U.S. National Strategy to Counter Antisemitism, described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," while DOE launched its Antisemitism Awareness Campaign. As part of that campaign, on November 7, 2023, OCR reminded schools of their "[l]egal responsibility under Title VI" to "provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics," to "address prohibited discrimination against students and others on your campus—including those who are or are perceived to be Jewish [or] Israeli," and to "take immediate and effective action to respond to harassment that creates a hostile environment."

417.    On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism, eight federal agencies confirmed yet again that Title VI prohibits antisemitic forms of discrimination in federally funded programs and activities.

418.    On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics."  The letter stated: "It is your legal obligation under Title VI to

address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter."

419.    On May 7, 2024, OCR released another letter promulgating Title VI guidance, making clear, among other things, that the "fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs . . . does not relieve a school of its obligation to respond under Title VI . . . if the harassment creates a hostile environment in school for a student or students," "harassing conduct that otherwise appears to be based on views about a country's policies or practices [that] is targeted at or infused with discriminatory comments about persons from or associated with a particular country" may implicate Title VI, and that "[h]arassing conduct need not always be targeted at a particular person in order to create a hostile environment for a student or group of students," but "may be directed at anyone."  The letter also provided examples of conduct with respect to which a college's failure to take effective preventative action could give rise to a Title VI violation—namely, the very kind of harassment and intimidation that has been regularly occurring at Harvard.

420.    As described above, under Executive Order 13899, the Executive Branch must consider the IHRA definition of antisemitism when evaluating whether a violation of Title VI has occurred. The IHRA definition of antisemitism provides, among other things, that the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such

as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"; and

- "Holding Jews collectively responsible for actions of the state of Israel."

421.    Harvard recently agreed to adopt the IHRA definition of antisemitism to resolve two lawsuits brought by civil rights associations.[62] Nonetheless, Harvard refuses to enforce and implement settlement agreement.

422.    Harvard receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

---

[62] *Harvard and Students Against Antisemitism Announce Settlement of Lawsuit*, (Jan. 21, 2025), https://www.harvard.edu/media-relations/2025/01/21/press-release-settlement-harvard-saa/

423.    Discrimination against Jews and/or Israelis—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the U.S. Department of Education.

424.    Mr. Segev is and identifies as Jewish. He is also an Israeli American. His status and identification as both a Jew and an Israeli bring him within the scope of Title VI protections.

425.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

426.    The acts and omissions of Harvard and its administrators subjected Mr. Segev to discrimination and harassment on the basis of his actual and/or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

427.    Harvard and its administrators had actual notice that such discrimination and harassment, over which Harvard has substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on Jewish ancestry, race, ethnic characteristics, or national origin that deprived Mr. Segev of full access to Harvard's educational programs, activities, and opportunities.

428.    Harvard and its administrators discriminated against Mr. Segev in violation of Title VI, on the basis of his actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin, as exhibited by Harvard and its administrators' deliberate indifference.

429.    Specifically, Harvard and its administrators clearly and unreasonably

failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Mr. Segev and the hostile environment that he and other Jewish students were and are forced to endure at Harvard because of their race, ethnic characteristics, or national origin.

430.    The environment at Harvard, which was rendered hostile for Mr. Segev as a result of his Jewish ancestry, race, ethnic characteristics, or national origin, was sufficiently severe, pervasive, persistent, and offensive such that it deprived Mr. Segev of equal access to the educational opportunities and benefits that Harvard provides to non-Jewish students.

431.    Harvard and its administrators actively and intentionally engage in this pattern of severe and pervasive discrimination.

432.    Harvard both unreasonably failed to act and acted grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including Mr. Segev.

433.    Harvard's acts and omissions are the actual, direct, and proximate causes of Mr. Segev's injuries.

434.    As a result of the foregoing, Mr. Segev has suffered substantial damages, in amounts to be determined at trial.

435.    Mr. Segev has been injured because Harvard denied him equal access to the educational opportunities, benefits, and full value provided to other students.

436.    Mr. Segev is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

## Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

### (Direct Discrimination; Harvard)

437.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully stated herein.

438.    Title VI of the Civil Rights Act of 1964 provides the following: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

439.    Mr. Segev is Jewish and of Israeli descent and therefore is a member of two protected classes within the scope of Title VI's protections.

440.    Mr. Segev, who at all relevant times paid tuition to Defendant Harvard, was qualified to continue the pursuit of his education.

441.    Mr. Segev is entitled to the benefits of educational and other programs at Harvard.

442.    As a direct result of being a member of a protected class, Mr. Segev suffered several adverse actions while at Harvard and was subjected to discrimination by Defendant Harvard based on his Israeli national origin and Jewish ethnicity and ancestry.

