**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

----------------------------------------------------------- X

YOAV SEGEV,  :
 :
 :
 :
 :
                          Plaintiff,  :
          v.  :
 :
 :
PRESIDENT AND FELLOWS OF  :
HARVARD COLLEGE; MEREDITH  :    Case No. 1:25-cv-12020-RGS
WEENICK; VICTOR A. CLAY; and  :
HARVARD UNIVERSITY POLICE  :
DEPARTMENT,  :
 :
 :
 :
                          Defendants.  :
----------------------------------------------------------- X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION & SUMMARY OF ARGUMENT .................................................... 1

BACKGROUND ............................................................................................................... 3

   A.   Harvard Condones Severe and Pervasive Antisemitism ...................................... 3

   B.   Visibly Jewish, Mr. Segev Is Attacked by an Antisemitic Mob on October 18 and Thereafter Is Harassed by Other Students and Faculty ........................................... 4

   C.   Harvard Ignores Mr. Segev While Defending the Antisemitic Assailants ........................ 6

   D.   Mr. Segev Endures a Hostile Environment Until He Graduates ............................. 7

   E.   Harvard Praises and Rewards Mr. Segev's Attackers ........................................... 8

   F.   The Hostile Environment Profoundly Hurt Mr. Segev and Persists to this Day ................ 8

ARGUMENT ...................................................................................................................... 9

I.   Mr. Segev Plausibly Alleges Violations of Title VI ................................................. 9

   A.   Mr. Segev Was Deprived of Educational Benefits Because of Harvard's Deliberate Indifference to the Hostile Environment for Jewish Students ............................. 9

      i.   Mr. Segev Endured a Hostile Environment at Harvard, Largely Based on His Attack but Also Because of Other Antisemitic Incidents ......................................... 10

      ii.   Harvard Was More Than Deliberately Indifferent to the Hostile Environment, It Protected and Rewarded Those Who Harassed Jews ............................... 13

      iii.   Harvard Ignores the Many Allegations that the Hostile Environment Deprived Mr. Segev of Educational Benefits ................................................................. 15

   B.   Mr. Segev Plausibly Alleges a Direct Discrimination Claim Under Title VI ................. 15

      i.   Mr. Segev Plausibly Alleges Discrimination Without a Comparator ........................ 15

      ii.   Harvard Cannot Argue Lack of Comparators When It Confidentially Maintains All Relevant Evidence of Comparators ........................................................ 16

II.   Mr. Segev Plausibly Alleges Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing ............................................................................................. 17

III.   The Complaint Sufficiently States § 1983 and Conspiracy Claims ........................ 21

   A.   Defendants' Conduct Constitutes State Action .................................................. 21

   B.   The Intracorporate Conspiracy Doctrine Is Inapplicable ...................................... 23

   C.   The Amended Complaint States Claims Against Ms. Weenick and Mr. Clay ................. 24

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Arista Records LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ...................................................................................17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................12

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*,
  531 U.S. 288 (2001) ...........................................................................................22

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ...........................................................................................23

*Colby v. Town of Henniker*,
  2001 U.S. Dist. LEXIS 8769 (D.N.H. Feb. 15, 2001) ......................................25

*Cruz-Arce v. Mgmt. Admin. Servs. Corp.*,
  19 F.4th 538 (1st Cir. 2021) ..........................................................................21, 23

*Czerwienski v. Harvard Univ.*,
  666 F. Supp. 3d 49 (D. Mass. 2023) ...............................................9, 18, 19, 20

*Damilare Sonoiki v. Harvard Univ.*,
  37 F.4th 691 (1st Cir. 2022) ...........................................................................18, 19

*Dartmouth Review v. Dartmouth Coll.*,
  889 F.2d 13 (1st Cir. 1989) ................................................................................15

*Dennis v. Sparks*,
  449 U.S. 24 (1980) ..............................................................................................22

*Dickerson v. Alachua Cnty. Comm'n*,
  200 F.3d 761 (11th Cir. 2000) ...........................................................................24

*Doe v. Harvard Univ.*,
  462 F. Supp. 3d 51 (D. Mass. 2020) ..................................................................18

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ..............................................................................15

*Doe ex rel. B.G. v. Bos. Pub. Sch.*,
  2019 U.S. Dist. LEXIS 32705 (D. Mass. Mar. 1, 2019) ...................................15

*Thomas v. Whitcomb*
   2025 U.S. Dist. LEXIS 50732 (D. Mass. Mar. 19, 2025) ........................................20

*Fennell v. Marion Indep. Sch. Dist.*,
   804 F.3d 398 (5th Cir. 2015) ........................................12

*Foley v. Connelie*,
   435 U.S. 291 (1978) ........................................21

*Franchina v. City of Providence*,
   881 F.3d 32 (1st Cir. 2018) ........................................9, 10

*G. v. Fay Sch.*,
   931 F.3d 1 (1st Cir. 2019) ........................................19, 20

*Grajales v. P.R. Ports Auth.*,
   682 F.3d 40 (1st Cir. 2012) ........................................12, 15

*Guckenberger v. Bos. Univ.*,
   974 F. Supp. 106 (D. Mass. 1997) ........................................17

*Hankey v. Town of Concord-Carlisle*,
   136 F. Supp. 3d 52 (D. Mass. 2015) ........................................11

*Harvard Crimson, Inc. v. President & Fellows of Harvard Coll.*,
   840 N.E.2d 518 (Mass. 2006) ........................................22, 23

*Jarvis v. Vill. Gun Shop, Inc.*,
   805 F.3d 1 (1st Cir. 2015) ........................................22

*Jones v. Baystate Health, Inc.*,
   2022 WL 21778544 (D. Mass. Nov. 4, 2022) ........................................15

*Kestenbaum v. President & Fellows of Harv. Coll.*,
   743 F. Supp. 3d 297 (D. Mass. 2024) ........................................10, 13, 14, 18, 19, 20, 21

*Kleiner v. Cengage Learning Holdings II Inc.*,
   66 F.4th 28 (1st Cir. 2023) ........................................25

*Louis D. Brandeis Ctr. for Hum. Rights Under L. v. President & Fellows of Harv. Coll.*,
   2024 U.S. Dist. LEXIS 200937 (D. Mass. Nov. 5, 2024) ........................................10

*Lu v. Smith*,
   2016 U.S. Dist. LEXIS 119127 (D. Mass. Sep. 2, 2016) ........................................21, 22

*M.L. v. Concord Sch. Dist.*,
  86 F.4th 501 (1st Cir. 2023) ................................................................14

*Manhattan Cmty. Access Corp. v. Halleck*,
  587 U.S. 802 (2019) ................................................................21

*Menard v. CSX Transp., Inc.*,
  698 F.3d 40 (1st Cir. 2012) ................................................................17

*Monteiro v. Tempe Union High Sch. Dist.*,
  158 F.3d 1022 (9th Cir. 1998) ................................................................11

*Ocasio-Hernandez v. Fortuno-Burset*,
  640 F.3d 1 (1st Cir. 2011) ................................................................15

*O'Rourke v. City of Providence*,
  235 F.3d 713 (1st Cir. 2001) ................................................................10

*Pollard v. Georgetown Sch. Dist.*,
  132 F. Supp. 3d 208 (D. Mass. 2015) ................................................................11

*Ricketts v. Wake Cnty. Pub. Sch. Sys.*,
  125 F.4th 507 (4th Cir. 2025) ................................................................10, 13

*Ruffino v. State St. Bank & Tr. Co.*,
  908 F. Supp. 1019 (D. Mass. 1995) ................................................................11