443.    Defendant Harvard violated Title VI by subjecting Mr. Segev to a series of intentional hostile acts and adverse actions while they were in pursuit of their education. These acts were designed to deprive Mr. Segev of the benefits of his education and derail his academic pursuit because of his national origin, ethnicity, and ancestry.

444.    More    specifically,    Defendant    Harvard    directly    and    intentionally

discriminated against Mr. Segev by fabricating an entirely new "standard practice" for addressing Mr. Segev's assault, which had been captured on camera at three different angles. There is no such policy or practice to await the criminal process before initiating the University disciplinary process.

445.    Defendant Harvard also directly and intentionally discriminated against Mr. Segev via the following actions: refusing to conduct an administrative investigation into his assault, refusing to punish Mr. Segev's attackers, refusing to punish those who publicly defamed and bullied Mr. Segev, and obstructing Defendant HUPD's investigation into Mr. Segev's assault.

446.    Mr. Segev was treated differently from their similarly situated non-Jewish, non-Israeli classmates. There was no legitimate, non-discriminatory reason for this adverse, disparate treatment.

447.    Defendant Harvard also failed to address other instances of discrimination that occurred on its campus and reported to university administrators.

448.    The discrimination deprived Mr. Segev of equal access to educational opportunities and benefits provided to other students at Harvard. As a result of the discrimination they faced, Mr. Segev was unable to get the full value of the degree for which they worked for several years.

449.    Defendant failed to cure or otherwise adequately address this discrimination against Mr. Segev, and it instead acted with deliberate indifference toward them.

450.    Defendant's actions and conduct had a disparate impact upon Mr. Segev.

451.    As a direct and proximate result of Defendant's actions and inactions, Mr. Segev was deprived of access to educational opportunities and benefits, including the

ability to receive an education in an environment free from discrimination and intimidation and the ability to fully and freely participate in all classes and campus activates without fear of discrimination and intimidation.

## COUNT III

## Breach of Contract

## (Harvard)

452.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully stated herein.

453.    At all relevant times, an express and implied contractual relationship existed between Harvard and Mr. Segev by virtue of his enrollment at Harvard and as defined by and through Harvard's written codes, policies, and procedures, governing student and faculty conduct, including, but not limited to, the Non-Discrimination Policy, Statement on Rights and Responsibilities, Protest Rules, Student Organization Policies, and Harvard's various student handbooks, which often adopt and expand on University-wide policies. Through these policies, Harvard makes contractual commitments to its students concerning safety, bias-related abuse, harassment, intimidation, and discrimination.

454.    Under those contracts, Mr. Segev agreed, among other things, to pay Harvard tuition, and Harvard agreed, among other things, to provide him with a discrimination-free environment to be achieved by Harvard abiding by and adequately and appropriately enforcing Harvard's policies.

455.    Mr. Segev complied with his obligations under these contracts.

456.    Harvard breached its contract with Mr. Segev by, among other things, failing to take measures to ameliorate, prevent, and punish the discriminatory and

harassing conduct that he endured; failing to enforce numerous provisions of Harvard's policies; and failing to meet Mr. Segev's reasonable expectations of the educational benefits to which he is entitled, all of which includes Harvard's failure to comply with the following provisions, among others:

- "Discrimination on the basis of . . . any [] legally protected basis[] is unlawful and is prohibited by this Policy." (Non-Discrimination Policy.)

- "Bullying, hostile and abusive behavior, and power-based harassment directly threaten the ability of community members to engage in the free exchange of ideas and pursue their educational and professional goals. Such behaviors, as defined in this Policy, are prohibited at Harvard." (Non-Discrimination Policy.)

- "Interference with [freedom of speech, academic freedom, freedom from personal force and violence, and freedom of movement] must be regarded as a serious violation of the personal rights upon which the community is based." (Statement on Rights and Responsibilities.)

- "[I]nterference with members of the University in performance of their normal duties and activities must be regarded as unacceptable obstruction of the essential processes of the University." (Statement on Rights and Responsibilities.)

- "Theft or willful destruction of the property of the University or its members must also be considered as unacceptable violation of the rights of individuals or of the community as a whole." (Statement on Rights and Responsibilities.)

- "It is implicit in the language of the Statement on Rights and Responsibilities that intense personal harassment of such a character as to amount to grave disrespect for the dignity of others be regarded as an unacceptable violation of the personal rights on which the University is based." (Statement on Rights and Responsibilities.)

- "It is implicit in the University-wide Statement on Rights and Responsibilities that any unauthorized occupation of a University building, or any part of it, that interferes with the ability of members of the University to perform their normal activities constitutes unacceptable conduct in violation of the Statement and is subject to appropriate discipline." (Statement on Rights and Responsibilities.)