*Sauer v. Belfor USA Grp.*,
  205 F. Supp. 3d 209 (D. Mass. 2016) ................................................................9

*Sheehan v. Town of Carver*,
  2025 U.S. Dist. LEXIS 87100 (D. Mass. May 7, 2025) ................................................................25

*Shulse v. W. New Eng. Univ.*,
  2020 WL 4474274 (D. Mass. Aug. 4, 2020) ................................................................17

*Smith v. Brown Univ.*,
  695 F. Supp. 3d 246 (D.R.I. 2023) ................................................................17

*Stathos v. Bowden*,
  728 F.2d 15 (1st Cir. 1984) ................................................................23, 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ................................................................3

*United States ex rel. Willette v. Univ. of Mass.*,
  812 F.3d 35 (1st Cir. 2016) ............................................................................23

*Warman v. Mount St. Joseph Univ.*,
  144 F.4th 880 (6th Cir. 2025) ..........................................................................21

*West v. Atkins*,
  487 U.S. 42 (1988) ...........................................................................................22

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ..........................................................................................23

**Statutes**

22 U.S.C. § 5201 ....................................................................................................5

42 U.S.C. § 1983 .............................................................................................21, 22

42 U.S.C. § 1985 ..................................................................................................24

Mass. Gen. Laws ch. 22C, § 63 ...........................................................................21

**Other**

34 C.F.R. 99.39 ....................................................................................................17

Black's Law Dictionary (11th ed. 2019) ...............................................................24

*Globalize the Intifada*, American Jewish Committee, *Translate Hate Glossary*,
  http://ajc.org/translatehate/Globalize-the-Intifada (last visited Nov. 16, 2025)...........................4

*From the River to the Sea*, American Jewish Committee, *Translate Hate Glossary*,
  https://www.ajc.org/translatehate/From-the-River-to-the-Sea (last visited Nov. 16, 2025) ...........4

Letter from Tim Walberg & Elise M. Stefanik to Alan M. Garber (Sept. 29, 2025),
  https://edworkforce.house.gov/uploadedfiles/harvard_letter_9.29.25.pdf. .....................................9

## INTRODUCTION & SUMMARY OF ARGUMENT

Harvard's Motion to Dismiss distorts and mischaracterizes the allegations in the Amended Complaint, and it omits almost all of the key details. Because Harvard cannot argue for dismissal while accepting the allegations as true, this Court should deny the motion.

At the outset, Harvard trivializes the October 18 assault, in which dozens of students surrounded Mr. Segev with keffiyehs, violently shoved him, and yelled "Shame!" in his face until he was forced out of a student quad. Harvard erases those facts, which are not only alleged but also captured on video. Harvard refers to this merely as an "altercation," though the attack prompted widespread and bipartisan condemnation. Harvard's inability to address these allegations head on is legally indefensible at the pleading stage, just as its failure to acknowledge the grotesqueness of the antisemitic attack is morally indefensible.

Harvard also distorts the Complaint by claiming it is about "one incident." This is false. The Complaint alleges that harassment against Mr. Segev persisted long after October 18, which included, among other things, students defaming him and calling him a "Zionist aggressor." The harassment also came from Harvard faculty, who publicly blamed Mr. Segev because his presence, as a Jew, was somehow "frightening" to other students. This pervasive harassment also includes Harvard mistreating and misleading Mr. Segev to deny him a fair process while protecting and rewarding his attackers. Harvard ignores these allegations. Moreover, while the Complaint *focuses* on Mr. Segev's assault, ensuing harassment, and Harvard's unreasonable response, it details the many other ways Harvard neglected the entire Jewish community, of which Mr. Segev is a member.

Harvard also rewrites the Complaint regarding its response to the attack on Mr. Segev and to antisemitism generally. By Harvard's own account, it investigated, fully cooperated with authorities, and took steps to remedy the issue. The Complaint alleges the opposite. It describes

the ways Harvard impeded the investigation, misled Mr. Segev and the public, protected assailants who flagrantly violated school policy, rewarded them with graduation honors and plaudits, and allowed rabid antisemitism to persist on campus. Harvard tries to cast all that aside by saying this is about Mr. Segev's "subjective" displeasure. While it is true Mr. Segev disapproves of Harvard's response, the allegations still establish a plausible Title VI violation based on Harvard's *objectively* unreasonable response to antisemitism on its campus, including an assault against a Jewish student.

Critically, this Court has already held that another Jewish student and two associations successfully claimed a hostile environment and that Harvard was deliberately indifferent. Those complaints included extensive allegations about Mr. Segev's assault specifically, as well as other campus events that Mr. Segev experienced and alleges here. This Court's conclusion therefore governs. Harvard cannot evade that holding by trying to distort and rewrite Mr. Segev's allegations.

Mr. Segev also alleges direct discrimination. Under Title VI, a plaintiff does not need a direct comparator to establish discriminatory intent. And, here, the discriminatory intent is plausibly alleged at the pleading stage based on (1) Harvard's consistently differential application of school policy to disfavor Jewish students, and (2) Harvard faculty, in this specific instance, calling for Mr. Segev's assailants to be protected *because* of their "dark skin," and by contrast, blaming Mr. Segev because his Jewish presence was "frightening."

In addition to successfully pleading Title VI violations, Mr. Segev successfully asserts breach of contract and breach of the implied covenant of good faith and fair dealing. As detailed in the Complaint, Harvard made both explicit and implicit promises to Mr. Segev in its official policies, including promises to follow specific procedures when responding to student complaints regarding discrimination. Harvard breached these promises by ignoring Mr. Segev's complaints of antisemitism and depriving him of his procedural rights through deception.

Finally, Mr. Segev plausibly alleges § 1983 and related conspiracy claims against all Defendants. Harvard cannot hide behind the state action doctrine. When its employees, acting as state police officers pursuant to Massachusetts statute, refused to investigate Mr. Segev's assault and deliberately delayed the assailants' prosecution, they "exercised powers traditionally, exclusively reserved to the State" or at the very least "jointly participated" with those who did. Nor can Harvard invoke the intracorporate conspiracy exception—a doctrine inapplicable to civil rights claims that allege a series of discriminatory acts—because, in any event, its agents conspired with agents of a different entity, namely the Commonwealth of Massachusetts.

## BACKGROUND

### A.    Harvard Condones Severe and Pervasive Antisemitism

Harvard has long permitted antisemitism on its campus and allowed it to become entrenched in the institution. D.E. 12 ("FAC") ¶¶ 42-68; *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 257 (2023) (Thomas, J., concurring). In recent years, even after students and faculty have committed heinous antisemitic acts—such as interrupting events at Hillel and vandalizing its building, painting swastikas on school property, and calling Jews derogatory terms (FAC ¶¶ 46, 48, 49, 52)—Harvard has refused to address the problem (*id.* ¶¶ 50, 58). In 2023, Harvard investigated a professor and even after finding he had discriminated against Jewish and Israeli students, did not publicly discipline him and instead praised him in the *Harvard Gazette*. *Id.* ¶ 64. One study from 2022 found that almost 80% of Jewish Harvard students had experienced some form of antisemitism or anti-Zionism. *Id.* ¶ 44.

Against this backdrop, Mr. Segev matriculated at the Harvard Business School ("HBS") in Fall 2022. *Id.* ¶ 35. Some of the above events occurred while Mr. Segev was a student (*id.* ¶¶ 61, 66, 68), but the most rampant and outward antisemitism began to erupt after October 7, 2023, the day that Hamas terrorists committed mass rape, murder, and capture of civilians in Israel. *Id.* ¶ 69.