- "[I]t is the responsibility of officers of administration and instruction to be

alert to the needs of the University community; to give full and fair hearing to reasoned expressions of grievances; and to respond promptly and in good faith to such expressions and to widely expressed needs for change." (Statement on Rights and Responsibilities.)

- "Any act or threat of physical violence must be regarded as a complete lack of respect for the deepest values that unite the community." (Faculty of Arts and Sciences Free Speech Guidelines.)

- "A disrupter who resists removal and persists in causing disruption should be subject to severe disciplinary measures." (Faculty of Arts and Sciences Free Speech Guidelines.)

- "In cases of obstruction, . . . the offenders should be punished for breaking the law of trespassing or rules against interfering with freedom of movement." (Faculty of Arts and Sciences Free Speech Guidelines.)

- "Yet our commitment to freedom of expression by its nature entails tolerating some speech that members of the community may receive as offensive or harmful. Although this expression may feel deeply injurious to some who hear it, it is nevertheless protected and permissible speech, unless it takes on a character that violates University or School policies on harassment, discrimination, or bullying." (Public Health Guidelines for Free Expression, Open Debate, Protest, and Dissent.)

- "Using or threatening force or violence, such as defacing a sign or assaulting a speaker or a member of the audience, is never permitted. Any interference with freedom of movement or with freedom from personal force or violence is a serious violation of personal rights." (Harvard Law Protest and Dissent Guidelines.)

- "[A]ny form of protest that disrupts the conduct of a[] [] class would violate the University-Wide Statement of Rights and Responsibilities' prohibition against interference with 'the performance of the normal duties and activities' of [Harvard]." (Harvard Law Protest and Dissent Guidelines.)

- "When a meeting is closed, dissent by non-attendees is limited to activity outside the meeting that does not impede access to the meeting or substantially interfere with the communication inside." (Harvard Law Protest and Dissent Guidelines.)

- "Chanting or making other sustained or repeated noise in a manner which substantially interferes with the speaker's communication is not permitted." (Harvard Law Protest and Dissent Guidelines.)

- "[A]ll may participate freely within a climate of openness, trust, and

sensitivity." (Harvard Divinity Statement of Community Values.)

- "[I]n seeking the long-term welfare of all, we endeavor to accept responsibility for the impact of [their] actions on our community, our environment, and the world. We hold ourselves and each other accountable for our behavior and our use of resources." (Harvard Divinity Statement of Community Values.)

- "Organizations defined as non-Harvard or as unrecognized organizations are not permitted to conduct any activity at Harvard even though their activities involve Harvard undergraduates." (Student Organization Policies.)

- "Student organizations may not co-sponsor on-campus events with external or unrecognized organizations." (Student Organization Policies.)

457.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Mr. Segev has been injured in amounts to be determined at trial.

## COUNT IV

## Breach of the Implied Covenant of Good Faith and Fair Dealing

## (Harvard)

458.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully stated herein.

459.    Harvard has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Mr. Segev. Among other things, Harvard selectively applies or enforces its student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations in bad faith and in a discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, or national origin bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including Mr. Segev, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

116

460.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Mr. Segev has been damaged, in amounts to be determined at trial.

## COUNT V

## 42 U.S.C. § 1985(3) – Civil Conspiracy to Deprive Civil Rights
## (Harvard and HUPD)

461.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully stated herein.

462.    Defendants knowingly and willfully conspired with each other and with others whose identities are currently unknown in order to deprive Mr. Segev of the equal protection of the laws and the equal privileges and immunities secured to all citizens of the United States, in violation of 42 U.S.C. § 1985(3).

463.    Mr. Segev is both Jewish and Israeli. Therefore, for the purposes of the Equal Protection Clause of the Fourteenth Amendment, he is a member of two different protected classes based on his religion and national origin.

464.    The conspiracy between Defendants was motivated by invidiously discriminatory animus based on Mr. Segev's membership in those two protected classes as both a Jewish individual and an Israeli.

465.    In furtherance of the conspiracy, Defendants committed overt acts designed to actively obstruct the investigation into Mr. Segev's assault over a period of time greater than a year, thereby ensuring Mr. Segev's rights would not be vindicated.

466.    More specifically, Defendant Harvard instructed Defendant HUPD to halt its investigation into Mr. Segev's assault and to not cooperate with local authorities as local authorities attempted to prosecute Mr. Segev's attackers.

467.    As a direct and proximate result of Defendants' unlawful conspiracy and

overt acts, Mr. Segev was deprived of his constitutional rights and suffered injury to person, including severe emotional distress. Mr. Segev is therefore entitled to compensatory damages.