3

Unlike with other recent global events, Harvard was conspicuously silent after the attack, which claimed more Jewish lives than any single day since the Holocaust. *Id.* ¶¶ 70-72. This prompted Harvard's former president to issue a public statement condemning Harvard's silence. *Id.* ¶ 76.

Immediately after October 7, more than 30 student groups issued a statement blaming Israel for the violence. *Id.* ¶ 75. Hundreds participated in disruptive protests almost every day, chanting and graffitiing slogans like "globalize the Intifada!" and "from the river to the sea!", which call for violence against Jews. *Id.* ¶¶ 73, 86.[1] Nonetheless, Harvard's first official act was to create a task force to protect the protestors, not Jewish students who were under attack. *Id.* ¶ 80. In addition to disruptive protests, Harvard student and faculty began spreading antisemitic hatred. The Harvard Divinity School ("HDS") honored a picture of a Jewish individual with an elongated nose and Star of David, hoarding water from a Palestinian. *Id.* ¶ 84. On "Sidechat," students uttered vile slurs. One asked classmates to "reflect on how much power the Jewish population has over the media." *Id.* ¶ 89. Another referred to a Jewish student as "pro-genocide" and said she "looks just as dumb as her nose is crooked." *Id.* ¶ 92. Other students posted things like "Harvard Hillel burning in hell," "LET EM COOK," "I support Hamas," and "Jewish people are controlling everything." *Id.* ¶¶ 96-97. Mobs disrupted classes, leading Jewish students to flee for safety. *Id.* ¶ 99.

**B.     Visibly Jewish, Mr. Segev Is Attacked by an Antisemitic Mob on October 18 and Thereafter Is Harassed by Other Students and Faculty**

On October 18, 2023, eleven days after 1,400 people in Israel were killed or taken hostage, scores of Harvard students gathered to protest Israel's right to exist and to accuse Israel of "war

---

[1] The term "intifada" means uprising and specifically refers to two violent Palestinian uprisings that claimed the lives of hundreds of Israelis. *Globalize the Intifada*, American Jewish Committee, *Translate Hate Glossary*, http://ajc.org/translatehate/Globalize-the-Intifada (last visited Nov. 16, 2025). Globalizing the intifada means to violently attack Jews throughout the world. *Id.* "From the river to the sea" similarly calls for the eradication of Israel, the only Jewish state. *From the River to the Sea*, American Jewish Committee, *Translate Hate Glossary*, https://www.ajc.org/translatehate/From-the-River-to-the-Sea (last visited Nov. 16, 2025).

crimes." *Id.* ¶ 147. The event was being recorded, including by an NBC helicopter. Students used their phones to film the event, and Mr. Segev chose to as well. *Id.* ¶ 150. Although the event was taking place in a university space where Mr. Segev lived, he was repeatedly shouted at to "get out." *Id.* ¶ 151. As he was walking and filming quietly, the protest's self-designated "safety marshals"— including HDS student Elom Tettey-Tamaklo and HLS student Ibrahim Bharmal, both of whom were also employed by Harvard—accosted Mr. Segev donning keffiyehs.[2] *Id.* ¶ 154.

Shortly after, a protester with a face mask leapt up at Mr. Segev. *Id.* ¶ 155. Others surrounded Mr. Segev with keffiyehs and grabbed him. *Id.* The mob forced Mr. Segev to the perimeter. *Id.* ¶ 156. One individual threw his arm into Mr. Segev's neck while several forcefully grabbed and pushed Mr. Segev away, even as he pleaded "Please don't touch me" and repeated "Please don't grab me." *Id.* ¶ 157-58. As Mr. Segev attempted to walk away, the mob continued to *surround* him, press up against him, and shove signs and keffiyehs in his face. *Id.* They began yelling chaotically in his face, "Shame! Shame! Shame!" *Id.* Fearful for his safety, Mr. Segev tried to escape and was finally able to move past the protestors. *Id.* Harvard University Police Department ("HUPD") officers watched the entire event unfold but did not intervene. *Id.* ¶ 159.

After the assault, Mr. Segev was publicly harassed based on his Jewish and Israeli identity. *Id.* ¶ 160. Students wrote about him online and in the press, lying about the attack by claiming he was to blame and that no one physically touched him. *Id.* ¶¶ 160-63. Even Harvard *faculty* issued a public statement blaming Mr. Segev for being attacked, because his presence made the protestors feel "unsafe" and "frighten[ed]." *Id.* ¶ 165. They called for the assaulters to be absolved because of their "dark skin," notwithstanding that they assaulted another student. *Id.* Another professor

---

[2] The keffiyeh represents violence against Jews. It was popularized by Yasser Arafat, who led the Palestine Liberation Organization, a designated foreign terrorist organization. 22 U.S.C. § 5201(b).

contributed to a *Boston Globe* article minimizing the attack. *Id.* ¶ 171. One student called Mr. Segev a "Zionist aggressor," invoking antisemitic tropes: "we all know who controls the media." *Id.* ¶ 166. Mr. Segev reported this to Harvard, which took no action. *Id.*

### C.    Harvard Ignores Mr. Segev While Defending the Antisemitic Assailants

On November 13 and 15, 2023, respectively, Mr. Segev filed complaints with HLS and HDS, detailing the assault and subsequent harassment. *Id.* ¶¶ 173-74. Harvard declined to act because Mr. Segev wanted to proceed anonymously based on safety concerns. *Id.* ¶ 175. Still, the assailants, including Messrs. Bharmal and Tettey-Tamaklo, were caught on camera assaulting a classmate and could have been punished without any formal complaint. Rather than punish them, then-President Claudine Gay claimed that the school had an unwritten policy not to invoke disciplinary processes until the "law enforcement's inquiry is complete." *Id.* ¶¶ 176-77.

At the same time, Harvard launched a sham investigation to delay and ultimately absolve Harvard of its responsibilities without having to discipline the attackers, who were supported by faculty because of their "dark skin." *Id.* ¶ 165. For example, although the "investigation" began in early January 2024 (two months after the assault), Harvard's outside counsel did not contact Mr. Segev until April 10, 2024. *Id* ¶¶ 183-86. And after only one interview, they did not contact him again. *Id.* ¶ 187. To this day, no results or conclusions have been shared with Mr. Segev, despite repeated requests. *Id.* ¶¶ 187-88. Because the investigation appeared to be going nowhere, Mr. Segev initiated non-anonymous complaints, as Harvard had told him he could do. *Id.* ¶ 195. Yet, at that point, rather than address the complaints, Harvard told him it was too late because Harvard had already completed its investigation, though it could not share the results. *Id.*

Harvard also impeded the criminal proceedings by the local authorities, which filed charges against the two assailants. *Id.* ¶ 229. Harvard Executive Vice President, Meredith Weenick, instructed HUPD and its chief, Victor Clay, "to halt their investigation into Mr. Segev's assault and

to not cooperate with local authorities." *Id.* ¶ 486. At the arraignment, the Assistant District Attorney asked the Court to continue the hearing because HUPD had "essentially refused to investigate," which had been a "shock to the Commonwealth." *Id.* ¶ 234. The Assistant DA stated, "We have made several requests to [Harvard] to look into this information, and they have been unwilling to follow up with us." *Id.* ¶ 235. After one of the officers made it clear that he would investigate Mr. Segev's attackers, HUPD removed him from the investigation. *Id.* ¶¶ 242-43.