468.   Mr. Segev is entitled to punitive damages, as well, because Defendants' conduct involved callous and reckless indifference to Mr. Segev's federally protected rights, including but not limited to his constitutional rights to freedom of movement and freedom of association, and his rights under federal statutory law, including but not limited to Title VI and the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771.

## COUNT VI

## 42 U.S.C. § 1983 – Deprivation of Rights under Color of State Law (HUPD)

469.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully stated herein.

470.   HUPD officers are "sworn special state police officers" under M.G.L. c. 22C § 63, with full arrest powers and jurisdiction to enforce local laws and Commonwealth laws on Harvard-owned property and adjacent public areas. This Commonwealth-delegated authority makes HUPD a state actor for purposes of 42 U.S.C. § 1983.

471.   At all relevant times, Defendant HUPD's officers were acting under color of state law and within the scope of their official duties as special state police officers in the Commonwealth of Massachusetts.

472.   Mr. Segev had rights secured by the Constitution and by the laws of the United States, including but not limited to, the right to equal protection, as articulated in the Fourteenth Amendment.

473.   Mr. Segev is both Jewish and Israeli. Therefore, for the purposes of the

Equal Protection Clause of the Fourteenth Amendment, he is a member of two different protected classes based on his religion and national origin.

474.    Defendant HUPD, by refusing to investigate Mr. Segev's assault, deprived Mr. Segev of those rights.

475.    More specifically, Defendant HUPD is liable for its inaction because it failed to perform its duty, and, as a result, HUPD officers affirmatively increased the danger facing Mr. Segev following his assault; they had knowledge of the identity-based threats Mr. Segev had received and continued to receive following his attack; they had the authority to investigate, intervene, or collaborate with local authorities in responding to his attack; and, yet, they were deliberately indifferent to the risk facing Mr. Segev.

476.    Defendant HUPD's inaction was based on invidious discriminatory animus toward Mr. Segev's membership in two protected classes as both a Jewish individual and as an Israeli.

477.    As a direct and proximate result of Defendant HUPD's actions, Mr. Segev suffered injuries, including severe emotional distress.

478.    Defendant HUPD's treatment of Mr. Segev differs from the treatment administered to similarly situated victims of assault who were not Jewish and/or Israeli.

479.    Therefore, Defendant HUPD deprived Mr. Segev of equal protection under the laws, and Mr. Segev is entitled to compensatory damages.

480.    Mr. Segev is entitled to punitive damages, as well, because Defendant HUPD's conduct involved callous and reckless indifference to Mr. Segev's federally protected rights, including but not limited to his rights to freedom of movement and freedom of association, and his federal statutory rights, including but not limited to Title VI and the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays and requests that a judgment be entered in his favor, and against Harvard awarding the following:

A. Compensatory, consequential, and punitive damages in amounts to be determined at trial;

B. Reasonable attorneys' fees, costs of suit, and expenses;

C. Re-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

D. Such other and further relief as the Court deems just and proper.

Dated:   July 17, 2025                     Respectfully submitted,

                                           YOAV SEGEV

                                           By his attorneys,

                                           */s/ Mark I. Pinkert*
                                           Mark I. Pinkert*
                                           HOLTZMAN VOGEL BARAN TORCHINSKY &
                                           JOSEFIAK PLLC
                                           119 S. Monroe Street
                                           Suite 500
                                           Tallahassee, FL 32301
                                           mpinkert@holtzmanvogel.com

                                           */s/ Douglas S. Brooks*
                                           Douglas S. Brooks, BBO #636697
                                           LIBBY HOOPES BROOKS MULVEY, P.C.
                                           260 Franklin Street
                                           Boston, MA 02110
                                           (617) 338 9300
                                           dbrooks@lhbmlegal.com

                                           Jason B. Torchinsky*
                                           John J. Cycon*
                                           Erielle Davidson*
                                           Jared Bauman*
                                           HOLTZMAN VOGEL BARAN TORCHINSKY &
                                           JOSEFIAK PLLC
                                           2300 N Street NW
                                           Suite 643
                                           Washington, DC 20037
                                           (202) 737-8808
                                           jtorchinsky@holtzmanvogel.com
                                           jcycon@holtzmanvogel.com
                                           edavidson@holtzmanvogel.com
                                           jbauman@holtzmanvogel.com

                                           Jonathan Lienhard*
                                           HOLTZMAN VOGEL BARAN TORCHINSKY &
                                           JOSEFIAK PLLC
                                           15405 John Marshall Hwy
                                           Haymarket, VA 20169
                                           jlienhard@holtzmanvogel.com

                                           *Counsel for Plaintiff Yoav Segev*
                                           *\*pro hac vice forthcoming*