### D.    Mr. Segev Endures a Hostile Environment Until He Graduates

Meanwhile, Mr. Segev continued to suffer from the overall hostile and discriminatory environment. In November 2023, Mr. Segev tried to register for a student event. At the registration table, administrators kept a separate list of Jewish students, with designations for those they deemed "peaceful" or "protestor[s]." *Id.* ¶ 169. Harvard administrators told Mr. Segev and others who objected to Jewish blacklisting that it was "not a big deal." *Id.* ¶ 170.

Mr. Segev was also aware of and deeply disturbed by Harvard's student body growing increasingly more publicly and virulently antisemitic. Not only was he aware of the vile and violent Sidechat messages described above, he saw that one of his attackers, Mr. Tettey-Tamaklo, published a video quoting a Nazi theologian and a poem accusing Israelis of being "vipers [] who siphon the lifeblood of the innocent." *Id.* ¶ 218. Mr. Tettey-Tamaklo also authored an article in which he feted a terrorist who tried to murder Israeli civilians, including children. *Id.* Again, Harvard ignored calls to investigate the attackers' violations of school policies. *Id.* ¶¶ 217-20.

Harvard cannot claim it was unaware of antisemitism on campus. In addition to receiving dozens of complaints and media attention, Harvard itself has acknowledged the problem. *Id.* ¶ 371. Nonetheless, while Mr. Segev was a student, and still to this day, it has refused to take necessary steps, such as disciplining students or faculty who violate school policies, as it has done when violations harm Harvard's favored minority groups. *Id.* ¶¶ 326-31. To create the façade of action,

Harvard established an Antisemitism Advisory Group but made it powerless and lacking any real influence, causing several members to resign. *Id.* ¶¶ 371-73. In June 2025, following an investigation, the federal government notified Harvard that it was in violation of federal civil rights law based on its treatment of Jewish and Israeli students, including, among many other incidents, Mr. Segev's attack and Harvard's non-response. *Id.* ¶¶ 388-90.

### E. Harvard Praises and Rewards Mr. Segev's Attackers

Although Harvard promised Mr. Segev and the public that it would undertake disciplinary measures against the assailants after the criminal proceedings, it declined to impose any reasonable discipline whatsoever. To the contrary, the students both graduated in good standing and were showered with awards and plaudits from Harvard. Mr. Bharmal was awarded a paid public interest fellowship from the *Harvard Law Review*, received a glowing profile on Harvard webpages, and was featured on the HLS events calendar as someone who could speak about "courageous lawyering." *Id.* ¶ 247. Meanwhile, while Mr. Tettey-Tamaklo was initially removed from his proctoring role, he served in an honorary role at HDS graduation as class marshal. *Id.* ¶ 248.

### F. The Hostile Environment Profoundly Hurt Mr. Segev and Persists to this Day

Because of Harvard's mistreatment of Mr. Segev and the Jewish community writ large, Mr. Segev lost out on educational benefits. He did not feel safe on campus or that he had support from the school, nor did he feel he was able to fully participate in educational and extracurricular activities. *Id.* ¶ 414. Indeed, he was blacklisted from one student event. *Id.* ¶ 169. In class, he was not free to express his beliefs or highlight his Jewish identity, limiting his participation. *Id.* ¶¶ 414, 417. Having been attacked physically and then in the media by his classmates and faculty, Mr. Segev "was often unable to focus, study, or perform his coursework to the best of his ability." *Id.* ¶ 420. This "severely impact[ed]" his "health, mental well-being, and sense of security." *Id.* ¶ 425.

Harvard claims to have taken steps to address antisemitism, but—other than make empty public statements—it has done nothing of the sort. For example, as part of its settlement with student associations in January 2025, it agreed to adopt the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism. *Id.* ¶ 198. Nonetheless, when Mr. Segev reported an incident in March in which a student compared Israel to Nazi Germany, Harvard declined to discipline the student despite this glaring violation of the IHRA definition of antisemitism. *Id.* Since then, incidents of antisemitism have been rampant and remain unaddressed. *Id.* ¶¶ 408-12. After this Complaint was filed, the U.S. House Committee on Education and Workforce sent a letter to Harvard regarding its ongoing investigation into antisemitism at Harvard, noting that "the Committee is deeply concerned that Harvard is failing to uphold its obligations under Title VI."[3]

## **ARGUMENT**

### I.    **Mr. Segev Plausibly Alleges Violations of Title VI**

#### A.    **Mr. Segev Was Deprived of Educational Benefits Because of Harvard's Deliberate Indifference to the Hostile Environment for Jewish Students**

To plead a hostile environment claim, a plaintiff must allege that he "was subject to severe, pervasive, and objectively offensive" harassment, which "caused the plaintiff to be deprived of educational opportunities or benefits," and "the school knew" of but "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 84 (D. Mass. 2023). Whether an environment is hostile "depends on a constellation of surrounding circumstances," *id.* at 86 (quotation omitted), that "cannot be taken in isolation but rather must be viewed as [a] whole." *Sauer v. Belfor USA Grp.*, 205 F. Supp. 3d 209, 216 (D. Mass. 2016). Because there is no "precise test" to assess a hostile environment, *Franchina v. City of Providence*, 881 F.3d 32, 46

---

[3] Letter from Tim Walberg & Elise M. Stefanik to Alan M. Garber (Sept. 29, 2025), https://edworkforce.house.gov/uploadedfiles/harvard_letter_9.29.25.pdf.

(1st Cir. 2018) (quotation omitted), it "*must* be determined by the fact-finder," *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001) (emphasis added).

Twice, this Court has correctly held that, based on similar allegations (including allegations involving Mr. Segev's attack), Harvard was deliberately indifferent to a hostile environment. *Kestenbaum v. President & Fellows of Harv. Coll.*, 743 F. Supp. 3d 297, 302, 310 (D. Mass. 2024); *Louis D. Brandeis Ctr. for Hum. Rights Under L. v. President & Fellows of Harv. Coll.*, 2024 U.S. Dist. LEXIS 200937 (D. Mass. Nov. 5, 2024). Those decisions govern, as Mr. Segev raises materially similar allegations. Mr. Segev is a member of Harvard's Jewish community, and he suffered from Harvard's indifference just as much as other Jewish students, if not more, because he was attacked, defamed by faculty and students, and abandoned by the University, which decided to praise and reward his attackers and praise and reward antisemitism. Harvard cannot explain why this Court's orders sustaining claims of one Jewish student and two student associations do not control here, especially when Mr. Segev was a member of one those associations.

i.   Mr. Segev Endured a Hostile Environment at Harvard, Largely Based on His Attack but Also Because of Other Antisemitic Incidents

Mr. Segev alleges both that he individually suffered severe and pervasive harassment based on his ethnicity and that there was a hostile environment for Jews on campus more generally. At the outset, he endured an attack that was alone sufficiently "severe" to trigger Title VI, as he was surrounded by a mob, pushed and shoved, and had students yell "Shame!" in his face. FAC ¶ 158. Beyond the attack, however, he was derided on social media and in the press by his classmates and even faculty after October 18, at one point getting called a "Zionist aggressor." *Id.* ¶ 166. That is severe and pervasive harassment under Title VI. *See, e.g. Ricketts v. Wake Cnty. Pub. Sch. Sys.*, 125 F.4th 507, 521-22 (4th Cir. 2025) (student stated Title VI claim when students labeled her an "angry black girl").

Additionally, Mr. Segev alleges that the *overall* environment was hostile for Jewish students and that he was aware of and directly affected by those issues. At one point, he and other Jewish students were blacklisted from a student event. FAC ¶¶ 169-70. He was subjected to vile antisemitic slurs in public and on Sidechat from Harvard students and faculty (*id.* ¶¶ 88-97), and he was subjected to unlawful and disruptive campus protests (*id.* ¶¶ 73, 143, 408, 409, 412). *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (in Title VI case, "racist attacks need not be directed at the complainant in order to create a hostile educational environment"); *Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1038 n.34 (D. Mass. 1995) (in Title VII case, "the conduct to be considered as comprising hostile environment discrimination need not all have been directed personally at the plaintiff").

Harvard's only means of addressing this element of the hostile environment claim is to ignore key allegations and argue that this case is just about one incident. Mot. 5 ("Mr. Segev's experience on October 18 fails to state a Title VI claim based on student-on-student conduct."). To be sure, even if the Complaint were about one incident (it is not), that attack would still be sufficiently severe to raise a plausible claim of hostile environment. A mob assault against a student for being Jewish should certainly be "vile enough" at the pleading stage, contrary to Harvard's argument that such antisemitic violence is merely a humdrum "altercation." *Id.* at 5-6.[4]

Harvard also argues that the attack was not based on Mr. Segev's membership in a protected class but instead because he was quietly filming. *Id.* at 7. Yet Harvard bypasses blackletter pleading

---

[4] Harvard's cases are distinguishable, as they involved "mock[ing]" and "snide comments," *see Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 230-31 (D. Mass. 2015), and one instance of keying a car with a derogatory term, *see Hankey v. Town of Concord-Carlisle*, 136 F. Supp. 3d 52, 66-67 (D. Mass. 2015), but no physical assault. Further, in *Pollard*, the court permitted amendment to the complaint, suggesting that allegations beyond the one derogatory comment specifically alleged would suffice. 132 F. Supp. at 231. *Hankey* was at the summary judgment stage. 136 F. Supp. 3d at 65.

standards, which require a court to accept the well-pleaded allegations *and* reasonable inferences in the plaintiff's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009). Here, because Mr. Segev was visibly Jewish and wearing a blue bracelet connected to Israel, it is reasonable to infer the attack was based on his ethnicity and national origin. And while Harvard makes a counterfactual argument that Mr. Segev's filming was what prompted the attack (Mot. 6-7), Harvard fails to acknowledge that many other students were filming but were not attacked. A state prosecutor also stated publicly that Mr. Segev was an "innocent victim" (FAC ¶ 152), meaning his attackers were likely motivated by discriminatory malice rather than responding to something improper Mr. Segev was doing. Beyond that, the mob's antisemitic motivation is further supported by: students yelling "Shame!" in his face and using anti-Jewish keffiyehs to surround him (*id.* ¶ 158); one assailant later quoting a Nazi theologian and calling Israelis "vipers" (*id.* ¶ 218); and the student body being unabashedly antisemitic on Sidechat and other forums (*id.* ¶¶ 88-97). Contrary to Harvard's argument that Mr. Segev must have some smoking gun evidence of the mob's motive, both the direct and circumstantial evidence alleged is more than enough at the pleading stage. *See Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012).

Harvard also argues that the "handful of online interactions discussing the events of October 18 do not move the needle." Mot. 7. But again, Harvard misrepresents the Complaint with inaccurate and anodyne descriptions. Those "online interactions" were not interactions at all, but one-sided and defamatory attacks against Mr. Segev, in the press and throughout social media, by students and faculty who called him a "Zionist aggressor" and said his Jewish presence was "frightening." FAC ¶¶ 165-66; *see Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) ("[T]he use of a noose accompanied by a vitriolic and epithet-laden note only underscores the severe, pervasive, and objectively offensive nature of the harassment.").

In any event, Harvard's argument mostly attacks a strawman. The Complaint *focuses* on the assault and the ensuing harassment but also describes many other instances of antisemitic harassment and exclusion, including Mr. Segev being blacklisted from public events as a Jewish individual labeled not "peaceful," and being subjected to violent antisemitic slogans and imagery. FAC ¶¶ 100, 169-70; *see Ricketts*, 125 F.4th at 518-21 (successful Title VI claim where student was excluded based on race, called a "cockroach," and labeled an "angry black girl"). Harvard's refusal to address those allegations waives any argument that Mr. Segev failed to allege a sufficiently hostile environment beyond just the October 18 assault.

ii.   <u>Harvard Was More Than Deliberately Indifferent to the Hostile Environment,
It Protected and Rewarded Those Who Harassed Jews</u>

Like the plaintiffs in *Kestenbaum* and *Brandeis Center*, Mr. Segev successfully claims that "Harvard failed its Jewish students," *Kestenbaum*, 743 F. Supp. 3d at 310, which includes Mr. Segev. Once again, Harvard ignores that Mr. Segev alleges the administration was aware of but deliberately indifferent to the hostile environment, as this Court has already recognized.

Even focusing on the October 18 assault, as Harvard tries to do, in no scenario was its deliberate indifference more apparent. While a prosecutor obtained a criminal indictment based on those facts and a court determined the assailants required pre-trial diversion community service and anger management, Harvard deemed those students worthy of *honors*. That disparity alone establishes a plausible claim, at the pleading stage, that its response was objectively unreasonable.

Harvard claims that Mr. Segev "acknowledges that Harvard conducted an investigation into the October 18 incident," but that he only objects to the results and timing, which were within Harvard's "reasonable discretion." Mot. 9-10. This again ignores the legal standards and allegations. It is not enough that Harvard merely *announce* an investigation or take perfunctory steps designed to go nowhere. If that were true, universities could avoid Title VI liability altogether

by making "virtuous public statements" while doing nothing in practice. *Kestenbaum*, 743 F. Supp. 3d at 310. Although universities are entitled to *some* deference in how they conduct investigations, *see M.L. v. Concord Sch. Dist.*, 86 F.4th 501, 512 (1st Cir. 2023), that discretion is not absolute, nor is the school's obligation satisfied because it uses the magic word "investigation." Like any response to discrimination, an investigation must still be *objectively* reasonable.

In this case, nothing that Harvard did was objectively reasonable, including (1) inventing a nonsensical "unwritten" policy to delay student discipline pending a criminal proceeding (FAC ¶¶ 172-79); (2) waiting months before starting its investigation and interviewing Mr. Segev only once (*id.* ¶¶ 183-87); (3) refusing to cooperate with authorities to the point where the prosecutor expressed "shock" by Harvard's conduct (*id.* ¶¶ 230-42); and (4) removing an HUPD officer who was trying to investigate the attack (*id.* ¶ 243). Harvard also argues that it does not need to share the developments with Mr. Segev; but in this case, Harvard exploited opacity to prevent Mr. Segev from obtaining redress. At first, Harvard told Mr. Segev that he had to proceed non-anonymously, and while he declined because of safety concerns and because he believed Harvard would do what was right, he later chose to move forward once it was clear Harvard would not act at all. But at that point, Harvard told Mr. Segev its secret investigation and secret results precluded his own complaint. Harvard misdirected and misled Mr. Segev to avoid punishing students.

While Harvard's misdirection, secrecy, and interference with the criminal proceedings all establish that it acted objectively unreasonably in response to antisemitism, this is a unique case in which Harvard's unreasonable response is evident solely from the outcome. That is, even if Harvard had undertaken a rigorous and fair *procedure* (it did not), the fact that it allowed antisemitic attackers to graduate in good standing and with plaudits is *substantively* unreasonable at the pleading stage. If students with Confederate flags surrounded a black student, assaulted him

and yelled "Shame!" in his face and Harvard allowed them to graduate with awards, it would be plausible that the result itself was objectively unreasonable and violated Title VI. So too here.

        iii.   <u>Harvard Ignores the Many Allegations that the Hostile Environment Deprived Mr. Segev of Educational Benefits</u>

Mr. Segev describes in painful detail his loss of education benefits and emotional toll that the physical and media attacks took on him, as well as the emotional toll from Harvard abandoning him. Those allegations—which are quoted in detail *supra* p.8-9 and at FAC ¶¶ 414-25—more than suffice at the pleading stage. *See, e.g.*, *Doe ex rel. B.G. v. Bos. Pub. Sch.*, 2019 U.S. Dist. LEXIS 32705, at *33-34 (D. Mass. Mar. 1, 2019) (because student had to interact with assailant at school, relive the trauma of assault, and lived in fear of being assaulted show the assault disrupted student's education). Harvard's argument that Mr. Segev merely "restates the legal standard" (Mot. 8) is belied by the actual allegations, which Harvard refuses to quote or address head on.

    **B.**    **Mr. Segev Plausibly Alleges a Direct Discrimination Claim Under Title VI**

To allege direct discrimination, a student need only raise a "plausible inference" he was denied educational benefits because of race or national origin. *See Doe v. Purdue Univ.*, 928 F.3d 652, 670 (7th Cir. 2019); *Jones v. Baystate Health, Inc.*, 2022 WL 21778544, at *6 (D. Mass. Nov. 4, 2022). "'Smoking gun' proof of discrimination is rarely available, especially at the pleading stage." *Grajales*, 682 F.3d at 49. The student only needs to "raise a reasonable expectation that discovery will reveal evidence" of direct discrimination. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 17 (1st Cir. 2011). A plaintiff *may* "identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently," but it is not required. *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989) (quotation omitted).

        i.   <u>Mr. Segev Plausibly Alleges Discrimination Without a Comparator</u>

Mr. Segev plausibly alleges that Harvard's mistreatment of him was motived by anti-Jewish or anti-Israeli animus, even without a direct comparator, which is not required. For one, at a higher

level of generality, Harvard has exercised its discretion and enforced its policies vigorously to protect other minorities while it has evaded or distorted policies *only* when it comes to Jews. *See* FAC ¶¶ 288-308, 325. For example, despite flying Ukraine's flag to show support for its war effort just months earlier (despite a policy against doing so), Harvard denied a request to fly Israel's flag following October 7. *Id.* ¶ 308. Similarly, Harvard refused to meaningfully discipline students who took over University Hall in November 2023, even though it previously ejected and arrested other students who had taken over buildings in protest. *Id.* ¶ 325. Harvard's own Presidential Task Force Report admits there is a "widespread sentiment" that Harvard treats anti-Israel and anti-Jewish discrimination differently than hostility toward other minorities—namely, that Harvard administrators do not consider either form of discrimination to be a "serious form of bias within their purview." *Id.* ¶ 310.

That evidence, taken together, creates a plausible inference at the pleading stage that Mr. Segev's attackers—who were caught on camera flagrantly violating school policies—were protected and rewarded *because of* the victim's protected status. Indeed, here, Harvard faculty specifically called for the protection of Mr. Segev's attackers *based on their race*, while they blamed Mr. Segev, a Jew, simply for being present at the scene. *Id.* ¶ 165. It is thus reasonable to infer at this stage that Harvard felt pressure from those faculty or was even directly aligned with them and believed that students with "dark skin" should not be punished for assaulting a "frighten[ing]" Jew. *Id.* At this early stage, and with such strong circumstantial evidence of discriminatory intent, discovery is warranted to determine Harvard's motivations.

> ii. Harvard Cannot Argue Lack of Comparators When It Confidentially Maintains All Relevant Evidence of Comparators

Harvard ignores that a comparator is not necessary yet hinges most of its argument on that point. Still, Harvard's argument is unpersuasive at the pleading stage because Harvard possesses

all the relevant evidence of comparators and invokes the Family Educational Rights and Privacy Act ("FERPA") to withhold those student disciplinary records from Mr. Segev and the public.[5] Here, a comparator for Mr. Segev would involve disciplinary proceedings surrounding a racist or sexist assault or harassment, none of which is available to Mr. Segev or the public. While Harvard could release such information under FERPA's exceptions for a "crime of violence," *see* 34 C.F.R. 99.39, it chooses not to.

For the reasons above, it is likely that punishment for perpetrators of attacks or harassment against *other* minorities is severely punished but not for Jews like Mr. Segev, and it is plausible at this stage that discovery will yield evidence of direct comparators. To that end, courts have liberalized pleading standards in Title VI cases concerning the identification of comparators by allowing for comparators to be identified over the course of discovery. *See, e.g.*, *Smith v. Brown Univ.*, 695 F. Supp. 3d 246, 249 (D.R.I. 2023); *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (noting that "some latitude" is appropriate at the pleadings stage where information is "in the control of defendants"); *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

## II.    Mr. Segev Plausibly Alleges Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

"[T]he relationship between a university and a student is contractual in nature." *Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997). "Under Massachusetts law, the promise, offer, or commitment that forms the basis" of that contract "can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials." *Id.*; *see also Shulse v. W. New Eng. Univ.*, 2020 WL 4474274, at *9 (D. Mass. Aug. 4, 2020). A university may breach its contract with a student by failing to fulfill the

---

[5]         *FERPA         Overview*,         HARV.         UNIV., https://provost.harvard.edu/sites/g/files/omnuum12476/files/provost/files/ferpa_overview.pdf (last visited Nov. 16, 2025).

promises "found in the express language of the governing contract," or by failing to meet the student's "reasonable expectation[s] . . . of the contract's terms." *Damilare Sonoiki v. Harvard Univ.*, 37 F.4th 691, 709 (1st Cir. 2022) (citation omitted). "[A]t the motion to dismiss stage, the reasonable expectation standard is focused on the student's interpretation of the contract's terms," even if those expectations are "different from the interpretation the university places on the same terms." *Id.* Further, all contracts contain an implied covenant of good faith and fair dealing under Massachusetts law, which may be breached "when 'one party violates the reasonable expectations of the other.'" *Czerwienski*, 666 F. Supp. 3d at 102 (quoting *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 66 (D. Mass. 2020)).

Mr. Segev plausibly alleges both claims. The Complaint alleges that Harvard's Non-Discrimination and Anti-Bullying Policies ("NDAB"), University-wide Statement on Rights and Responsibilities ("USRR"), and other policies created enforceable contractual obligations. *See* FAC ¶ 471. Indeed, this Court has already said so, sustaining contract claims based on these exact policies. *See Kestenbaum*, 743 F. Supp. 3d at 311-12.  These obligations were based on the policies' explicit and implicit promises, which gave rise to Mr. Segev's reasonable expectation that Harvard would punish discriminatory conduct, discipline those who engage in "unwelcome and offensive conduct that is based on an individual or group's protected status," and follow specific procedures when students lodge complaints regarding policy violations. FAC ¶¶ 250-85, 471-72.

Mr. Segev details how Harvard breached these obligations, including by "refus[ing] to take any reasonable action to punish the student-employees who maliciously attacked" him (*id.* ¶ 172), conducting a sham investigation into the assault that aimed "to keep Mr. Segev effectively in the dark" (*id.* ¶¶ 181-96), fabricating "standard practice[s]" to justify its inaction (*id.* ¶¶ 176-80), and refusing to respond to Mr. Segev's repeated letters requesting information and notifying Harvard

of additional policy violations (*id.* ¶¶ 214-24). Not only did these failures contravene Harvard's explicit and implicit promises to prohibit discriminatory conduct, bullying, and hostile and abusive behavior with "fairness, rigor, and impartiality" (*id.* ¶¶ 253-64 (quoting the NDAB)), they also "intentionally prejudice[d]" Mr. Segev's "ability to pursue administrative remedies." *Id.* ¶ 196.

Harvard attempts to hide its failures by claiming the Complaint "does not identify any policy . . . that grants a legally enforceable right to Mr. Segev," but rather cites policies that "are precisely the type of 'generalized, aspirational statements that are insufficiently definite' to form a contractual relationship." Mot. 16 & 15 n.6 (quoting *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019)). Not so. Unlike the pronouncements of "core values" and "aspirational diversity statements" on which the plaintiffs relied in *Fay School*, the Complaint cites policy provisions that define *concrete* rights and responsibilities, including a provision of the USRR that explicitly states "it is the *responsibility* of officers of administration and instruction . . . to give full and fair hearing to reasoned expressions of grievances; and to respond promptly and in good faith to such expressions." FAC ¶ 474 (emphasis added). Such a demarcation of official duties is "comparable to statements that courts have considered adequate to allege the terms of a contract between an educational institution and its students," *Czerwienski*, 666 F. Supp. 3d at 101 (collecting cases), and gives rise to a reasonable expectation that Harvard's "officers of administration and instruction" will fulfill their "responsibility." Harvard cannot hide behind the fact that *some* language in its policies is "aspirational" to avoid its obligations, even if it now purports that terms like "responsibility," "unacceptable violation," "unlawful," and "prohibited" were never meant to confer contractual rights. *See Sonoiki*, 37 F.4th at 709.

Neither can Harvard hide behind the NDAB's disclaimer language. *See* Mot. 17 n.7. As an initial matter, this Court has already held that violations of the NDAB form a "cognizable breach

of contract theory." *Kestenbaum*, 743 F. Supp. 3d at 311. This is because the NDAB—which "applies to 'alleged acts of discrimination that are committed by any member of the Harvard community'"—prescribes concrete "complaint-handling procedures," and "examples of Harvard failing to follow this procedure . . . suffice to state a breach of contract claim." *Id.* at 312. Moreover, the cases on which Harvard relies are inapposite. In *Fay School*, the court did not hold that the disclaimer was independently fatal to the contract claim; rather, the school was entitled to summary judgment because the policy, unlike here, did not contain "sufficiently definite promise[s]," which were merely "reinforced" by the disclaimer language. 931 F.3d at 13. In *Thomas v. Whitcomb*, 2025 U.S. Dist. LEXIS 50732 (D. Mass. Mar. 19, 2025), the disclaimer was also not dispositive. There, the school was entitled to summary judgment because the "particular language" the plaintiff invoked was "too vague to give rise to the contractual commitments" she alleged were violated, and that "[t]he critical problem with Plaintiff's rejoinder is that she has not alleged a violation of the reporting and resolution procedures." *Thomas*, 2025 U.S. Dist. LEXIS 50732, at *37-40. Here, the Complaint details how Harvard violated the NDAB's procedural requirements by ignoring, misleading, and deceiving Mr. Segev in a manner that deprived him of his procedural rights.[6]

Harvard's arguments for dismissing the breach of contract claim fail for the same reasons this Court rejected them in *Kestenbaum*. They likewise fail for Mr. Segev's implied covenant claim, as a breach of the implied covenant can occur in a manner "similar to a breach of the contract itself," *Czerwienski*, 666 F. Supp. 3d at 102, as well as when policies are selectively enforced. *See Kestenbaum*, 743 F. Supp. 3d at 312. Harvard's Motion to Dismiss should be denied in this regard.

---

[6] Harvard suggests that Mr. Segev was unable to file his complaint against his assailants because he "changed his mind" regarding anonymity too late in the process. Mot. 17. This again misstates the allegations that Mr. Segev opted to file a non-anonymous complaint because Harvard's investigation turned out to be a sham. FAC ¶¶ 176-88. Mr. Segev at all points attempted to "avail himself" of the NDAB process but was misled by the University. Mot. 17.

### III.    The Complaint Sufficiently States § 1983 and Conspiracy Claims

#### A.    Defendants' Conduct Constitutes State Action

Although Harvard operates as a private educational institution, the Complaint plausibly alleges that Defendants, *in this instance*, engaged in conduct attributable to the state under § 1983. As the First Circuit has held, private parties qualify as "state actor[s]" if they (1) perform "a public function which, by tradition is exclusively reserved to the state," or (2) act as "joint participants in the challenged conduct" with the government. *Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 544 (1st Cir. 2021). Under either definition, Harvard and HUPD Defendants engaged in state action when they used the police power delegated by the Commonwealth to delay and obstruct the investigation into Mr. Segev's assault.

As Defendants acknowledge, under Massachusetts law, HUPD officers are appointed as "special state police officers" who "have the same power to make arrests as regular police officers for any criminal offense committed" on University property. Mass. Gen. Laws ch. 22C, § 63. Accordingly, when Defendants, acting as state police officers under statute, refused to investigate Mr. Segev's assault and deliberately delayed the assailants' prosecution, they "exercise[d] 'powers traditionally exclusively reserved to the State,'" making them state actors. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (quotation omitted); *Foley v. Connelie*, 435 U.S. 291, 297 (1978) (the "police function" is "one of the basic functions of government").

Courts, including this one, have held that privately owned campus police officers act under the color of state law when they engage in law-enforcement activities delegated to them under state law. *See, e.g.*, *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 893 (6th Cir. 2025) (campus police officers qualified as state actors when "engaging in law enforcement activities" because the state had delegated to the campus police the very powers that the state police force possess); *Lu v. Smith*, 2016 U.S. Dist. LEXIS 119127, at *6-7 (D. Mass. Sep. 2, 2016) (complaint plausibly

alleged that campus police officer was a state actor when the officer exercised law-enforcement power as "special state police officer" under Massachusetts law). Because Defendants "exercised power possessed by virtue of state law" when investigating Mr. Segev's assault, which was "made possible only because [they were] clothed with the authority of state law[,]" they qualify as state actors subject to § 1983 liability. *West v. Atkins*, 487 U.S. 42, 49 (1988).

Moreover, to the extent that any Defendant did not exercise the police power themselves, they remain state actors because they jointly participated with those that did. Joint participation can be shown through conspiracy, *Dennis v. Sparks*, 449 U.S. 24, 28-29 (1980), or through "pervasive entwinement" in the private entity's "composition and workings." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 298 (2001). As discussed below, the Complaint alleges that Harvard and HUPD conspired to "halt the[] investigation into Mr. Segev's assault." FAC ¶ 495. And, in any event, the Defendants exercise extensive control over HUPD and its officers such that they are pervasively entwined. *Id.* ¶¶ 133-42. For instance, Harvard employs HUPD officers, funds their operations, and oversees their day-to-day affairs—all of which the First Circuit has determined favors a finding of joint action. *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 9 (1st Cir. 2015). The HUPD Chief even directly reports to Harvard's Executive Vice President, allowing Defendants to work hand-in-glove on law enforcement operations, including the investigation into Mr. Segev's assault. FAC ¶ 140. Thus, Defendants engaged in state action when they exercised law-enforcement power granted to HUPD officers under Massachusetts law.

Defendants insist that neither Harvard nor HUPD can ever be state actors because they generally operate as private institutions.[7] But the relevant question is not whether Defendants are

---

[7] Defendants also rely on *Harvard Crimson, Inc. v. President & Fellows of Harvard Coll.*, 840 N.E.2d 518, 524-525 (Mass. 2006), to argue that HUPD is not a state actor. But that reliance is misplaced. *Harvard Crimson* dealt with access to public records and confronted the different

state actors in the abstract. It is whether they acted under the color of state law in this instance. *Cruz-Arce*, 19 F.4th at 543 (the state-action inquiry focuses on the "challenged conduct"). Defendants' theory of state action not only ignores binding caselaw, but its logic would allow government to delegate unconstitutional operations to a private institution without consequence.[8]

### B. The Intracorporate Conspiracy Doctrine Is Inapplicable

Defendants argue that the conspiracy claims must fail because, as employees of Harvard, their actions are attributable to Harvard, which cannot conspire with itself. That is wrong. At the outset, while it is generally true that "an agreement between or among agents of the same legal entity . . . is not an unlawful conspiracy," *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017), the intracorporate conspiracy doctrine, born out of antitrust law, is inapplicable in the civil rights context. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001) (explaining the doctrine "turns on specific antitrust objectives"). Because "[t]he evil at which [antitrust] 'conspiracy' . . . is aimed" exists "only when two different business *enterprises join* to make a decision," there is a distinct "need for an 'intracorporate' exception to ordinary conspiracy principles" in antitrust law. *Stathos v. Bowden*, 728 F.2d 15, 20-21 (1st Cir. 1984) (Breyer, J.). But such considerations are absent where, as here, civil rights violations are at issue; employees of a single entity can violate an individual's civil rights with or without the assistance of another entity. Accordingly, the First Circuit has concluded that "the boundaries of an 'intracorporate' exception to the § 1985(3) conspiracy provision should be narrower than in antitrust." *Id.* at 21 ("[W]e do

---

[8] question of whether HUPD was an "agency of the Commonwealth such that it becomes subject to the mandates of the public records law." *Id.* at 525.

[8] Without support, Defendants states that Harvard and HUPD are immune from damages under the Eleventh Amendment. Such an undeveloped argument is insufficient to satisfy "the burden of demonstrating that it is an arm of the state," which Defendants bear as the "party claiming sovereign status." *United States ex rel. Willette v. Univ. of Mass.*, 812 F.3d 35, 40 (1st Cir. 2016).

not see why they should extend—if at all—beyond the ministerial acts of several executives needed to carry out a single discretionary decision.").

Second, the intracorporate conspiracy doctrine, which "stems from basic agency principles," *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000), only applies when employees of the same corporation act as *agents* on behalf of the same legal entity. Here, with respect to all relevant conduct, HUPD and its officers acted as agents not for Harvard but for Massachusetts. Indeed, Chief Clay made this clear when he "claimed he did not answer to the Harvard Administration but *only* to Massachusetts state law." FAC ¶ 129. Thus, even though HUPD officers are employees of Harvard, they act as agents of the state when conducting law-enforcement activities. *See* Black's Law Dictionary (11th ed. 2019) (defining "agent" as "[s]omeone who is authorized to act for . . . another"). Consequently, HUPD officers can conspire with other Harvard employees where, as here, they act as law-enforcement officers.

Third, even if Defendants were acting as agents of the same corporation, the First Circuit has held that the intracorporate-conspiracy doctrine does not shield defendants from liability when the employees' conduct goes "beyond 'a single act' of discrimination." *Stathos*, 728 F.2d at 21. As noted above, Defendants' conduct involved a series of discriminatory acts over the span of several months that deprived Jewish students, including Mr. Segev, of police protection. Thus, the intracorporate conspiracy exception, to the extent that it is even applicable in the § 1985 context, does not bar Mr. Segev's conspiracy claims.

## C.    The Amended Complaint States Claims Against Ms. Weenick and Mr. Clay

Contrary to Defendants' assertion, the Complaint contains allegations that Ms. Weenick and Mr. Clay took actions that deprived Mr. Segev of his rights. Specifically, it alleges that Ms. Weenick instructed HUPD and Mr. Clay "not to intervene in the ongoing protests" or "cooperate with local authorities" (FAC ¶¶ 159, 486), and Mr. Clay, as HUPD Chief, ensured that his

department followed Harvard's instructions, "delay[ing] its response to antisemitic violence," (*id.* ¶ 142), and "remov[ing]" an officer who was intent on investigating (*id.* ¶ 243). Given those allegations, Defendants seem to argue they are not insufficiently pleaded but factually false. *See* Mot. 21 (describing allegations as "implausible on their face" and "false"). That counterfactual argument is inappropriate in a motion to dismiss. *Kleiner v. Cengage Learning Holdings II Inc.*, 66 F.4th 28, 29 (1st Cir. 2023).[9]

***

Finally, Harvard states without support or argument that the Complaint should be dismissed with prejudice. Mot. 23. Because it does not argue that Mr. Segev's claims are futile, it has waived any such argument. *See, e.g.*, *Colby v. Town of Henniker*, 2001 U.S. Dist. LEXIS 8769, at *12-13 (D.N.H. Feb. 15, 2001) (dismissal with prejudice waived when defendants did not "state[] why a dismissal [ ] should be with prejudice"). Nor could Harvard argue futility. This Court has already held that other Jewish students were harmed by Harvard's deliberate indifference to antisemitism, and they relied in substantial part on Mr. Segev's experience and suffering. To suggest that Mr. Segev's claims are futile would flout this Court's holdings in *Kestenbaum* and *Brandeis Center*. While this Court can and should permit the claims to go forward because they are adequately alleged at the pleading stage, any dismissal should be without prejudice.

## <u>CONCLUSION</u>

This Court should deny Defendants' Motion to Dismiss Plaintiff's Amended Complaint.

---

[9] Again, this Court should reject Defendants Weenick and Clay's perfunctory attempt at asserting qualified immunity. "Successfully invoking qualified immunity requires more than mentioning the immunity without any attempt at developed argument." *Sheehan v. Town of Carver*, 2025 U.S. Dist. LEXIS 87100, at *69-70 (D. Mass. May 7, 2025). Because Defendants present no legal analysis supporting their argument, they have failed to sufficiently put the issue before this Court.

Dated:    November 17, 2025            Respectfully submitted,

*/s/ Mark I. Pinkert*
Mark I. Pinkert*
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK PLLC
119 S. Monroe Street
Suite 500
Tallahassee, FL 32301
mpinkert@holtzmanvogel.com

*/s/ Douglas S. Brooks*
Douglas S. Brooks, BBO #636697
LIBBY HOOPES BROOKS MULVEY, P.C.
260 Franklin Street
Boston, MA 02110
(617) 338 9300
dbrooks@lhbmlegal.com

Jason B. Torchinsky*
John J. Cycon*
Erielle Azerrad*
Jared Bauman*
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK PLLC
2300 N Street NW
Suite 643
Washington, DC 20037
(202) 737-8808
jtorchinsky@holtzmanvogel.com
jcycon@holtzmanvogel.com
edavidson@holtzmanvogel.com
jbauman@holtzmanvogel.com

Jonathan Lienhard*
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
jlienhard@holtzmanvogel.com

*Counsel for Plaintiff Yoav Segev*
*\*pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on November 17, 2025, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Mark I. Pinkert*
Mark I. Pinkert